IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICAL CIRCUIT
IN AND FOR BAY COUNTY, FLORIDA

**KRISTINA TRIPP, THOMAS
MCFATTER, individually
and on behalf of all others similarly
situated,**

      **Plaintiffs,**

**v.**

      **Case No:** ▬▬▬ 19003820CA
      **Class Representation**

**TOMMY FORD, SHERIFF OF BAY
COUNTY, FLORIDA,**

      **Defendant.**

_____/

## COMPLAINT

Plaintiffs, Kristina Tripp and Thomas McFatter, individually and on behalf of all others similarly situated, sue Defendant, Tommy Ford, Sheriff of Bay County, Florida ("Sheriff" or "Defendant") and allege:

### Nature of the Action

1.    This is a class action for damages in excess of $15,000 and for equitable, injunctive and declaratory relief brought under the common law of Florida.

2.    On Wednesday, October 10th, 2018, Hurricane Michael made landfall in the Florida panhandle as a Category 5 hurricane, severely damaging numerous structures located in Panama City. As a result of the

storm, the Bay County Sheriff's Office Jail building sustained damage to many areas. As detailed below, the response of the Sheriff in the wake of the hurricane utterly failed to meet the standard of care required of him to ensure the safety, security and health of the Plaintiffs and the class of other inmates held in the jail at the time. As a result, the Plaintiffs and the class they seek to represent have suffered physical and other injuries sustained as a direct consequence of the Sheriff's negligence. The Plaintiffs seek for themselves monetary damages for injuries sustained as a proximate result of the Sheriff's negligence and also for the class a finding that of class-wide liability based on the Sheriff's negligence.

## Jurisdiction and Venue

3.    Jurisdiction is proper in this court. Venue is proper in this court because the Defendant resides in Bay County, Florida, and the cause of action accrued in Bay County, Florida.

## Conditions Precedent

4.    Plaintiffs have satisfied all conditions precedent to this action

## Parties

5.    Plaintiff Kristina Tripp is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County

2

Jail during all times material to the allegations in this Complaint and has
suffered actual physical injury as a consequence of the Defendant's
negligence described herein.

6.    Plaintiff Thomas McFatter is an individual who was under the
supervision, care and custody of the Defendant and held at the Bay County
Jail during all times material to the allegations in this Complaint and has
suffered actual physical injury as a consequence of the Defendant's
negligence described herein

7.    Defendant, Sheriff Tommy Ford, is the duly elected sheriff of
Bay County, Florida, and is subject to the jurisdiction of this Court.

### Allegations of Fact

8.    The Sheriff operates the Bay County Jail.  The jail has a daily
average population of 900 inmates.  The Sheriff is required by statute to
adopt and to operate the jail consistent with model standards for county
and municipal detention facilities developed by the Florida Sheriffs'
Association which has promulgated the Florida Model Jail Standards.  The
Standards required, among other things, that the Sheriff develop and
maintain policy and procedure directives that include emergency plans in
the event of natural disaster.  The Sheriff's Disaster Emergency Operations

Manual addresses the emergency response to natural disasters. It requires that the Sheriff have an emergency/disaster plan.

9.    On Tuesday, October 9, one day before Hurricane Michael made landfall, The Sheriff's Chief Deputy sent an email addressed to "everyone@bayso.org" with the subject line "Hurricane Michael." The purpose of the email was to "make sure everyone knows briefly our plans/preparations in anticipation of the arrival of Hurricane Michael." The email contains numerous directives and information on an array of operations including administration, field services, SID, CID, civil, warrants and court security, community services, and bridges. It contains as single, apparently joking, entry regarding the jail: "Jail – Locked and loaded – literally."

10.    The jail consists of the original jail annex located at the north end of the complex and the addition that opened in 2008. Among many areas of the jail damaged were several inmate dorms, including dorms A-G and J, and the jail kitchen.

11.    Several other correctional facilities in the Florida panhandle were affected by the hurricane due to damage to the structures. As a result, the Florida Department of Corrections as well as the U.S. Bureau of Prisons facility in Marianna, Florida, evacuated their inmates after the storm

to other locations. In addition, Bay Correctional Institution, a private
correctional facility also located in Bay County, evacuated its inmates.

12.    Unlike these institutions, the Sheriff, however, refused to
evacuate inmates at the jail, even though he was offered locations in
Florida and Georgia to house them and the use of buses to transport them.

13.    Once the hurricane hit, the jail lost power which caused the
jail's main airflow system which is generated by the air conditioning units to
fail.  This caused high humidity levels throughout the jail.  The paint on the
walls to bubble in large sheets which released a brown fluid which leaded
out.

14.    The loss of power and water caused the sewage system to fail
which made the flushing of the toilets in the dorms and individual
confinement cells impossible.  This caused feces and urine to back up in
the toilets and onto the floors creating a biohazardous condition for the
inmates. Inmates had to stand in water and sewage mix up to an inch deep
in some locations.  The inmates walked around the dorms wearing only
socks and the open toe sandals they are issued.  Female inmates reported
that in addition to the water and sewage, female hygiene pads were
present.

15.    Inmates housed in confinement (C Dorm) were locked in their cells for days following the hurricane and resorted to defecating in plastic bags to avoid the accumulation of waste in the toilets in their cells which were occupied by two inmates.  The odor and air quality from the lack of ventilation made them sick.  The only ventilation to the cells is a food flap which can be opened and closed.  Despite these unbearable conditions, inmates were not allowed to go outside for approximately two weeks after the hurricane.

16.    A small riot started in A1 Dorm after the conditions brought tension/stress levels to a boil after repeated requests for relief went ignored by jail staff.  The Sheriff gassed the inmates by dropping canisters of chemical agents from the ceiling.   Inmates were subsequently taken outside but no decontamination process was conducted by staff.  Inmates were told they were "part of the problem" and if they did not sign some medical form stating that they were not injured, they would "go to confinement."

17.    After the hurricane, the inmates had no access to clean drinking water as the normal flow of water was disrupted leaving only a trickle of water at the faucets.  After a few days (which varied between dorms) they were provided five-gallon drinking coolers of water, which was brownish in

color and contained sediment. The coolers provided did not provide enough to water for the dorm's population.  Because of this, fights among inmates broke out as the tension level among inmates.  Older inmates often did not get to the water coolers and were dependent on other inmates to provide them some water.

18.    When water was restored, the jail staff filled water coolers from the kitchen faucets or spigots from the "mop closets."  Inmates were told by staff the water was safe to consume, despite the fact that Bay County Emergency Management had issued a boil water advisory. Jail staff did not provide enough water for the number of inmates in the dorms and many went without.  This was exacerbated by the hot temperatures and humidity that existed in the dorms.  Many inmates suffered digestive issues, including severe stomach cramping, nausea, vomiting and diarrhea, from the water which was described "dirty" with a brownish color.

19.    The hot and humid conditions also caused rapid mold and mildew build up on the walls, bunks, inmate bedding matts, sheets and clothes and personal items.  Many inmates were not given clean clothes referred to as "change outs" for weeks.  The normal rotation is twice weekly for stripes and longer for their "whites" (underwear and T-shirts).  The inmates did what they could to try to clean their clothes, but their clothes

7

would not dry due to the humid conditions which created more mold and mildew on them. Many used their clothes to contain the sewage water overflow on the floors by creating clothing damns.

20.    Inmates housed in the confinement cells reported they were forced to defecate and urinate in the sandwich bags due to the sewage backup in their two-man cells. They had to throw the bags out of the food flaps which often broke open when they hit the floor of the common area. They reported the floors remained uncleaned for days.

21.    The inmates were left in the open bay dorms and confinement dorms for days/weeks before they were allowed fresh air in the recreation areas. Exposure to the urine and fecal matter as well as the mold growth in the hot humid and stale air caused respiratory issues to many of the inmates.

22.    Inmates' medical issues were routinely ignored as their sick call requests went unanswered by medical staff or their complaints were not being adequately addressed when they were seen by medical staff. As a result of their experiences, numerous inmates reported physical and/or psychological problems. Medical request forms had to be requested to, and supplied by, corrections staff, but because staff was scarce it was

8

difficult to put in a medical call request.  Inmates who did submit formal

requests often received no medical attention or response at all.

23.    Many inmates had respiratory issues from breathing the poor

air quality due to the mold, sewage backup and lack of clean air circulation.

The health problems resulting from the jail conditions were so pervasive

that inmates referred to their health problems as the "Bay County crud."

24.    Several inmates suffering from serious medical conditions were

ignored or poorly treated. Among them was an inmate suffering from

severe edema from a heart condition, an elderly inmate died from sepsis

and an inmate with a severe tooth infection from a broken tooth that has

not been treated.

25.    Family members/spouses of inmates were told the inmates

were evacuated out of the jail.  As a result of the storm, the phone system

was down and visits by family were not allowed. It was several weeks

before they were allowed to make phone calls to their families.  Jail staff

passed around notebooks for inmates could put down their family contact

numbers so that their families would be contacted and told they were okay.

However, no such calls were made by jail staff.

26.    In the kitchen unsanitary conditions remained near the food

preparation area.  The ceiling in the kitchen was damaged from the rain

and leaked for many weeks.  Mold and mildew grew as well.  There was

note adequate cleaning soap and no hot water to clean the food trays and

inmates were served their meals on them.

27.    In addition to these many failures of the Sheriff, the jail suffered

substantial staffing shortages as a result of staff quitting and not coming to

work.  In short, the jail and its staff were unprepared before and after the

hurricane.  The inmates stated they felt they were left alone "to fend for

themselves" as staff was scarce and many did not know what to do.

### Class Action Allegations:

28.    Plaintiffs reallege and incorporate herein by reference the

foregoing paragraphs 1 through 27.

29.    Plaintiffs seek class certification under subsection (b)(2) or,

alternatively, (b)(3) of Rule 1.220 against the Defendant.

30.    Commonality: Questions of law and fact are common to all

members of the class.  Specifically, the Plaintiffs' claims arise from the

same events or practices or course of conduct by the Defendant which

gives rise to the claims of the putative class, and their claims are based

upon the same legal theories as those of the putative class.  The

overarching common issue is whether the Defendant breached his duty of

reasonable care to the Plaintiffs and the class.  The common questions of law and fact at issue include, among others:

    a.    What is the appropriate standard of care by which the Defendant's conduct should be measured;

    b.    Whether the Defendant's failure to relocate inmates to outside facilities offered by other correctional authorities was a breach of his duty of reasonable care;

    c.    Whether the Defendant's failure to maintain adequate alternative electrical power was a breach of his duty of reasonable care;

    d.    Whether the Defendant's failure to maintain an adequate water supply was a breach of his duty of reasonable care; and

    e.    Whether the Defendant's failure to maintain adequate sanitation and alternative sewage was a breach of his duty of reasonable care

The answers to these common questions of law and fact are subject to common legal theories and generalized proof.

    31.    Typicality: Plaintiffs' claims are typical of the claims of the class inasmuch as they arise from the same course of conduct as the claims of

the putative class; that is, the Defendant's breach of its duty of reasonable care to inmates to protect them from injury and harm.

32.    Numerosity and Class Definition: it is estimated there are approximately 900 individuals in the putative class.  Therefore, the putative class is so numerous that separate joinder of each member is impracticable. The proposed class consists of:

All inmates in the supervision, care and custody of the Defendant and held at the Bay County Jail on and after October 10, 2018;

33.    Adequacy of Representation: Plaintiffs will fairly and adequately protect and represent the interests of each member of the class in that they have interests in common with the class, have no conflicts with the class, understand their responsibilities as class representatives, and have retained counsel experienced in the prosecution of complex class action litigation. The Plaintiffs are members of the class they seek to represent.

34.    The Defendant has acted on grounds generally applicable to all the members of the class, to wit: his breach of the reasonable duty of care adversely affected in a general manner the class, thereby making appropriate final declaratory relief in the form of a finding of liability on the issue of negligence respecting the class as a whole. Accordingly, this action is maintainable under subsection (b)(2) of Rule 1.220.

12

35.    Alternatively, Defendant's breach of his duty of reasonable care raises questions of law and fact common to the Plaintiffs and the class. These questions, stated above, predominate over questions affecting only individual members, and class representation is superior to other available methods for the fair and efficient adjudication of the controversy. Accordingly, this action is also maintainable under subsection (b)(3) of Rule 1.220.

## COUNT I:  NEGLIGENCE

36.    The Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs 1 through 35.

37.    Each of the Plaintiffs was under the supervision, care and custody of and held by the Defendant at the Bay County Jail on October 10, 2018 and thereafter.

38.    Each of the Plaintiffs was subjected to and endured the conditions at the jail described above.  Plaintiffs Tripp was held in the jail's open population dorms during such time and Plaintiff McFatter was held in the jail's confinement dorms during such time.

39.    The Defendant owed the Plaintiffs a duty of reasonable care to protect the Plaintiffs from injury and harm.

40.    The Defendant breached his duty of care to the Plaintiffs.

41.    As a direct and proximate result of the above-described negligence of the Defendant, Plaintiff have each suffered actual physical injury and are entitled to recover damages from the Defendant in an amount to be proved at trial.

WHEREFORE, the Plaintiffs demand the following relief:

a.    certification of the class defined herein under subsection (b)(2) or, alternatively, subsection (b)(3) of Rule 1.220 against the Defendant;

b.    certification of the Plaintiffs as class representatives of the class alleged and of Plaintiffs' counsel as class counsel;

c.    judgment in favor of the Plaintiffs and class and against the Defendant finding and declaring that the Defendant' actions described violated the Defendant's duty of care to the Plaintiffs and the class

d.    judgment in favor of the class finding and declaring that the common core finding of negligence alleged herein will have *res judicata* effect in any subsequent proceedings brought by class members against the Defendant arising out of the allegations of this Complaint;

e.    judgment in favor of the Plaintiffs and against the Defendant awarding each of them damages in an amount to be proved at trial;

f.    award Plaintiffs their attorney's fees and costs as allowed by law; and

g.      award such further relief as is equitable and just.

Dated this 7th day of October, 2019.

Respectfully submitted,


/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P. A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
Facsimile: (850) 383-4801

And

/s/  John C. Davis
John C. Davis
Law Offices of John C. Davis
623 Beard Street
Tallahassee, FL  32303
Telephone: (850) 222-4770
Facsimile:   (850) 222-3119

ATTORNEYS FOR
PLAINTIFFS