**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

**KRISTINA TRIPP, THOMAS**      **Case No: 5:23-cv-112-AW-MJF**
**MCFATTER, MICHAEL MURRERO-**      **Class Representation**
**DELGADO, AMBER AHNE, AMBER**
**LYN TIDWELL, CONRAD FORRENCE,**
**PAULA COOPER, CAMERON WILSON,**
**JOSHUA FOSTER, and NORMANDO**
**BROWN, individually, and on behalf**
**of all others similarly situated,**

      **Plaintiffs,**

**v.**

**TOMMY FORD, SHERIFF OF BAY**
**COUNTY, FLORIDA, in his official capacity**
**as Sheriff,**

      **Defendant.**
_____/

## FIFTH AMENDED COMPLAINT

Plaintiffs, Kristina Tripp, Thomas McFatter, Michael Murrero-Delgado, Amber Ahne, Amber Lyn Tidwell, Conrad Forrence, Paula Cooper, Cameron Wilson, Joshua Foster, and Normando Brown, individually and on behalf of all others similarly situated, sue Defendant, Tommy Ford, Sheriff of Bay County, Florida ("Sheriff" or "Defendant"), in his official capacity as Sheriff and allege:

**Nature of the Action**

1.     This is a class action for damages in excess of $50,000 and for equitable, injunctive and declaratory relief brought under the common law of Florida, the Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 1986 and 42 U.S.C. §1988.

**Jurisdiction and Venue**

2.      Jurisdiction is proper in this court. Venue is proper in this court because the Defendant resides in Bay County, Florida, and the causes of action accrued in Bay County, Florida.

**Conditions Precedent**

3.     Plaintiffs have satisfied all conditions precedent to this action in that they have served notice as required under Chapter 768, Florida Statutes.  This action is timely filed thereafter.

**Parties**

4.     Plaintiff Kristina Tripp is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County Jail during all times material to the allegations in this Complaint and has suffered actual physical injury as a consequence of the Defendant's negligence described herein. Ms. Tripp was housed in the female dorm, believed to be Dorm E-2, at the time of

Hurricane Michael and remained in the Bay County Jail from around August 22, 2018 until January 10, 2019.

5.     Plaintiff Thomas McFatter is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County Jail during all times material to the allegations in this Complaint and has suffered actual physical injury as a consequence of the Defendant's negligence described herein. Mr. McFatter was housed in C Dorm at the time of Hurricane Michael and was in the Bay County Jail from June 22, 2018 until in or around June 2019.

6.     Plaintiff Michael Murrero-Delgado is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County Jail during all times material to the allegations in this Complaint and has suffered actual physical injury as a consequence of the Defendant's negligence described herein. Mr. Murrero-Delgado was housed in A Dorm at the time of Hurricane Michael and he was in the Bay County Jail from June 22, 2017 through in or around November 9, 2018.

7.     Plaintiff Amber Ahne is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County Jail during all times material to the allegations in this Complaint and has suffered actual physical injury as a consequence of the Defendant's negligence described herein.  Ms. Ahne was in

the female dorm at the time of Hurricane Michael and was released around October 18, 2018, approximately 10 days after the hurricane.

8.     Plaintiff Cameron Wilson is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County Jail during all times material to the allegations in this Complaint and has suffered actual physical injury as a consequence of the Defendant's negligence described herein. Mr. Wilson was in G Dorm/open population at the time of Hurricane Michael and was released around October 18, 2018, approximately 10 days after the hurricane.

9.     Plaintiff Conrad Forrence is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County Jail during all times material to the allegations in this Complaint and has suffered actual physical injury as a consequence of the Defendant's negligence described herein. Mr. Forrence was in A-Dorm at the time of Hurricane Michael and was released around October 26, 2018, approximately 10 days after the hurricane.

10.     Plaintiff Paula Cooper is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County Jail during all times material to the allegations in this Complaint and has suffered actual physical injury as a consequence of the Defendant's negligence described herein.  Ms. Cooper was in the female dorm at the time of Hurricane Michael and was released around October 18, 2018, approximately 10 days after the hurricane.

4

11.    Plaintiff Amber Lyn Tidwell is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County Jail during all times material to the allegations in this Complaint and has suffered actual physical injury as a consequence of the Defendant's negligence described herein. Ms. Tidwell was in the female dorm at the time of Hurricane Michael and was released around October 17, 2018, approximately 10 days after the hurricane.

12.    Plaintiff Normando Brown is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County Jail during all times material to the allegations in this Complaint and has suffered actual physical injury as a consequence of the Defendant's negligence described herein. Mr. Brown was in C-2 Dorm at the time of Hurricane Michael and was in the Bay County Jail from October 5, 2018 and remained in the jail until in or around February 2019.

13.    Plaintiff Joshua Foster is an individual who was under the supervision, care and custody of the Defendant and held at the Bay County Jail during all times material to the allegations in this Complaint and has suffered actual physical injury as a consequence of the Defendant's negligence described herein.  Mr. Foster was in D Dorm at the time of Hurricane Michael and was in the Bay County Jail from August 6, 2017 and remained in the jail until in or around July 2019.

14.     Defendant, Sheriff Tommy Ford, is the duly elected sheriff of Bay County, Florida, and is subject to the jurisdiction of this Court.

**Allegations of Fact**

15.     On Wednesday, October 10, 2018, Hurricane Michael made landfall in the Florida panhandle as a Category 5 hurricane, severely damaging numerous structures located in Panama City.

16.     As a result of the storm, the Bay County Sheriff's Office Jail building sustained damage to many areas including the areas in which inmates were housed. All of the Plaintiffs were housed in areas of the Jail in which the flooding, sewage exposure, mold and other acts described below occurred.

17.     The Sheriff operates the Bay County Jail.

18.     The jail has a daily average population of 900 inmates.

19.     The Sheriff is required by state statute to adopt and to operate the jail consistent with model standards for county and municipal detention facilities developed by the Florida Sheriffs' Association which has promulgated the Florida Model Jail Standards (hereinafter "MJS").   [See Exhibit A for MJS that were operational at the time of Hurricane Michael and thereafter].

6

20.     Generally, the MJS in effect at all times materials to this Complaint require, among other things, that inmates have reasonable access to toilet, sink and drinking water facilities, that inmates have hygiene items, that they are allowed to shower daily, that they have three meals daily, that food supplies, equipment and facilities are clean, well-ventilated and common sanitary measures are observed, that inmates have clean and sanitary clothing and bedding, that the jail facility is kept clean and sanitary, that plumbing fixtures operate and are sanitary; that there is adequate and safe water supplies accessible to inmates at all times, that the jail facility is free of offensive odors and has adequate ventilation, and that sewage and waste is property disposed of and that inmates have reasonable access to telephones and visitation.

21.     On Tuesday, October 9, 2018, one day before Hurricane Michael made landfall, the Sheriff's Chief Deputy, Joel Heape, sent an email addressed to "everyone@bayso.org" with the subject line "Hurricane Michael."

22.     The purpose of the email was to "make sure everyone knows briefly our plans/preparations in anticipation of the arrival of Hurricane Michael."

23.     The email contains numerous directives and information on an array of operations including administration, field services, SID, CID, civil, warrants and court security, community services, and bridges.

24.    It contains as single, apparently joking, entry regarding the jail: "Jail – Locked and loaded – literally."    There were no emergency plans, directives or information enumerated for the Jail.  There no emergency General Orders, policies or procedures for the operation of the Jail prior to October 10, 2018 that were disseminated or made known to employees and inmates in the Jail.

25.    In the October 9, 2018 email, every other division of the Defendant Sheriff's Office had pre and post Hurricane directives and areas of responsibility but not the jail. The inmates were, consequently, left of their own and what little, if any, care was given by the employees of the jail.

26.    The jail consists of the original jail annex located at the north end of the complex and the addition that opened in 2008.

27.    There was no preparation for Hurricane Michael in the Jail.

28.    Hurricane Michael began hitting the Jail around 10:00 a.m. on October 10, 2018.

29.    In general, among many areas of the jail damaged during Hurricane Michael were several inmate dorms, including dorms A-G and J, and the jail kitchen. Plaintiffs and all other class members were housed in these dorms.

30.    Once the Hurricane hit on October 10, 2018, the jail lost power which caused the jail's main airflow system, which is generated by the air conditioning units, to fail.

8

31.    This caused high humidity levels throughout the jail.

32.    As discussed below, for a period of at least several to many weeks and possibly longer, inmates had to endure conditions that were inhumane and cruel, which Defendant Sheriff, through his final policymaker, Rick Anglin, knew and ignored.  For example, again as discussed below, for at least 10-14 days, inmates that are included as Plaintiffs in this case had to stand in water and sewage mix of up to an inch deep in some locations of the jail.

33.    At the time of the Hurricane, Rick Anglin was the Major/Warden over the jail.  He had been given delegated final policymaking decisions over the jail as early as December 8, 2009, in writing from former Sheriff Frank McKeithen.  His final policymaking authority over the jail was confirmed by Tommy Ford when he became the Sheriff.  Whether Anglin was a final policymaker for the Defendant's jail was further confirmed by the Honorable Robert Hinkle in Carney et al v. Sheriff of Bay County, et al, 5:17-cv-00085-RH-GRJ, Doc 83, pg. 5 (April 20, 2018) based on the Sheriff's attorney's concession that the "the warden [Anglin] is a person whose edicts or acts could fairly be said to represent official policy."  Rick Anglin was the delegated final policymaker for the jail at the time of Hurricane Michael and made every single decision about the operation of the jail complained of herein. Anglin's decisions regarding the Jail were unreviewed by the Sheriff regarding the Hurricane and were immune from further review.  At the time of the Hurricane, the

9

Sheriff had no involvement in the operation of the jail and delegated the complete and total operation of the jail exclusively to Anglin, who did, in fact, make all decisions complained of herein.

34.     Shortly after the Hurricane hit, and within a few days of the Hurricane, the paint on the walls of the jail began to bubble in large sheets which released a brown fluid that leaked out.

35.     Within three to five days after the Hurricane and continuing for months thereafter, because of the failure of the Defendant to properly extract water, control the humidity and/or to clean the jail, mold started to grow in the cells and other housing units in the jail where inmates were housed.

36.     Starting on the day of the Hurricane and continuing until at least October 24, 2018, the loss of power and water caused the sewage system to fail which made the flushing of the toilets in the dorms and individual confinement cells impossible.

37.     Water intrusion from the Hurricane caused flooding and water on the floors of most if not all of the cells/pods in the jail, which created an inhumane condition by itself, which lasted for around 10 to 14 days.

38.     The failure of the sewage system caused feces and urine to back up in the toilets and onto the floors, creating a biohazardous condition for the inmates which lasted until around October 24, 2018.

39.     The inmates walked around the dorms wearing only socks and open-toed sandals which they were issued by the jail.

40.     Female inmates reported that in addition to the water and sewage problems, female hygiene pads were present in the water and sewage mix and could not be properly disposed of.

41.     Inmates housed in confinement (C Dorm) were locked in their cells for 10-14 days following the Hurricane and resorted to defecating in plastic bags to avoid the accumulation of waste in the toilets in their cells, which were occupied by two to three inmates per cell.  There were 72 in cells in C Dorm housing around 140 inmates.

42.     The odor, water intrusion and air quality from the lack of ventilation made the inmates in A-G and J dorms sick.

43.     Despite these unbearable conditions, inmates were not allowed to go outside for recreation for approximately two to three weeks after the Hurricane.

44.     Despite the fact that bottled water had been brought to the jail, it was used primarily if not exclusively by the jail staff and was not given to inmates, who either had no drinkable water for at least one to two weeks or, if they were given water by the Defendant, it was not drinkable as it was not boiled in accordance with a "boil only" directive for the use of water in Bay County after the Hurricane, as discussed below.

45.     In short, the conditions in the jail were so unbearable, intolerable, and inhumane that they rose to a level that would not be expected nor tolerated in society. These conditions were extreme and posed an unreasonable risk of serious damage to the inmates' future health and safety and lasted a period of at least several weeks if not longer.

46.     Because of these conditions, a small riot started in A1 Dorm after the conditions brought tension/stress levels to a boil after repeated requests for water and edible food went ignored by jail staff.

47.     Rather than address the inmates' concerns, Sergeant Wellman gassed them by dropping canisters of chemical agents from the ceiling. This was at the direction of Anglin. The inmates doused with chemical agents were subsequently taken outside but no decontamination process was provided by Defendant.

48.     Inmates were told they were "part of the problem" and if they did not sign some medical form stating that they were not injured, they would "go to confinement."

49.     After the Hurricane, the inmates had no access to clean drinking water as the normal flow of water was disrupted leaving only a trickle of water at the faucets.

50.    After a few days (which varied between dorms), inmates were provided five-gallon drinking coolers of water, which was brownish in color and contained sediment.  Inmates had to use this brownish well water for at least fourteen days.

51.    This water was from a well that was not tested since the Hurricane and, therefore, should have been subject to the "boil only" notice from Bay County or should have been sanitized prior to use because it was not tested to determine if it was safe to use.

52.    The coolers provided did not provide enough water for the dorm's populations, and moreover, it was not boiled, making it unsafe for consumption.

53.    Because of the lack of drinking water, fights among inmates broke out as the tension level among inmates increased.

54.    Older inmates often did not get to the water coolers and were dependent on other inmates to provide them water, which they often did not get.

55.    During the fourteen day or more time period that the inmates were given the brownish water, they were told by jail staff, including both detention specialists and certified officers, that the water was safe to consume, despite the fact that Bay County Emergency Management had issued the boil water advisory.

56.    Both detention specialists and certified staff did not provide enough water for the number of inmates in the dorms and many went without.

57.     The harm to the inmates was exacerbated by the hot temperatures and humidity that existed in the dorms, and the unsafe and hazardous living conditions that existed in the jail dorms due to the feces and urine that permeated the cells for weeks after the hurricane.

58.     Many inmates suffered digestive issues, including severe stomach cramping, nausea, vomiting and diarrhea, from the water which was described as "dirty" with a brownish color.

59.     The hot and humid conditions also caused rapid mold and mildew buildup on the walls, bunks, inmate bedding matts, sheets, clothes, and personal items that started within three to five days after the Hurricane and continued for weeks and months thereafter.

60.     Many inmates were not given clean clothes referred to as "change outs" for several weeks.

61.     The normal rotation was twice weekly for uniforms, underwear and T-shirts.

62.     The inmates did what they could to try to clean their clothes, but their clothes would not dry due to the humid conditions which created more mold and mildew on them.

63.     Many inmates used their clothes to contain the sewage water overflow on the floors by creating clothing dams.

14

64.     Inmates who were housed in the confinement cells and forced to defecate and urinate in sandwich bags due to the sewage backup in their two-man cells had to throw the bags out of the food flaps which often broke open when they hit the floor of the common area.

65.     The floors remained uncleaned for at least 14 days.

66.     Exposure to the urine and fecal matter as well as the mold growth in the hot humid and stale air caused respiratory and other issues for many of the inmates. This was exhibited by inmates and staff coughing, having diarrhea, hand, foot and mouth disease, and sinus infections.

67.     Inmates' medical issues were routinely ignored as their sick call requests went unanswered by medical staff, or their complaints were not being adequately addressed when they were seen by medical staff inside the jail.

68.     As a result of their experiences, numerous inmates reported physical and/or psychological problems.

69.     Medical request forms had to be requested to, and supplied by, corrections staff, but because staff was scarce it was difficult to put in a medical call request.

70.     Inmates who did submit formal requests often received no medical attention or response at all.

15

71.    The health problems resulting from the jail conditions were so pervasive that inmates referred to their health problems as the "Bay County crud."

72.    Family members/spouses of inmates were falsely told the inmates were evacuated out of the jail.

73.    As a result of the storm, the phone system was down and visits by family were not allowed. It was several weeks before they were allowed to make phone calls to their families.

74.    Jail staff passed around notebooks for inmates to put down their family contact numbers so that their families would be contacted and told they were okay.

75.    However, no such calls were made by jail staff.

76.    In the kitchen, unsanitary conditions remained near the food preparation area.

77.    The ceiling in the kitchen was damaged from the rain and leaked for many weeks.

78.    Mold and mildew grew here as well.

79.    There was no adequate cleaning soap or hot water to clean the food trays, yet inmates were served their meals on them.

80.    Plaintiffs in C-Dorm, identified in paragraphs 5 and 12 above, suffered all of the conditions described in paragraphs 27-32, 34-39, 41-45, and 49-79 above.

81.  Plaintiffs in A-Dorm, identified in paragraphs 6 and 9 above, suffered all of the conditions described in paragraphs 27-32, 34-39, and 42-79 above.

82.  Plaintiffs in the female dorms identified in paragraphs 4, 7, 10 and 11 above, suffered all of the conditions described above except as set forth in paragraphs 39, 41, and 46-48.

83.  The Plaintiffs in G Dorm, identified in paragraph 8 above, suffered all conditions described in paragraphs 27-32, 34-39, 42-45, and 49-79 above.

84.  The Plaintiff in D Dorm, identified in paragraph 13 above, suffered all conditions described in paragraphs 27-32, 34-39, 42-45 and 49-79 above.

85.  In addition to the many failures of Defendant identified above and below, the jail suffered substantial staffing shortages as a result of staff quitting and not coming to work.

86.  The jail and its staff were unprepared before and after the hurricane to provide humane care for the inmates who suffered from known deplorable conditions.

87.  The inmates stated they felt they were left alone "to fend for themselves" as staff was scarce and many did not know what to do. The dorms were seriously understaffed and the staff that were present, were not permitted to go into the dorms on a routine basis other than to feed the inmates.

88.     There were multiple laws, rules, and regulations governing the operation of the jail in October 2018 and the care and treatment of inmates that were breached, discussed more fully below.

89.     The breaches that occurred were based on operational duties that were owed to the specific class of inmates housed in the Bay County Jail at the time of Hurricane Michael in October 2018, representatives of whom are identified as the named Plaintiffs herein.

90.     Thus, a duty of care was owed under the common law and under the laws, rules, and regulations to the inmates who were housed in the Bay County Jail at the time of Hurricane Michael.

91.     Under §951.23(4), Florida Statutes, county jails are required to abide by the Model Jail Standards (MJS) adopted by the Florida Sheriff's Association.

92.     In addition, county jails, like the jail operated by Defendant herein, is required to abide by Chapter 951.[1]

93.     Under MJS 1.14, Defendant was to have continuous visual observation, 24 hours each day, with physical observations documented at intervals not to exceed 15 minutes for adult inmates and 10 minutes for juveniles.

---

[1]     To the extent that Defendant implemented concomitant policies and general orders, they were likewise violated to the same extent as were the MJS identified herein.

94.     This duty/standard was breached during and after Hurricane Michael resulting in injury to the named Plaintiffs and to the class. In fact, other than feeding the inmates, Defendant's corrections staff were directed not to enter or go onto the pods/cells where the inmates were located because it was too dangerous due to fecal and other material and the general unsafe condition of the jail.

95.     Under MJS 2.1(b), inmates were required to have reasonable access to toilet, sink, and drinking water facilities.

96.     This duty/standard was breached during and after Hurricane Michael resulting in injury to the named Plaintiffs and to the class.

97.     Under MJS 2.1(c), the cells within which inmates were kept had to meet the requirements of the State Fire Codes at all times.

98.     This duty/standard was breached during and after Hurricane Michael resulting in injury to the named Plaintiffs and to the class.

99.     Under MJS 2.1(d), cells in which inmates were housed were required to comply with sanitation standards as prescribed in Chapter 12 of the MJS.

100.    Under Chapter 12 of the MJS, sanitation requirements are delineated including without limitation the following: light fixtures shall be kept clean; floors, walls, ceiling, windows, doors, and all appurtenances of the structure shall be kept clean; plumbing fixtures shall be kept clean and sanitary at all times; sinks, toilets, water fountains, and floor drains shall be clean; laundry facilities shall be kept clean;

19

if laundry facilities are not available on site, sheets and blankets shall be sent to commercial laundries; utility closets, pipe chases and corridors will be kept clean and free of clutter at all times; all garbage, trash and rubbish shall be collected and removed from inmate residential areas at least daily; bedding, clothing and personal items are required to be kept in good repair and cleaned and sanitized regularly; and inmate residential areas shall be kept clean and sanitary at all times.

101.   These duties/standards were breached during and after Hurricane Michael resulting in injury to the named Plaintiffs and to the class.

102.   Under MJS 2.1(f), inmates could not be held in a holding cell in excess of 8 hours.  Routinely, during Hurricane Michael, inmates, including one or more of the named Plaintiffs, were kept in holding cells in excess of 8 hours.

103.   This duty/standard was breached during and after Hurricane Michael resulting in injury to the named Plaintiffs and to the class.

104.   Under MJS 5a1, Defendant was required to have policy and procedure directives which contained emergency plans for the operation of the Bay County Jail.   Under MJS 1.20, Defendant was required to have policy and procedure directives for employees and inmates concerning the operation of its detention facility.

105.   Defendant either failed to have emergency plans or directives as required by the MJS, or failed to implement these plans, either or both of which are

operational, not discretionary, functions of Defendant because Defendant does not

have discretion to develop or activate emergency plans, because they are required in

the MJS.

106.   This duty/standard was breached during and after Hurricane Michael

resulting in injury to the named Plaintiffs and to the class.

107.   In fact, there was no emergency plan in place at all or no emergency

plan that was followed for the jail other than "Locked and loaded."[2]

108.   Under MJS 5e, the Defendant was required to establish an agreement

with one or more health care providers to provide emergency services to Bay County

Jail inmates.

109.   This duty/standard was breached during and after Hurricane Michael

resulting in injury to the named Plaintiffs and to the class.

---

[2] In an "After Action Report" prepared on January 30, 2019 by a former
employee of the Defendant, there is a reference to a Hurricane Preparedness Plan
that was developed on May 8, 2018.  However, other than a "to do" list that is
attached as Exhibit B, no emergency plan or rules have even been identified or
implemented to handle the health, safety and welfare of inmates following a
natural disaster like Hurricane Michael.  Even if there were emergency rules, they
were never implemented or given to Defendant's staff who were working in the jail
at the time of Hurricane Michael nor were these staff given directions as to what to
do in the case of this emergency nor told of the existence of any emergency plans,
policies and procedures.  In short, staff were told nothing about any emergency
plans, policies and procedures nor were any implemented.  In the October 9, 2018,
email, referenced in paragraphs 21-25 above, emergency plans were identified for
every other unit of the Defendant but not the jail.

110.   Each standard/duty set forth in paragraphs 88-106 above was an operation duty imposed on the Defendant by law under Chapter 951 or through the Model Jail Standards.

111.   Each standard/duty set forth above was violated/breached by the Defendant causing injury to Plaintiffs.

112.   Plaintiffs were all located in the Bay County Jail at the time of Hurricane Michael and suffered injuries due to breach of the duties identified above.

113.   Although Defendant was required to have emergency rules as set forth above, Defendant violated the MJS directive to have in place emergency rules.

114.   Alternatively, if Defendant had emergency rules, Defendant utterly failed to activate these emergency rules that were required under the MJS to provide for the care and custody of inmates consistent with the MJS, some of which are set forth above in paragraphs 88-106.

115.   Defendant had no discretion to develop and have in place emergency rules at the time that Hurricane Michael hit Bay County.

116.   Defendant had no discretion to enforce existing emergency rules, if they existed at the time that Hurricane Michael hit Bay County.

117.   Defendant breached these duties which resulted in injury to the Plaintiffs.

118.   Each of the named Plaintiffs, as representatives of the class, was subjected to sewage leaks and water infiltrating their cells beginning on October 10, 2018 until at least October 24, 2018.

119.   Each of the named Plaintiffs, as representatives of the class, did not have safe and/or any drinking water for a substantial period of time after the Hurricane beginning on October 10, 2018 until at least October 24, 2018.

120.   Each of the named Plaintiffs, as representatives of the class, did not have floors, walls, ceiling, windows, doors, and all appurtenances of the structure kept clean beginning on October 10, 2018 until at least October 24, 2018.

121.   Each of the named Plaintiffs, as representatives of the class, were subject to unsanitary plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains beginning on October 10, 2018 until at least October 24, 2018.

122.   Each of the named Plaintiffs, as representatives of the class, slept in filth largely caused by backed up plumbing and unsanitary liquid on the floors of their cells beginning on October 10, 2018 until at least October 24, 2018.

123.   Each of the named Plaintiffs, as representatives of the class, was subjected to no air flowing in the cells which resulted in mold and dangerous air quality beginning on October 10, 2018 and lasting into 2019. Superficial efforts were made to clean the mold but it regrew multiple times well into the 2019 time period.

124.   Each of the named Plaintiffs resided in unsanitary conditions described in part above beginning on October 10, 2018 until at least October 24, 2018.

125.   Defendant, through Anglin, knew of these unsanitary and unsafe conditions and ignored them, allowing the inmates to suffer.

126.   When the conditions described above became apparent to Defendant, through Anglin, Plaintiffs should have been relocated to another jail or prison, which jails and prisons were available and offered to Defendant but ignored.

127.   Anglin and the Defendant's employees who were under his supervision and acting at his direction, knew that the Plaintiffs were in deplorable conditions, outlined above and below, and knowingly left them in those conditions.  Defendant knowingly failed to provide Plaintiffs with edible food; failed to provide safe potable drinking water to Plaintiffs; failed to provide them with clean and sanitary bedding and clothing; failed to provide medical care to the inmates suffering from stomach cramping, nausea and diarrhea caused by either moldy food or drinking unpotable water; failed to give inmates access to medical care needed for illnesses and conditions that existed before, during and after the Hurricane, failed to provide cells that did not have feces and urine; failed to provide sanitation facilities to use the restroom causing many of the inmates instead to have to defecate in baggies, which were passed through feeding slots in their cells after they had been used and were filled with fecal and other biohazardous material; and failed to eradicate or control

mold growth on the walls in the jail after the Hurricane which caused the inmates to be exposed to toxic mold.

128.   Anglin knew that Plaintiffs and inmates were left in cells in which they had to stand in water, sewage and other biohazardous material up to an inch deep for at least 10-14 days after Hurricane Michael yet did nothing including transferring and/or transporting Plaintiffs and other inmates to other jails and prisons that had been offered for the inmates care and custody following the Hurricane.

129.   Additionally, Anglin failed or refused to have any policy in advance of, during or after Hurricane Michael to prevent, cure, repair or treat the conditions set forth above and below.

130.   In short, Anglin, as the final policymaker for the Defendant's jail, ignored the evacuation orders given before the Hurricane, then allowed Plaintiffs to exist in deplorable conditions that knowingly resulted in injury to them.  Anglin was in the jail to personally witness these conditions and/or was personally made aware of these conditions, described above and below, yet did nothing.

131.   The conditions to which Plaintiffs were subjected constituted cruel and unusual punishment under the Fourteenth Amendment to the United States Constitution and/or was conscious shocking behavior.  The events that unfolded after Hurricane Michael and the conditions to which Plaintiffs were subjected were not isolated to one day but lasted weeks if not months.

132.   Defendant Sheriff, through Anglin, knew of all of the conditions set forth in paragraphs 137-451 and caused these conditions to exist.  In other words, Anglin was aware of the conditions in paragraph 137-451 below and the conditions set forth above, including paragraph 127, and did nothing to correct these conditions each of which was caused by the Defendant Sheriff.  Defendant Sheriff, after knowledge of these conditions, did nothing which resulted in harm to Plaintiffs.  All of the events set forth in this Complaint, including without limitation paragraphs 127 and 137-451 were caused by acts and omissions on the Sheriff, through Anglin.

133.   In addition to identifying a final policymaker, Anglin, who was responsible for the constitutional violations set forth herein, there was also a custom and practice of Defendant ignoring its obligations for the care of inmates in the Sheriff's jail, as set forth herein.  There were weeks, if not months, of the deplorable conditions, described in part in paragraphs 127 and 137-451, existing without remedy or correction.  There is a direct causal link between the actions of the Sheriff, through Anglin, and the constitutional violations, namely, not to subject Plaintiffs to cruel and unusual punishment during their confinement, as they were subjected to as described above and in paragraphs 127 and 137-451, all of which conditions were caused by the Sheriff's actions or inactions and all of which caused harm to Plaintiffs.

26

134.   The Sheriff, not Hurricane Michael, was the catalyst for the deplorable conditions complained of herein.  Hurricane Michael did not cause these conditions; it caused water, rain and destruction.  The Sheriff, through Anglin, caused the inmates to have no food or moldy food, to have no potable water, to have no clothes or no clean clothes, to have no, or a limited, ability to use restrooms, to have no ability to obtain medical care and to live in moldy conditions.  The failure to have any emergency policy to prevent, cure, remedy or fix the conditions to which the Plaintiffs were subjected constitutes deliberate indifference by itself.

135.   Knowingly subjecting Plaintiffs to conditions that are toxic, dangerous, unhealthy and inhumane arises to a constitutional violation.

136.   Further, few if any deputies who worked during Hurricane Michael were trained to avoid the constitutional violations identified here. They acted at the direction exclusively of Anglin and there was no training regarding hurricane preparedness for the jail and the deputies, consequently, were unable, through the lack of training, to know what to do to cure and remedy the constitutional violations set forth herein such as providing food to inmates, providing potable water, providing clothes, providing restrooms or other facilities for inmates private needs, obtaining medical care for the inmates and cleaning or preventing moldy living conditions.

## ALLEGATIONS SPECIFIC TO KRISTINA TRIPP

137.   Plaintiff Kristina Tripp was in the Bay County Jail at the time of Hurricane Michael from August 22, 2018, until January 10, 2019. Plaintiff Tripp was denied potable water during the Hurricane and thereafter for a period of what appears to be several weeks.

138.   After the Hurricane, there was standing water remaining on the floor of the Jail and extreme humidity causing condensation where Plaintiff Tripp was housed.  She was housed on a top bunk before and after the Hurricane and when she climbed down from her top bunk, she slipped due to the condensation and lack of air flow inside the female unit of the Jail.

139.   She fell forward after slipping due to the condensation, standing water containing feces and urine, and rain from the hole left after the AC unit was ripped off the roof during the Hurricane, after which no tarp or other covering was used to prevent the elements from intruding into the Jail, and she knocked out one of her front teeth. When she asked for help and medical care due to knocking out her front teeth, she was denied medical attention. These actions by the Defendant violated MJS 12.2 12.3 12.4 7.2C 7.10.

140.   During the time that Plaintiff Tripp was located in the Jail, she was subjected to sewage leaks and water infiltrating her cell. There was standing water in her cell that contained feces, used sanitary pads, and urine on the floors, creating

a biohazardous condition for the inmates including Plaintiff. These actions by the Defendant violated MJS 12.4 12.8.

141.   Because of the fact that there was no clean water to bathe, Plaintiff and other females had to live in these unsanitary conditions for weeks. This violated MJS 6.3 and other standards set forth herein including 8.5.

142.   Plaintiff Tripp and other females did not have potable water. The water that they were given to drink was not boiled and was brown.

143.   The plumbing features including the toilets, sinks, water fountains and floor drains that Plaintiff Tripp and other females were required to use did not work, resulting in standing water, toilets backing up with excrement which went onto the floors, and the inability to properly clean themselves. Defendant's failures left Plaintiff Tripp and other females in these conditions, and resulted in Plaintiff and other females being subjected to unsanitary plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11

144.   Plaintiff Tripp and other females housed in her area of Defendant's Jail, also slept in filth largely caused by backed up plumbing and unsanitary liquid on the floors of their cells, and no ability to bathe. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11

145.   Plaintiff Tripp and other females housed in her area of Defendant's Jail had no air flowing in her cells which resulted in mold. Defendant repeatedly tried to conceal the mold by painting over it rather than curing the root problem of the mold, which resulted in dangerous and life-threatening air quality. This was a violation of MJS 17.5 A.

146.   As an additional health hazard for Plaintiff Tripp, as a result of the feces, sanitary pads, and urine in the standing water on the floor of Plaintiff's cell and other common areas, Plaintiff Tripp and other inmates were exposed to HIV and other STDs because of other females who had these illnesses defecated, urinated, and used sanitary pads that were not disposed of properly by Defendant. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

147.   Defendant violated MJS 12- Sanitation, specifically 12.1 through 12.16, which adversely affected and caused health hazards for Plaintiff Tripp and other females in the Bay County Jail, and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

148.   Defendant violated MJS 16- Plumbing, specifically 16.9-16.10, which adversely affected and caused health hazards for Plaintiff Tripp and other females in the jail, and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

149.   Defendant violated MJS 16.9 in that there were no water supplies available for Plaintiff Tripp and other female inmates that were adequate to serve the demands of the detention facility.

150.   In violation of MJS 16 and the Florida Administrative Code, Defendant's water supply was not of safe bacteriological and chemical quality. Drinking water was not accessible to all inmates including Plaintiff and other female inmates. Showers were not available to inmates including Plaintiff.  The plumbing in the jail did not comply with the requirements stated in Chapter 153, Florida Statutes.

151.   Hot and cold water was not available in convenient locations throughout the jail for the proper disposal of cleaning water and to facilitate cleaning. Floor drains were inoperable.

152.   Sewage and liquid waste were not disposed of into an approved sewerage system which met the requirements of Chapter 381, Florida Statutes. All of these violations directly affected Plaintiff Tripp and other females located in the jail as Plaintiff was directly exposed to mold, feces, urine, used sanitary pads and extreme humidity without proper ventilation which exacerbated the growth of the mold. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

31

153.   Plaintiff Tripp had no access to clean clothes and bedding supplies for several weeks and began to get ill from either having no water to drink or drinking discolored water that was unsanitary. The failure to provide clean bedding violated MJS 8.2 and 12.9.

154.   Plaintiff Tripp and other females were exposed to extreme temperatures without ventilation inside the jail, which was so extreme that paint started to come off the walls due to the condensation.

155.   The windows in the jail were so fogged up that staff from outside could not see into the dorms.

156.   Staff stopped doing security checks which made it like a jungle inside the dorm. Inmates were panicking and staff could be over heard talking about dead people on the streets. These actions by the Defendant violated MJS 1.45 1.47 2.8 A 1., 2.8 A 5. J. 11.18 11.20.

157.   Plaintiff Tripp and other female inmates were all exposed to massive amounts of mold that had started to build inside the female dorm. During the day, it was extremely hot and during the night, it was beginning to get cold and inmates like Plaintiff did not have appropriate clothing for the elements nor food. This violated MJS 8.2-4.  Plaintiff began to get sinus infections, colds and began to have digestive issues including stomach cramping, nausea, and diarrhea caused either by

moldy food or drinking unpotable water. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

158.   Plaintiff Tripp and other females in E Dorm personal suffered the conditions and violations described above except as set forth in paragraphs except as set forth in paragraphs 39, 41, and 46-48. Living in the conditions described above regarding Plaintiff Tripp and in all paragraphs above other than paragraphs except as set forth in paragraphs 39, 41, and 46-48 was horrific and extreme, causing not only physical illnesses but emotional pain and suffering, fear, and extreme anxiety. These actions by the Defendant violated MJS 1.47 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11

159.   There was also overcrowding in the female Dorm which contributed to Plaintiff's anxiety, post traumatic stress disorder, fear, physical illnesses and emotional pain and suffering. These actions by the Defendant violated MJS 16.3.

## ALLEGATIONS SPECIFIC TO AMBER LYNN TIDWELL

160.   Plaintiff Amber Ahne Tidwell was in the Bay County Jail at the time of Hurricane Michael and was incarcerated in the jail from around September 30, 2018, was until around October 17, 2018. Plaintiff Tidwell was located in the same dorm, E Dorm, as Plaintiff Tripp and was subjected to the same conditions as Plaintiff Tripp. Plaintiff Tidwell was denied potable water during the Hurricane until her

release. These actions by the Defendant violated MJS 1.47 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

161.    After the Hurricane, there was standing water remaining on the floor of the Jail and extreme humidity causing condensation where Plaintiff Tidwell was housed.

162.    There was condensation, standing water containing feces and urine, and rain from a hole left after the AC unit that was ripped off the roof during the Hurricane, after which no tarp or other covering was used to prevent the elements from intruding into the Jail. These actions by the Defendant violated MJS 1.47 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

163.    During the time that Plaintiff Tidwell was located in the Jail, she was subjected to sewage leaks and water infiltrating her cell. There was standing water in her cell that contained feces, used sanitary pads, and urine on the floors, creating a biohazardous condition for the inmates including Plaintiff. These actions by the Defendant violated MJS 1.47 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

164.    Because of the fact that there was no clean water to bathe, Plaintiff and other females had to live in these unsanitary conditions that lasted for Plaintiff until her release.  This violated MJS 6.3 and other standards set forth therein including MJS 8.5.

165.   Plaintiff Tidwell and other females did not have potable water. The water that they were given to drink was not boiled and was brown. The plumbing features including the toilets, sinks, water fountains, and floor drains that Plaintiff Tidwell and other females were required to use did not work resulting in standing water toilets backing up with excrement which went onto the floors and the inability to properly clean themselves.

166.   The failure of Defendant leaving Plaintiff Tidwell and other females in these condition, resulted in Plaintiff and other females being subjected to unsanitary plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains. These actions by the Defendant violated MJS 1.47 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

167.   Plaintiff Tidwell and other females housed in her area of Defendant's Jail, also slept in filth largely caused by backed up plumbing and unsanitary liquid on the floors of their cells and no ability to bathe. These actions by Defendant violated MJS 1.47 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

168.   Plaintiff Tidwell and other females housed in her area of Defendant's jail, had no air flowing in their cells, which resulted in mold, which Defendant repeatedly tried to conceal by painting over the mold rather than curing the root problem of the mold, and creating dangerous air quality. These actions by the

Defendant violated MJS 1.47 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

169.   As an additional health hazard for Plaintiff Tidwell, as a result of feces, sanitary pads, and urine in the standing water on the floor of Plaintiff's cell and other common areas, Plaintiff Tidwell and other inmates were exposed to HIV and other STDs because other females who had these illnesses defecated, urinated, and used sanitary pads that were not disposed of properly to the Defendant. These actions by the Defendant violated MJS 1.47 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

170.   Defendant violated MJS 12- Sanitation, specifically 12.1-12.16, which adversely affected and caused health hazards for Plaintiff Tidwell and other females in the jail, and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

171.   Defendant violated MJS 16- Plumbing, specifically 16.9-16, which adversely affected and caused health hazards for Plaintiff Tidwell and other females in the jail, and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

172.   Defendant violated MJS 16.9 in that there were no water supplies available for Plaintiff Tidwell and other female inmates that were adequate to serve the demands of the detention facility.

173. In violation of MJS 16 and the Florida Administrative Code, the Defendant's water supply was not of safe bacteriological and chemical quality. Drinking water was not accessible to all inmates including Plaintiff and other female inmates. Showers were not available to inmates including Plaintiff. The plumbing in the jail did not comply with the requirements stated in Chapter 153, Florida Statutes. These actions by the Defendant violated MJS 1.47 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

174. Hot and cold water was not available in convenient locations throughout the jail for the proper disposal of cleaning water and to facilitate cleaning. Floor drains were inoperable. Sewage and liquid waste were not disposed of into an approved sewerage system which met the requirements of Chapter 381, Florida Statutes.

175. All of these violations directly affected Plaintiff Tidwell and other females located in the jail, as Plaintiff was directly exposed to mold, feces, urine, used sanitary pads and extreme humidity without proper ventilation, which exacerbated the growth of the mold. These actions by the Defendant violated MJS 1.47 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

176. Plaintiff Tidwell had no access to clean clothes and bedding supplies for several weeks and began to get ill from either having no water to drink or

drinking discolored water that was unsanitary. The failure to provide clean bedding violated MJS 8.2 and 12.9.

177.   While Plaintiff Tidwell and other females were exposed to extreme temperatures without ventilation inside the jail which was so extreme that paint started to come off the walls due to the condensation.

178.   The windows in the jail were so fogged up so that staff from outside could not see into the dorms.

179.   Staff stopped doing security checks which made it like a jungle inside the dorm. Inmates were panicking and staff could be overheard talking about dead people, on the streets. These actions by the Defendant violated MJS 1.45 1.47 2.8 A 1., 2.8 A 5. J. 11.18 11.20.

180.   Plaintiff Tidwell and other female inmates were all exposed to massive amounts of mold that had started to build inside the female dorm. During the day, it was extremely hot and during the night, it was beginning to get cold and inmates like Plaintiff did not have appropriate clothing for the elements nor food. This violated MJS 8.2-4.

181.   Plaintiff began to get sinus infections and colds, and began to have digestive issues including stomach cramping, nausea, and diarrhea caused either by moldy food or drinking unpotable water.  These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

182.   Plaintiff Tidwell and other females in E Dorm personal suffered the conditions and violations described above except as set forth in paragraphs except as set forth in paragraphs 39, 41, and 46-48. Living in the conditions described above regarding Plaintiff Tidwell and in all paragraphs above other than paragraphs except as set forth in paragraphs 39, 41, and 46-48, was horrific and extreme, causing not only physical illnesses but emotional pain and suffering, fear, and extreme anxiety.

183.   There was also overcrowding in the female Dorm which contributed to or caused Plaintiff Tidwell's anxiety, depression, fear, physical illnesses and emotional pain and suffering.

## ALLEGATIONS SPECIFIC TO MICHAEL MURRERO-DELGADO

184.   Plaintiff Michael Murrero-Delgado was in the Bay County Jail at the time of Hurricane Michael and was incarcerated in the jail from around June 22, 2017, through on or around November 9, 2018. Plaintiff Murrero-Delgado was in A Dorm at the time of the Hurricane and thereafter. In A Dorm, he was subjected to the same conditions as the Plaintiffs described above.

185.   Plaintiff Murrero-Delgado was denied potable water during the Hurricane and for several weeks thereafter. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

186.   After the Hurricane, there was standing water remaining on the floor of the Jail and extreme humidity causing condensation where Plaintiff Murrero-

Delgado was housed. There was condensation, standing water containing feces and urine that Plaintiff had to walk through daily.

187.   During the time that Plaintiff Murrero-Delgado was located in the jail during and after the Hurricane, he was subjected to sewage leaks and water infiltrating his cell. There was standing water in his cell that contained feces and urine, creating a biohazardous condition for the inmates including Plaintiff. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

188.   Because of the fact that there was no clean water to bathe, Plaintiff and other inmates in A Dorm had to live in these unsanitary conditions that lasted for Plaintiff until his release. This violated MJS 6.3 and other standards set forth herein including MJS 8.5.

189.   Plaintiff Murrero-Delgado and other males in A Dorm did not have potable water. The water that they were given to drink was not boiled and was brown.

190.   The plumbing features including the toilets, sinks, water fountains, and floor drains that Plaintiff Murrero-Delgado and other males in A Dorm were required to use, did not work, resulting in standing water and toilets backing up with excrement which went onto the floors, and the inability to properly clean themselves.

191.   The failure of Defendant and leaving Plaintiff Murrero-Delgado and other inmates in A Dorm in these condition resulted in Plaintiff and other inmates

being subjected to unsanitary plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

192.  Plaintiff Murrero-Delgado and other inmates housed in A-Dorm of the jail, also slept in filth largely caused by backed up plumbing and unsanitary liquid on the floors of their cells and no ability to bathe. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

193.  Plaintiff Murrero-Delgado and other inmates housed in A Dorm within the jail had no air flowing in his cell for weeks, which resulted in mold. Defendant repeatedly tried to conceal the mold by painting over it rather than curing the root problem of the mold, and the dangerous air quality resulting from the mold which Plaintiff and other inmates had to breathe. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

194.  As an additional health hazard for Plaintiff Murrero-Delgado, as a result of the feces and urine in the standing water on the floor of Plaintiff's cell and other common areas, Plaintiff and other inmates were exposed to HIV and other STDs because inmates who had these illnesses had defecated and urinated, which was on the floor of Plaintiff and other inmates' cells. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

195.  Defendant violated MJS 12- Sanitation, specifically 12.1-12.16, which adversely affected and caused health hazards for Plaintiff Murrero-Delgado and other inmates in the jail, and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

196.  Defendant violated MJS 16- Plumbing, specifically 16.9-16, which adversely affected and caused health hazards for Plaintiff Murrero-Delgado and other inmates in A Dorm in the jail, and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.  These actions by the Defendant violated MJS 1.45 1.47 2.8 A 1., 2.8 A 5. J. 11.18 11.20.

197.  Defendant violated MJS 16.9 in that there was no water supplies available for Plaintiff Murrero-Delgado and other inmates in A Dorm that were adequate to serve the demands of the detention facility.

198.  In violation of MJS 16 and the Florida Administrative Code, the Defendant's water supply was not of safe bacteriological and chemical quality. Drinking water was not accessible to all inmates including Plaintiff and other inmates in A Dorm.

199.  Showers were not available to inmates including Plaintiff. The plumbing in the jail did not comply with the requirements stated in Chapter 153,

Florida Statutes. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

200.    Hot and cold water was not available in convenient locations throughout the jail for the proper disposal of cleaning water and to facilitate cleaning. Floor drains were inoperable.  Sewage and liquid waste were not disposed of into an approved sewerage system which met the requirements of Chapter 381, Florida Statutes.

201.    All of these violations directly affected Plaintiff Murrero-Delgado and other inmates located A Dorm in the jail, as Plaintiff was directly exposed to mold, feces, urine, and extreme humidity without proper ventilation, which exacerbated the growth of the mold. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

202.    Plaintiff Murrero-Delgado had no access to clean clothes and bedding supplies for several weeks and began to get ill from either having no water to drink or drinking discolored water that was unsanitary. The failure to provide clean bedding violated MJS 8.2 and 12.9.

203.    While Plaintiff Murrero-Delgado and other inmates in A Dorm were exposed to extreme temperatures without ventilation inside the jail, which was so extreme that paint started to come off the walls due to the condensation. The

windows in the jail were so fogged up that staff from outside could not see into the dorms.

204.   Staff stopped doing security checks which made it like a jungle inside the dorm. Inmates were panicking and staff could be overheard talking about dead people on the streets. These actions by the Defendant violated MJS 1.45 1.47 2.8 A 1., 2.8 A 5. J. 11.18 11.20.

205.   Because of the conditions in the jail including without limitation the standing water with feces and urine, and no food and water, the day after the Hurricane, inmates in A Dorm rioted.

206.   As a result, Defendant's staff dropped CS grenades from the roof through a tube designed in the roof. Although this was appropriate to control the riot for the inmates involved, the inmates who got chemical agents on them due to the riot control were never decontaminated and they did not have the ability to bathe to wash the chemical agents off their clothes or skin for several weeks, which became a skin irritant to inmates like Plaintiff. These actions by the Defendant violated MJS 3.3 A.

207.   Defendant also failed to have all inmates examined for contamination, including Plaintiff, and he and other inmates in A Dorm were locked in their cells for several days thereafter with extreme heat with mold starting to grow inside the cells.

44

208.   The cells in A Dorm had no food flaps so the inmates in those cells had no air flow or ventilation inside the cells.

209.   The inmates in A Dorm including Plaintiff had no access to fresh water.

210.   When the inmates tried to clean the floors, they had no protective equipment like masks and gloves to do so.

211.   Staff within the jail stopped doing security checks and kept the inmates housed in their cells for days on end due to lack of staff and/or the fear of staff of becoming infected due to the bacterial and other unsanitary conditions inside the Jail. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

212.   Plaintiff Murrero-Delgado and other inmates in A Dorm went several weeks before they could shower or bathe. Water coolers began to be brought into A Dorm in the jail within the first week after Hurricane Michael hit but the water was discolored and had not been boiled, despite a boil-only notice issued by the Health Department in Bay County.

213.   Further, even though Plaintiff and other inmates in A Dorm began to have stomach problems, diarrhea, and other forms of illness, they had no access to medical care during at least the first two weeks after the Hurricane. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

214.   Plaintiff Murrero-Delgado and other inmates in A Dorm were all exposed to massive amounts of mold that had started to build inside their cells and common dorm areas. During the day, it was extremely hot and during the night, it was beginning to get cold, and inmates like Plaintiff did not have appropriate clothing for the elements nor food.  This violated MJS 8.2-4.  Plaintiff began to have digestive issues including stomach cramping, nausea, and diarrhea caused either by moldy food or drinking unpotable water.

215.   Plaintiff Murrero-Delgado and other inmates in A Dorm personally suffered the conditions described above. Living in the conditions described above was horrific and extreme, causing not only physical illnesses but emotional pain and suffering, fear, and extreme anxiety that Plaintiff Murrero-Delgado personally suffered and saw other inmates suffering as well.

216.   Plaintiff Murrero-Delgado was exposed to unsafe and unthinkable conditions including mold and being locked in a cell with no ventilation. He also had at least a week or longer of exposure to chemical agents without decontamination.

217.   He had no or unpotable water and no or little food. The first meal that Plaintiff was given were frozen waffles that were still frozen.

218.   Plaintiff and others became ill because of these conditions and there may be long-term effects caused by the exposure to mold. Plaintiff and other inmates

in A Dorm suffered all of the conditions and violations described in paragraphs 27-32, 34-39, and 42-79 above and Plaintiff was harmed as a result thereof.

## ALLEGATIONS SPECIFIC TO THOMAS MCFATTER

219.   Plaintiff Michael McFatter was in the Bay County Jail at the time of Hurricane Michael and was incarcerated in the Jail from around June 22, 2018, until in or around June 2019.  He was in C Dorm (confinement) within the jail at the time of Hurricane Michael and for a time thereafter. He was subjected to the same conditions as Plaintiffs described above.

220.   Plaintiff McFatter was denied potable water during the Hurricane and for several weeks thereafter. These actions by the Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

221.   During and after Hurricane Michael, Plaintiff suffered a seizure due at least in part to the conditions in the Jail. There was feces on the floor of his cell and overflowing and flooding caused by the overflowing toilets.

222.   For approximately two or more weeks after the Hurricane, Plaintiff had to pass his feces on a food tray, or into empty sandwich bags and/or trash bags, and pass it through a food flap on his cell door.  After he suffered the seizure, Plaintiff was carried/pulled through the feces on the floor to get him out of his cell. These actions by the Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

223.   Inmates like Plaintiff in confinement did not have access to even the buckets of unpotable water, and the only water that they received was passed through the same flap that their, including Plaintiff's, feces were passed through. There were no emergency lights that worked in confinement nor electricity or ventilation. These actions by Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

224.   Plaintiff McFatter was exposed to mold and had never suffered a seizure that he can remember until shortly after (believed to be several days after) Hurricane Michael. Plaintiff was under significant stress due to the living conditions caused and/or created by the Defendant. After he had the seizure, Defendant returned him back to his cell which resulted in Plaintiff having another seizure.  These actions by Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

225.   After the Hurricane, there was standing water remaining on the floor of the jail and extreme humidity causing condensation where Plaintiff McFatter was housed. There was condensation, and standing water containing feces and urine that Plaintiff had to walk through daily. These actions by the Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

226.   During the time that Plaintiff McFatter was located in the jail during and after the Hurricane, he was subjected to sewage leaks and water infiltrating his

48

cell. There was standing water in his cell that contained feces and urine, creating a biohazardous condition for the inmates, including Plaintiff. These actions by the Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

227.   Because of the fact that there was no clean water to bathe, Plaintiff and other inmates in C Dorm had to live in these unsanitary conditions that lasted for Plaintiff until his release. This violated MJS 6.3 and other standards set forth herein including 8.5.

228.   Plaintiff McFatter and other males in C Dorm did not have potable water.  The water that they were given to drink was not boiled and was brown. The plumbing features including the toilets, sinks, water fountains and floor drains that Plaintiff McFatter and other inmates in C Dorm were required to use did not work, resulting in standing water and toilets backing up with excrement, which went onto the floors, and the inability to properly clean themselves.

229.   The failure of the Defendant and leaving Plaintiff McFatter and other inmates in C Dorm in these conditions resulted in Plaintiff and other inmates being subjected to unsanitary plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains. These actions by the Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

230.   Plaintiff McFatter and other inmates housed in C Dorm of the Defendant's jail, also slept in filth, largely caused by backed-up plumbing and unsanitary liquid on the floors of their cells, and no ability to bathe. These actions by Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

231.   Plaintiff McFatter and other inmates housed in C Dorm within Defendant's jail had no air flowing in cells for week, which resulted in mold. Defendant repeatedly tried to conceal the mold by painting over it rather than curing the root problem of the mold, and the dangerous air quality resulting from the mold which Plaintiff and other inmates had to breathe. These actions by the Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

232.   As an additional health hazard for Plaintiff McFatter, as a result of the feces and urine in the standing water on the floor of Plaintiff's cell and other common areas, Plaintiff and other inmates were exposed to HIV and other STDs because other inmates who had these illnesses had defecated and urinated, which was on the floor of Plaintiff's and other inmates' cells. These actions by the Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

233.   Defendant violated MJS 12- Sanitation, specifically 12.1-12.16, which adversely affected and caused health hazards for Plaintiff McFatter and other inmates in the jail, and there were insufficient staff to perform the checks required

under MJS 12 to protect the inmates including Plaintiff. These actions by the Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

234.   Defendant violated MJS 16- Plumbing, specifically 16.9-16, which adversely affected and caused health hazards for Plaintiff McFatter and other inmates in C Dorm in the jail, and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates, including Plaintiff.

235.   Defendant violated MJS 16.9 in that there were no water supplies available for Plaintiff McFatter and other inmates in C Dorm that were adequate to serve the demands of the detention facility.

236.   In violation of MJS 16 and the Florida Administrative Code, Defendant's water supply was not of safe bacteriological and chemical quality. Drinking water was not accessible to all inmates including Plaintiff and other inmates in C Dorm.

237.   Showers were not available to inmates including Plaintiff. The plumbing in the jail did not comply with the requirements stated in Chapter 153, Florida Statutes. These actions by Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

238.   Hot and cold water was not available in convenient locations throughout the jail for the proper disposal of cleaning water and to facilitate cleaning.

239.   Floor drains were inoperable.

240.   Sewage and liquid waste were not disposed of into an approved sewerage system which met the requirements of Chapter 381, Florida Statutes. All of these violations directly affected Plaintiff McFatter and other inmates located C Dorm in the jail, as Plaintiff was directly exposed to mold, feces, urine, and extreme humidity without proper ventilation which exacerbated the growth of the mold. These actions by the Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

241.   Plaintiff McFatter had no access to clean clothes and bedding supplies for several weeks and began to get ill from either having no water to drink or drinking discolored water that was unsanitary. The failure to provide clean bedding violated MJS 8.2 and 12.9.

242.   While Plaintiff McFatter and other inmates in C Dorm were exposed to extreme temperatures without ventilation inside the Jail which was so extreme that paint started to come off the walls due to the condensation.

243.   Staff stopped doing security checks which made it like a jungle inside the dorm. Inmates were panicking. These actions by the Defendant violated MJS 1.45 1.47 2.8 A 1., 2.8 A 5. J. 11.18 11.20.

244.   Because of the conditions in the jail including without limitation the standing water with feces and urine, no food and water, the inmates including

Plaintiff became ill. Plaintiff and other inmates in C Dorm were locked in their cells for several days thereafter with extreme heat with mold starting to grow inside the cells.

245.   There was no ventilation inside the cells.

246.   The inmates in C Dorm including Plaintiff had no access to fresh water.

247.   When the inmates tried to clean the floors, they had no protective equipment like masks and gloves to do so.

248.   Staff within the jail stopped doing security checks and kept the inmates housed in their cells for days on end due to lack of staff and/or the fear of staff of becoming infected due to the bacterial and other unsanitary conditions inside the jail. These actions by Defendant violated MJS 1.45 1.47 2.8 A 1., 2.8 A 5. J. 11.18 11.20.

249.   Plaintiff McFatter and other inmates in C Dorm went several weeks before they could shower or bathe. When water coolers began to be brought into C Dorm in the jail, the water was discolored and had not been boiled, despite a boil-only notice issued by the Health Department in Bay County.

250.   And even though Plaintiff and other inmates in C Dorm began to have stomach problems, diarrhea, and other forms of illness, they had no access to medical care during at least the first two weeks after the Hurricane. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

251.   Plaintiff McFatter and other inmates C Dorm were all exposed to massive amounts of mold that had started to build inside their cells and common dorm areas. During the day, it was extremely hot and during the night, it was beginning to get cold and inmates like Plaintiff did not have appropriate clothing for the elements nor food. This violated MJS 8.2-4.

252.   Plaintiff began to have digestive issues including stomach cramping, nausea, and diarrhea caused either by moldy food or drinking unpotable water. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

253.   Plaintiff McFatter and other inmates in C Dorm personally suffered the conditions described above. Living in the conditions described above was horrific and extreme causing not only physical illnesses but emotional pain and suffering, fear, and extreme anxiety that Plaintiff McFatter personally suffered and saw other inmates suffering as well.

254.   Plaintiff McFatter was exposed to unsafe and horrible conditions including mold and being locked in a cell with no ventilation.

255.   He had no or unpotable water and no or little food. Plaintiff and others became ill because of these conditions and there may be long term effects caused by the exposure to mold.  Plaintiff McFatter suffered all of the conditions and violations

described in paragraphs 27-32, 34-39, 41-45, and 49-79 above including all violations set forth therein.

## ALLEGATIONS SPECIFIC TO NORMANDO BROWN

256.   Plaintiff Normando Brown was in the Bay County Jail at the time of Hurricane Michael and was incarcerated in the Jail from around October 5, 201,8 and remained in the jail until in or around February 2019.  He was in A Dorm within the Jail at the time of Hurricane Michael and for a time thereafter. He was subjected to the same conditions as Plaintiffs described above.

257.   Plaintiff Brown was denied potable water during the Hurricane and for several weeks thereafter. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

258.   During and after Hurricane Michael, Plaintiff lived in conditions in which there were feces on the floor of his cell and overflowing and flooding caused by the overflowing toilets. For approximately two or more weeks after the Hurricane, Plaintiff had to pass his feces on a food tray, empty sandwich bags, and/or trash bags, and pass it through a food flap on his cell door. After he suffered the seizure, Plaintiff was carried/pulled through the feces on the floor to get him out of his cell. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

259.   Inmates like Plaintiff in confinement did not have access to even the buckets of unpotable water and the only water that they received was passed through the same flap that their, including Plaintiff's, feces was passed through. There were no emergency lights that worked in confinement nor electricity and no ventilation. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

260.   After the Hurricane, there was standing water remaining on the floor of the Jail and extreme humidity causing condensation and mold where Plaintiff Brown was housed. There was condensation, and standing water containing feces and urine that Plaintiff had to walk through daily. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

261.   During the time that Plaintiff Brown was located in the jail during and after the Hurricane, he was subjected to sewage leaks and water infiltrating his cell. There was standing water in his cell that contained feces and urine creating a biohazardous condition for the inmates including Plaintiff. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

262.   Because of the fact that there was no clean water to bathe, Plaintiff and other inmates in A Dorm had to live in these unsanitary conditions that lasted for

Plaintiff until his release. This violated MJS 6.3 and other standards set forth herein including 8.5.

263.   Plaintiff Brown and other males in A Dorm did not have potable water. The water that they were given to drink was not boiled and was brown.

264.   The plumbing features including the toilets, sinks, water fountains and floor drains that Plaintiff Brown and other inmates in A Dorm were required to use did not work, resulting in standing water toilets backing up with excrement which went onto the floors and the inability to properly clean themselves. The failure of Defendant, which left Plaintiff Brown and other inmates in A Dorm in these conditions, resulted in Plaintiff and other inmates being subjected to unsanitary plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

265.   Plaintiff Brown and other inmates housed in A Dorm of Defendant's jail, also slept in filth largely caused by backed up plumbing and unsanitary liquid on the floors of their cells and no ability to bathe.

266.   Plaintiff Brown and other inmates housed in A Dorm within Defendant's jail had no air flowing in their cell for weeks, which resulted in mold. Defendant repeatedly tried to conceal the mold by painting over it rather than curing

the root problem of the mold, and the dangerous air quality resulting from the mold, which Plaintiff and other inmates had to breathe.

267.   As an additional health hazard for Plaintiff Brown, as a result of the feces and urine in the standing water on the floor of Plaintiff's cell and other common areas, Plaintiff and other inmates were exposed to HIV and other STDs because other inmates who had these illnesses defecated and urinated, which was on the floor of Plaintiff's and other inmates' cells. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

268.   Defendant violated MJS 12- Sanitation, specifically 12.1-12.16, which adversely affected and caused health hazards for Plaintiff Brown and other inmates in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

269.   Defendant violated MJS 16- Plumbing, specifically 16.9-16, which adversely affected and caused health hazards for Plaintiff Brown and other inmates in A Dorm in the jail, and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

270.   Defendant violated MJS 16.9 in that there were no water supplies available for Plaintiff Brown and other inmates in A Dorm that were adequate to serve the demands of the detention facility.

271.   In violation of MJS 16 and the Florida Administrative Code, Defendant's water supply was not of safe bacteriological and chemical quality. Drinking water was not accessible to all inmates including Plaintiff and other inmates in A Dorm.

272.   Showers were not available to inmates including Plaintiff. The plumbing in the jail did not comply with the requirements stated in Chapter 153, Florida Statutes.

273.   Hot and cold water was not available in convenient locations throughout the jail for the proper disposal of cleaning water and to facilitate cleaning. Floor drains were inoperable.

274.   Sewage and liquid waste were not disposed of into an approved sewerage system which met the requirements of Chapter 381, Florida Statutes. All of these violations directly affected Plaintiff Brown and other inmates located A Dorm in the jail, as Plaintiff was directly exposed to mold, feces, urine, and extreme humidity without proper ventilation, which exacerbated the growth of the mold. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11

275.   Plaintiff Brown had no access to clean clothes and bedding supplies for several weeks and began to get ill from either having no water to drink or drinking

discolored water that was unsanitary. The failure to provide clean bedding violated MJS 8.2 and 12.9.

276.   Plaintiff Brown and other inmates in A Dorm were exposed to extreme temperatures without ventilation inside the jail which was so extreme that paint started to come off the walls due to the condensation.

277.   Staff stopped doing security checks which made it like a jungle inside the dorm. Inmates were panicking. These actions by Defendant violated MJS 1.45 1.47 2.8 A 1., 2.8 A 5. J. 11.18 11.20

278.   Because of the conditions in the jail including without limitation the standing water with feces and urine, and no food and water, the inmates including Plaintiff became ill.

279.   Plaintiff and other inmates in A Dorm were locked in their cells for several days thereafter with extreme heat with mold starting to grow inside the cells.

280.   There was no ventilation inside the cells.

281.   The inmates in A Dorm including Plaintiff had no access to fresh water.

282.   When the inmates tried to clean the floors, they had no protective equipment like masks and gloves to do so.

283.   Staff within the jail stopped doing security checks and kept the inmates housed in their cells for days on end due to lack of staff and/or the fear of staff of becoming infected due to the bacterial and other unsanitary conditions inside the jail.

These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

284.   Plaintiff Brown and other inmates in A Dorm went several weeks before they could shower or bathe.

285.   When water coolers began to be brought into A Dorm in the jail, the water was discolored and had not been boiled, despite a boil-only notice issued by the Health Department in Bay County. Plaintiff and other inmates in A Dorm began to have stomach problems, diarrhea, and other forms of illness, yet they had no access to medical care during at least the first two weeks after the Hurricane. These actions by the Defendant violated MJS 7.9 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

286.   Plaintiff Brown and other inmates A Dorm were all exposed to massive amounts of mold that had started to build inside their cells and common dorm areas. During the day, it was extremely hot and during the night, it was beginning to get cold, and inmates like Plaintiff did not have appropriate clothing for the elements nor food. This violated MJS 8.2-4. Plaintiff began to have digestive issues including stomach cramping, nausea, and diarrhea caused either by moldy food or drinking unpotable water. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

287.   Plaintiff Brown and other inmates in A Dorm personally suffered the conditions described above. Living in the conditions described above was horrific and extreme causing not only physical illnesses but emotional pain and suffering, fear, and extreme anxiety that Plaintiff personally suffered and saw other inmates suffering as well.

288.   Plaintiff Brown was exposed to unsafe and horrible conditions including mold and being locked in a cell with no ventilation.

289.   He had no or unpotable water and no or little food. Plaintiff and others became ill because of these conditions and there may be long term effects caused by the exposure to mold.  Plaintiff suffered all of the conditions and violations described in paragraphs 27-32, 34-39, 41-45, and 49-79 above including all violations set forth therein.

## ALLEGATIONS SPECIFIC TO CONRAD FORRENCE

290.   Plaintiff Conrad Forrence was in the Bay County Jail at the time of Hurricane Michael and was released on or around October 26, 2018. Plaintiff Forrence was in A Dorm at the time of the Hurricane and thereafter.  In A Dorm, he was subjected to the same conditions as Plaintiffs Tripp, Tidwell, and Murrero-Delgado as described above.

291.   Plaintiff Forrence was denied potable water during the Hurricane and for several weeks thereafter. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

292.   After the Hurricane, there was standing water remaining on the floor of the jail and extreme humidity causing condensation where Plaintiff Forrence was housed. There was condensation, standing water containing feces and urine that Plaintiff had to walk through daily. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

293.   During the time that Plaintiff Forrence was located in the jail during and after the Hurricane, he was subjected to sewage leaks and water infiltrating his cell. There was standing water in his cell that contained feces and urine creating a biohazardous condition for the inmates including Plaintiff. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

294.   Because of the fact that there was no clean water to bathe, Plaintiff and other inmates in A Dorm had to live in these unsanitary conditions that lasted for Plaintiff until his release. This violated MJS 6.3 and other standards set forth herein including 8.5.

295.   Plaintiff Forrence and other males in A Dorm did not have potable water. The water that they were given to drink was not boiled and was brown.

296.   The plumbing features including the toilets, sinks, water fountains and floor drains that Plaintiff Forrence and other males in A Dorm were required to use did not work resulting in standing water toilets backing up with excrement which went onto the floors and the inability to properly clean themselves. The failure of Defendant and leaving Plaintiff Forrence and other inmates in A Dorm in these conditions resulted in Plaintiff and other inmates being subjected to unsanitary plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

297.   Plaintiff Forrence and other inmates housed in A-Dorm of Defendant's Jail, also slept in filth largely caused by backed up plumbing and unsanitary liquid on the floors of their cells and no ability to bathe. These actions by Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

298.   Plaintiff Forrence and other inmates housed in A Dorm within Defendant's jail had no air flowing in his cell for weeks which resulted in mold. Defendant repeatedly tried to conceal the mold by painting over it rather than curing the root problem of the mold, and the dangerous air quality resulting from the mold which Plaintiff and other inmates had to breathe. These actions by Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

299.   As an additional health hazard for Plaintiff Forrence, as a result of the feces and urine in the standing water on the floor of Plaintiff's cell and other common areas, Plaintiff and other inmates were exposed to HIV and other STDs because of other inmates who had these illnesses had defecated and urinated which was on the floor of Plaintiff and other inmates' cells.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11

300.   Defendant violated MJS 12- Sanitation, specifically 12.1-12.16, which adversely affected and caused health hazards for Plaintiff Forrence and other inmates in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

301.   Defendant violated MJS 16- Plumbing, specifically 16.9-16, which adversely affected and caused health hazards for Plaintiff Forrence and other inmates in A Dorm in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

302.   Defendant violated MJS 16.9 in that there were no water supplies available for Plaintiff Forrence and other inmates in A Dorm that were adequate to serve the demands of the detention facility.

303.   In violation of MJS 16 and the Florida Administrative Code, the Defendant's water supply was not of safe bacteriological and chemical quality. Drinking water was not accessible to all inmates including Plaintiff and other inmates in A Dorm.

304.   Showers were not available to inmates including Plaintiff.

305.   The plumbing in the Jail did not comply with the requirements stated in Chapter 153, Florida Statutes.

306.   Hot and cold water was not available in convenient locations throughout the Jail for the proper disposal of cleaning water and to facilitate cleaning.

307.   Floor drains were inoperable.   Sewage and liquid waste were not disposed of into an approved sewerage system which met the requirements of Chapter 381, Florida Statutes.

308.   All of these violations directly affected Plaintiff Forrence and other inmates located A Dorm in the Bay County Jail as Plaintiff was directly exposed to mold, feces, urine, and extreme humidity without proper ventilation which

exacerbated the growth of the mold.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

309.   Plaintiff Forrence had no access to clean clothes and bedding supplies for several weeks and began to get ill from either having no water to drink or drinking discolored water that was unsanitary.  The failure to provide clean bedding violated MJS 8.2 and 12.9.

310.   While Plaintiff Forrence and other inmates in A Dorm were exposed to extreme temperatures without ventilation inside the Jail which was so extreme that pain started to come off the walls due to the condensation. The windows in the Jail were so fogged up so that staff from outside could not see into the dorms.

311.   Staff stopped doing security checks which made it like a jungle inside the dorm. Inmates were panicking and staff could be over heard talking about dead people on the streets. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

312.   Defendant also failed to have all inmates examined for contamination, including Plaintiff, and he and other inmates in A Dorm were locked in their cells for several days thereafter with extreme heat with mold starting to grow inside the cells.

313.   The cells in A Dorm had no feet flaps so the inmates in those cells had no air flow or ventilation inside the cells.

67

314.   The inmates in A Dorm including Plaintiff had no access to fresh water.

315.   When the inmates tried to clean the floors, they had no protective equipment like masks and gloves to do so.

316.   Staff within the Jail stopped doing security checks and kept the inmates housed in their cells for days on end due to lack of staff and/or the fear of staff of becoming infected due to the bacterial and other unsanitary conditions inside the Jail. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

317.   Plaintiff Forrence and other inmates in A Dorm went several weeks before they could shower or bathe.

318.   Water coolers began to be brought into A Dorm in the Jail within the first week after Hurricane Michael hit but the water was discolored and had not been boiled, notwithstanding a boil only notice issued by the Health Department in Bay County.

319.   And even though Plaintiff and other inmates in A Dorm began to have stomach problems, diarrhea, and other forms of illness, they had no access to medical care during at least the first two weeks after the Hurricane.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

320.   Plaintiff Forrence and other inmates A Dorm were all exposed to massive amounts of mold that had started to build inside their cells and common dorm areas. During the day, it was extremely hot and during the night, it was beginning to get cold and inmates like Plaintiff did not have appropriate clothing for the elements nor food.  This violated MJS 8.2-4.  Plaintiff began to have digestive issues including stomach cramping, nausea, and diarrhea caused either by moldy food or drinking unpotable water. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

321.   Plaintiff Forrence and other inmates in A Dorm personally suffered the conditions described above.  Living in the conditions described above was horrific and extreme causing not only physical illnesses but emotional pain and suffering, fear, and extreme anxiety that Plaintiff Forrence personally suffered and saw other inmates suffering as well.

322.   Plaintiff Forrence was exposed to unsafe and horrible conditions including mold and being locked in a cell with no ventilation.

323.   He also had at least a week or longer exposure to chemical agents without decontamination.

324.   He had no or unpotable water and no or little food. The first meal that Plaintiff was given were frozen waffles that were still frozen.   Plaintiff and others became ill because of these conditions and there may be long term effects caused by

69

the exposure to mold. Plaintiff and other inmates in A Dorm suffered all of the conditions and violations described in paragraphs 27-32, 34-39, and 42-79 above and Plaintiff was harmed as a result thereof.

## ALLEGATIONS SPECIFIC TO PAULA COOPER

325.  Plaintiff Paula Cooper was in the Bay County Jail at the time of Hurricane Michael and was incarcerated in the Jail at the time of the Hurricane until around released around October 18, 2018. Plaintiff Cooper was located in the same dorm, E Dorm, as Plaintiffs Tripp and Tidwell and was subjected to the same conditions as they were. Plaintiff Cooper was denied potable water during the Hurricane until her release.

326.  After the Hurricane, there was standing water remaining on the floor of the Jail and extreme humidity causing condensation where Plaintiff Cooper was housed. There was condensation, standing water containing feces and urine, and rain from hole left after the AC unit that was ripped off the roof during the Hurricane, after which no tarp or other covering was used to prevent the elements from intruding into the Jail.

327.  During the time that Plaintiff Cooper was located in the Jail, she was subjected to sewage leaks and water infiltrating her cell. There was standing water in her cell that contained feces, used sanitary pads and urine on the floors creating a biohazardous condition for the inmates including Plaintiff.

328.   Because of the fact that there was no clean water to bathe, Plaintiff and other females had to live in these unsanitary conditions that lasted for Plaintiff until her release.  This violated MJS 6.3 and other standards set forth herein including 8.5.

329.   Plaintiff Cooper and other females did not have potable water. The water that they were given to drink was not boiled and was brown.

330.   The plumbing features including the toilets, sinks, water fountains and floor drains that Plaintiff Cooper and other females were required to use did not work resulting in standing water toilets backing up with excrement which went onto the floors and the inability to properly clean themselves.

331.   The failure of the Defendant and leaving Plaintiff Cooper and other females in these conditions resulted in Plaintiff and other females being subjected to unsanitary plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

332.   Plaintiff Cooper and other females housed in her area of the Defendant's Jail, also slept in filth largely caused by backed up plumbing and unsanitary liquid on the floors of their cells and no ability to bathe.

333.   Plaintiff Cooper and other females housed in her area of the Defendant's Jail had no air flowing in her cells which resulted in mold, that Defendant repeatedly tried to conceal by painting over the mold rather than curing

the root problem of the mold, and dangerous air quality. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

334.    As an additional health hazard for Plaintiff Cooper, as a result of the feces, sanitary pads, and urine in the standing water on the floor of Plaintiff's cell and other common areas, Plaintiff Cooper and other inmates were exposed to HIV and other STD's because of other females who had these illnesses had defecated, urinated and used sanitary pads that were not disposed of properly to the Defendant.

335.    Defendant violated MJS 12- Sanitation, specifically 12.1-12.16, which adversely affected and caused health hazards for Plaintiff Cooper and other females in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

336.    Defendant violated MJS 16-Plumbing, specifically 16.9-16, which adversely affected and caused health hazards for Plaintiff Cooper and other females in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

337.    Defendant violated MJS 16.9 in that there were no water supplies available for Plaintiff Cooper and other female inmates that were adequate to serve

the demands of the detention facility.  In violation of MJS 16 and the Florida Administrative Code, the Defendant's water supply was not of safe bacteriological and chemical quality.

338.    Drinking water was not accessible to all inmates including Plaintiff and other female inmates.

339.    Showers were not available to inmates including Plaintiff.

340.    The plumbing in the Jail did not comply with the requirements stated in Chapter 153, Florida Statutes.

341.    Hot and cold water was not available in convenient locations throughout the Jail for the proper disposal of cleaning water and to facilitate cleaning.

342.    Floor drains were inoperable.

343.    Sewage and liquid waste were not disposed of into an approved sewerage system which met the requirements of Chapter 381, Florida Statutes.

344.    All of these violations directly affected Plaintiff Cooper and other females located in the Bay County Jail as Plaintiff was directly exposed to mold, feces, urine, used sanitary pads and extreme humidity without proper ventilation which exacerbated the growth of the mold.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

345.    Plaintiff Cooper had no access to clean clothes and bedding supplies for several weeks and began to get ill from either having no water to drink or drinking discolored water that was unsanitary.  The failure to provide clean bedding violated MJS 8.2 and 12.9.

346.    While Plaintiff Cooper and other females were exposed to extreme temperatures without ventilation inside the Jail which was so extreme that pain started to come off the walls due to the condensation.  The windows in the Jail were so fogged up so that staff from outside could not see into the dorms.

347.    Staff stopped doing security checks which made it like a jungle inside the dorm. Inmates were panicking and staff could be over heard talking about dead people on the streets.

348.    Plaintiff Cooper and other female inmates were all exposed to massive amounts of mold that had started to build inside the female dorm. During the day, it was extremely hot and during the night, it was beginning to get cold and inmates like Plaintiff did not have appropriate clothing for the elements nor food. This violated MJS 8.2-4.

349.    Plaintiff began to get sinus infections, colds and began to have digestive issues including stomach cramping, nausea, and diarrhea caused either by moldy food or drinking unpotable water.

350.    Plaintiff Cooper and other females in E Dorm personal suffered the conditions and violations described above except as set forth in paragraphs except as set forth in paragraphs 39, 41, and 46-48.

351.    Living in the conditions described above regarding Plaintiff Cooper and in all paragraphs above other than paragraphs except as set forth in paragraphs 39, 41, and 46-48 was horrific and extreme causing not only physical illnesses but emotional pain and suffering, fear, and extreme anxiety.   These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

352.    There was also overcrowding in the female Dorm which contributed to or caused Plaintiff Cooper's anxiety, depressing fear, physical illnesses and emotional pain and suffering.   These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

**ALLEGATIONS SPECIFIC TO CAMERON WILSON**

353.    Plaintiff Cameron Wilson was in the Bay County Jail at the time of Hurricane Michael and was released on or around October 18, 2018.   Plaintiff Wilson was in G Dorm at the time of the Hurricane and thereafter.   In G Dorm, he was subjected to the same conditions as Plaintiffs described above.   Plaintiff Wilson was denied potable water during the Hurricane and for several weeks thereafter.

These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

354.    After the Hurricane, there was standing water remaining on the floor of the Jail and extreme humidity causing condensation where Plaintiff Wilson was housed.  There was condensation, standing water containing feces and urine that Plaintiff had to walk through daily. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

355.    During the time that Plaintiff Wilson was located in the Jail during and after the Hurricane, he was subjected to sewage leaks and water infiltrating his cell. There was standing water in his cell that contained feces and urine creating a biohazardous condition for the inmates including Plaintiff. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

356.    Because of the fact that there was no clean water to bathe, Plaintiff and other inmates in G Dorm had to live in these unsanitary conditions that lasted for Plaintiff until his release.  This violated MJS 6.3 and other standards set forth herein including 8.5.

357.    Plaintiff Wilson and other males in G Dorm did not have potable water. The water that they were given to drink was not boiled and was brown.

358.   The plumbing features including the toilets, sinks, water fountains and floor drains that Plaintiff Wilson and other males in G Dorm were required to use did not work resulting in standing water toilets backing up with excrement which went onto the floors and the inability to properly clean themselves.

359.   The failure of the Defendant and leaving Plaintiff Wilson and other inmates in G Dorm in these conditions resulted in Plaintiff and other inmates being subjected to unsanitary plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

360.   Plaintiff Wilson and other inmates housed in G-Dorm of the Defendant's Jail, also slept in filth largely caused by backed up plumbing and unsanitary liquid on the floors of their cells and no ability to bathe. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

361.   Plaintiff Wilson and other inmates housed in G Dorm within Defendant's Jail had no air flowing in his cell for weeks which resulted in mold. Defendant repeatedly tried to conceal the mold by painting over the it rather than curing the root problem of the mold, and the dangerous air quality resulting from the mold which Plaintiff and other inmates had to breathe. These actions by the

Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

362.   As an additional health hazard for Plaintiff Wilson, as a result of the feces and urine in the standing water on the floor of Plaintiff's cell and other common areas, Plaintiff and other inmates were exposed to HIV and other STD's because of other inmates who had these illnesses had defecated and urinated which was on the floor of Plaintiff and other inmates' cells.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

363.   Defendant violated MJS 12- Sanitation, specifically 12.1-12.16, which adversely affected and caused health hazards for Plaintiff Wilson and other inmates in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

364.   Defendant violated MJS 16- Plumbing, specifically 16.9-16, which adversely affected and caused health hazards for Plaintiff Wilson and other inmates in G Dorm in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

365.   Defendant violated MJS 16.9 in that there were no water supplies available for Plaintiff Wilson and other inmates in G Dorm that were adequate to serve the demands of the detention facility.  In violation of MJS 16 and the Florida

Administrative Code, the Defendant's water supply was not of safe bacteriological and chemical quality.

366.    Drinking water was not accessible to all inmates including Plaintiff and other inmates in G Dorm.

367.    Showers were not available to inmates including Plaintiff.

368.    The plumbing in the Jail did not comply with the requirements stated in Chapter 153, Florida Statutes. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

369.    Hot and cold water was not available in convenient locations throughout the Jail for the proper disposal of cleaning water and to facilitate cleaning.

370.    Floor drains were inoperable.

371.    Sewage and liquid waste were not disposed of into an approved sewerage system which met the requirements of Chapter 381, Florida Statutes.

372.    All of these violations directly affected Plaintiff Wilson and other inmates located G Dorm in the Bay County Jail as Plaintiff was directly exposed to mold, feces, urine, and extreme humidity without proper ventilation which exacerbated the growth of the mold.   These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

373.    Plaintiff Wilson had no access to clean clothes and bedding supplies for several weeks and began to get ill from either having no water to drink or drinking discolored water that was unsanitary.  The failure to provide clean bedding violated MJS 8.2 and 12.9.

374.     While Plaintiff Wilson and other inmates in G Dorm were exposed to extreme temperatures without ventilation inside the Jail which was so extreme that pain started to come off the walls due to the condensation.  The windows in the Jail were so fogged up so that staff from outside could not see into the dorms.

375.    Staff stopped doing security checks which made it like a jungle inside the dorm. Inmates were panicking and staff could be over heard talking about dead people on the streets.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

376.    Defendant also failed to have all inmates examined for contamination, including Plaintiff, and he and other inmates in G Dorm were locked in their cells for several days thereafter with extreme heat with mold starting to grow inside the cells.

377.    The cells in G Dorm had no feet flaps so the inmates in those cells had no air flow or ventilation inside the cells.

378.    The inmates in G Dorm including Plaintiff had no access to fresh water.

379.   When the inmates tried to clean the floors, they had no protective equipment like masks and gloves to do so.

380.   Staff within the Jail stopped doing security checks and kept the inmates housed in their cells for days on end due to lack of staff and/or the fear of staff of becoming infected due to the bacterial and other unsanitary conditions inside the Jail. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

381.   Plaintiff Wilson and other inmates in G Dorm went several weeks before they could shower or bathe.

382.   Water coolers began to be brought into G Dorm in the Jail within the first week after Hurricane Michael hit but the water was discolored and had not been boiled, notwithstanding a boil only notice issued by the Health Department in Bay County.

383.   And even though Plaintiff and other inmates in G Dorm began to have stomach problems, diarrhea, and other forms of illness, they had no access to medical care during at least the first two weeks after the Hurricane.   These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

384.   Plaintiff Wilson and other inmates G Dorm were all exposed to massive amounts of mold that had started to build inside their cells and common dorm areas.

During the day, it was extremely hot and during the night, it was beginning to get cold and inmates like Plaintiff did not have appropriate clothing for the elements nor food.  This violated MJS 8.2-4.  Plaintiff began to have digestive issues including stomach cramping, nausea, and diarrhea caused either by moldy food or drinking unpotable water.   These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

385.   Plaintiff Wilson and other inmates in G Dorm personally suffered the conditions described above. Living in the conditions described above was horrific and extreme causing not only physical illnesses but emotional pain and suffering, fear, and extreme anxiety that Plaintiff Wilson personally suffered and saw other inmates suffering as well.

386.   Plaintiff Wilson was exposed to unsafe and horrible conditions including mold and being locked in a cell with no ventilation.

387.   He had no or unpotable water and no or little food.

388.   Plaintiff and others became ill because of these conditions and there may be long term effects caused by the exposure to mold.  Plaintiff and other inmates in G Dorm suffered all of the conditions and violations described in paragraphs 27-32, 34-39, 42-45, and 49-79 above and Plaintiff was harmed as a result thereof including suffering from PTSD.

## ALLEGATIONS SPECIFIC TO AMBER AHNE

389.    Plaintiff Amber Ahne was in the Bay County Jail at the time of Hurricane Michael and was incarcerated in the Jail at the time of the Hurricane until around released around October 18, 2018.  Plaintiff Ahne was located in the same dorm, E Dorm, as Plaintiffs Tripp, Cooper and Tidwell and was subjected to the same conditions as they were.  Plaintiff Ahne was denied potable water during the Hurricane until her release.

390.    After the Hurricane, there was standing water remaining on the floor of the Jail and extreme humidity causing condensation where Plaintiff Ahne was housed.  There was condensation, standing water containing feces and urine, and rain from hole left after the AC unit that was ripped off the roof during the Hurricane, after which no tarp or other covering was used to prevent the elements from intruding into the Jail.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

391.    During the time that Plaintiff Ahne was located in the Jail, she was subjected to sewage leaks and water infiltrating her cell.  There was standing water in her cell that contained feces, used sanitary pads and urine on the floors creating a biohazardous condition for the inmates including Plaintiff. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

392.   Because of the fact that there was no clean water to bathe, Plaintiff and other females had to live in these unsanitary conditions that lasted for Plaintiff until her release.  This violated MJS 6.3 and other standards set forth herein including 8.5.

393.   Plaintiff Ahne and other females did not have potable water.  The water that they were given to drink was not boiled and was brown.

394.   The plumbing features including the toilets, sinks, water fountains and floor drains that Plaintiff Ahne and other females were required to use did not work resulting in standing water toilets backing up with excrement which went onto the floors and the inability to properly clean themselves.

395.   The failure of the Defendant and leaving Plaintiff Ahne and other females in these conditions resulted in Plaintiff and other females being subjected to unsanitary plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

396.   Plaintiff Ahne and other females housed in her area of the Defendant's Jail, also slept in filth largely caused by backed up plumbing and unsanitary liquid on the floors of their cells and no ability to bathe.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

397.   Plaintiff Ahne and other females housed in her area of the Defendant's Jail had no air flowing in her cells which resulted in mold, that Defendant repeatedly

tried to conceal by painting over the mold rather than curing the root problem of the mold, and dangerous air quality. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

398.   As an additional health hazard for Plaintiff Ahne, as a result of the feces, sanitary pads, and urine in the standing water on the floor of Plaintiff's cell and other common areas, Plaintiff Ahne and other inmates were exposed to HIV and other STD's because of other females who had these illnesses had defecated, urinated and used sanitary pads that were not disposed of properly to the Defendant.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

399.   Defendant violated MJS 12- Sanitation, specifically 12.1-12.16, which adversely affected and caused health hazards for Plaintiff Ahne and other females in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

400.   Defendant violated MJS 16- Plumbing, specifically 16.9-16, which adversely affected and caused health hazards for Plaintiff Ahne and other females in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

401.    Defendant violated MJS 16.9 in that there were no water supplies available for Plaintiff Ahne and other female inmates that were adequate to serve the demands of the detention facility.

402.    In violation of MJS 16 and the Florida Administrative Code, the Defendant's water supply was not of safe bacteriological and chemical quality. Drinking water was not accessible to all inmates including Plaintiff and other female inmates.

403.    Showers were not available to inmates including Plaintiff.

404.    The plumbing in the Jail did not comply with the requirements stated in Chapter 153, Florida Statutes.

405.    Hot and cold water was not available in convenient locations throughout the Jail for the proper disposal of cleaning water and to facilitate cleaning.

406.    Floor drains were inoperable.

407.    Sewage and liquid waste were not disposed of into an approved sewerage system which met the requirements of Chapter 381, Florida Statutes.  All of these violations directly affected Plaintiff Ahne and other females located in the Bay County Jail as Plaintiff was directly exposed to mold, feces, urine, used sanitary pads and extreme humidity without proper ventilation which exacerbated the growth

of the mold. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

408.   Plaintiff Ahne had no access to clean clothes and bedding supplies for several weeks and began to get ill from either having no water to drink or drinking discolored water that was unsanitary.  The failure to provide clean bedding violated MJS 8.2 and 12.9.

409.   While Plaintiff Ahne and other females were exposed to extreme temperatures without ventilation inside the Jail which was so extreme that pain started to come off the walls due to the condensation.  The windows in the Jail were so fogged up so that staff from outside could not see into the dorms.

410.   Staff stopped doing security checks which made it like a jungle inside the dorm. Inmates were panicking and staff could be over heard talking about dead people on the streets. These actions by the Defendant violated MJS 1.45 1.47 2.8 A 1., 2.8 A 5. J. 11.18 11.20.

411.   Plaintiff Ahne and other female inmates were all exposed to massive amounts of mold that had started to build inside the female dorm. During the day, it was extremely hot and during the night, it was beginning to get cold and inmates like Plaintiff did not have appropriate clothing for the elements nor food.  This violated MJS 8.2-4.

412.    Plaintiff began to get sinus infections, colds and began to have digestive issues including stomach cramping, nausea, and diarrhea caused either by moldy food or drinking unpotable water. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

413.    Plaintiff Ahne and other females in E Dorm personal suffered the conditions and violations described above except as set forth in paragraphs 39, 41, and 46-48.  Living in the conditions described above regarding Plaintiff Ahne and in all paragraphs above other than paragraphs 39, 41 and 46-48 was horrific and extreme causing not only physical illnesses but emotional pain and suffering, fear, and extreme anxiety.

414.    There was also overcrowding in the female Dorm which contributed to or caused Plaintiff Ahne's anxiety, depressing fear, physical illnesses and emotional pain and suffering.

**ALLEGATIONS SPECIFIC TO JOSHUA FOSTER**

415.    Plaintiff Joshua Foster was in the Bay County Jail at the time of Hurricane Michael and was released on or around July, 2019.  Plaintiff Foster was in G Dorm at the time of the Hurricane and thereafter.  In D Dorm, he was subjected to the same conditions as Plaintiffs described above.

416.   Plaintiff Foster was denied potable water during the Hurricane and for several weeks thereafter.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

417.   After the Hurricane, there was standing water remaining on the floor of the Jail and extreme humidity causing condensation where Plaintiff Foster was housed.  There was condensation, standing water containing feces and urine that Plaintiff had to walk through daily.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

418.   Foster was an orderly that was in charge of getting all the water for the coolers that went to all the dorms from the maintenance spicket to inside the Jail and he also painting over mold at the direction of the Jail staff.

419.   Major Anglin together with Mark Bailey and Frank Owens, both supervisors under Anglin, coerced Foster into making a statement favorable to the Jail regarding the treatment of inmates during Hurricane Michael and had him give a statement about the conditions without his attorney being present.

420.   The inmates in D-3, where Foster was located, were housed for 52 days until the Health Department or a mold company sent in an agent that said the smell was so bad that inmates would have to be moved out. This caused the Jail to go to the courts and get emergency relief for several inmates. Foster's statement was made

under duress. Assistance, meaning a reduction of the charges or some other favor, was offered by Jail staff if Foster played "ball."

421.    During the time that Plaintiff Foster was located in the Jail during and after the Hurricane, he was subjected to sewage leaks and water infiltrating his cell. There was standing water in his cell that contained feces and urine creating a biohazardous condition for the inmates including Plaintiff. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

422.    Because of the fact that there was no clean water to bathe, Plaintiff and other inmates in D Dorm had to live in these unsanitary conditions that lasted for Plaintiff until his release. This violated MJS 6.3 and other standards set forth herein including 8.5.

423.    Plaintiff Foster and other males in D Dorm did not have potable water. The water that they were given to drink was not boiled and was brown.

424.    The plumbing features including the toilets, sinks, water fountains and floor drains that Plaintiff Foster and other males in D Dorm were required to use did not work resulting in standing water toilets backing up with excrement which went onto the floors and the inability to properly clean themselves.  The failure of the Defendant and leaving Plaintiff Foster and other inmates in D Dorm in these conditions resulted in Plaintiff and other inmates being subjected to unsanitary

plumbing fixtures, floors, sinks, toilets, water fountains, and floor drains. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

425.   Plaintiff Foster and other inmates housed in D Dorm of the Defendant's Jail, also slept in filth largely caused by backed up plumbing and unsanitary liquid on the floors of their cells and no ability to bathe.  These actions by the Defendant violated MJS 5.10 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

426.   Plaintiff Foster and other inmates housed in D Dorm within Defendant's Jail had no air flowing in his cell for weeks which resulted in mold. Defendant repeatedly tried to conceal the mold by painting over the it rather than curing the root problem of the mold, and the dangerous air quality resulting from the mold which Plaintiff and other inmates had to breathe. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

427.   As an additional health hazard for Plaintiff Foster, as a result of the feces and urine in the standing water on the floor of Plaintiff's cell and other common areas, Plaintiff and other inmates were exposed to HIV and other STD's because of other inmates who had these illnesses had defecated and urinated which was on the floor of Plaintiff and other inmates' cells.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

428.   Defendant violated MJS 12- Sanitation, specifically 12.1-12.16, which adversely affected and caused health hazards for Plaintiff Foster and other inmates in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.

429.   Defendant violated MJS 16- Plumbing, specifically 16.9-16, which adversely affected and caused health hazards for Plaintiff Foster and other inmates in D Dorm in the Bay County Jail and there were insufficient staff to perform the checks required under MJS 12 to protect the inmates including Plaintiff.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

430.    Defendant violated MJS 16.9 in that there were no water supplies available for Plaintiff Foster and other inmates in D Dorm that were adequate to serve the demands of the detention facility.

431.   In violation of MJS 16 and the Florida Administrative Code, the Defendant's water supply was not of safe bacteriological and chemical quality. Drinking water was not accessible to all inmates including Plaintiff and other inmates in D Dorm.

432.   Showers were not available to inmates including Plaintiff.

433.   The plumbing in the Jail did not comply with the requirements stated in Chapter 153, Florida Statutes.

434.   Hot and cold water was not available in convenient locations throughout the Jail for the proper disposal of cleaning water and to facilitate cleaning.

435.   Floor drains were inoperable.

436.   Sewage and liquid waste were not disposed of into an approved sewerage system which met the requirements of Chapter 381, Florida Statutes.

437.   All of these violations directly affected Plaintiff Foster and other inmates located D Dorm in the Bay County Jail as Plaintiff was directly exposed to mold, feces, urine, and extreme humidity without proper ventilation which exacerbated the growth of the mold. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

438.   Plaintiff Foster had no access to clean clothes and bedding supplies for several weeks and began to get ill from either having no water to drink or drinking discolored water that was unsanitary.  The failure to provide clean bedding violated MJS 8.2 and 12.9.

439.   While Plaintiff Foster and other inmates in D Dorm were exposed to extreme temperatures without ventilation inside the Jail which was so extreme that pain started to come off the walls due to the condensation.  The windows in the Jail were so fogged up so that staff from outside could not see into the dorms.

440.   Staff stopped doing security checks which made it like a jungle inside the dorm. Inmates were panicking and staff could be over heard talking about dead people on the streets.

441.   Plaintiff and other inmates in D Dorm were locked in their cells for several days thereafter with extreme heat with mold starting to grow inside the cells.

442.   The inmates in D Dorm including Plaintiff had no access to fresh water.

443.   When the inmates tried to clean the floors, they had no protective equipment like masks and gloves to do so.

444.   Staff within the Jail stopped doing security checks and kept the inmates housed in their cells for days on end due to lack of staff and/or the fear of staff of becoming infected due to the bacterial and other unsanitary conditions inside the Jail. These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

445.   Plaintiff Foster and other inmates in D Dorm went several weeks before they could shower or bathe.  Water coolers began to be brought into D Dorm in the Jail within the first week after Hurricane Michael hit but the water was discolored and had not been boiled, notwithstanding a boil only notice issued by the Health Department in Bay County.

446.   And even though Plaintiff and other inmates in D Dorm began to have stomach problems, diarrhea, and other forms of illness, they had no access to medical

care during at least the first two weeks after the Hurricane.  These actions by the Defendant violated MJS 12.1 12.2 12.3 12.4 12.5 12.8 12.9 16.3 16.4 16.9 16.10 16.11.

447.    Plaintiff Foster and other inmates D Dorm were all exposed to massive amounts of mold that had started to build inside their cells and common dorm areas. During the day, it was extremely hot and during the night, it was beginning to get cold and inmates like Plaintiff did not have appropriate clothing for the elements nor food.  This violated MJS 8.2-4.

448.    Plaintiff began to have digestive issues including stomach cramping, nausea, and diarrhea caused either by moldy food or drinking unpotable water.

449.    Plaintiff Foster and other inmates in D Dorm personally suffered the conditions described above. Living in the conditions described above was horrific and extreme causing not only physical illnesses but emotional pain and suffering, fear, and extreme anxiety that Plaintiff Foster personally suffered and saw other inmates suffering as well.

450.    Plaintiff Foster was exposed to unsafe and horrible conditions including mold and being locked in a cell with no ventilation. He had no or unpotable water and no or little food. Plaintiff and others became ill because of these conditions and there may be long term effects caused by the exposure to mold.

451.   Plaintiff and other inmates in D Dorm suffered all of the conditions and violations described in paragraphs 27-32, 34-39, 42-45, and 49-79 above and Plaintiff was harmed as a result thereof including suffering from PTSD.

**Class Action Allegations**

1.   Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs 1 through 451.

2.   Plaintiffs seek class certification under subsection (b)(2) or, alternatively, (b)(3) of Rule 1.220 against the Defendant.

3.   Commonality: Questions of law and fact are common to all members of the class. Specifically, the Plaintiffs' claims arise from the same events or practices or course of conduct by the Defendant which gives rise to the claims of the putative class, and their claims are based upon the same legal theories as those of the putative class. The overarching common issue is whether the Defendant breached his duty of reasonable care to the Plaintiffs and the class.  The common questions of law and fact at issue include, among others:

a.   What is the appropriate standard of care by which the Defendant's conduct should be measured;

b.   Whether the Defendant's failure to maintain adequate alternative electrical power was a breach of his duty of reasonable care;

c.    Whether the Defendant's failure to maintain an adequate water supply was a breach of his duty of reasonable care;

d.    Whether the Defendant's failure to maintain adequate sanitation and alternative sewage was a breach of his duty of reasonable care;

e.    Whether the conditions described herein that Defendant permitted at the jail constitute a violation of Plaintiffs' clearly established constitutional rights under the Fourteenth Amendment to be free from conditions that amount to cruel and usual punishment;

f.    Whether the Defendant's maintenance of the conditions described herein constitute deliberate indifference to the constitutional rights of Plaintiffs;

g.    Whether the Defendant engaged in constitutionally inadequate training and supervision which were the moving forces behind and proximately caused the violations of Plaintiffs' constitutional rights;

The answers to these common questions of law and fact are subject to common legal theories and generalized proof.

4.    Typicality: Plaintiffs' claims are typical of the claims of the class inasmuch as they arise from the same course of conduct as the claims of the putative class; that is, the Defendant's breach of its duty of reasonable care to inmates to protect them from injury and harm.

5.     Numerosity and Class Definition: it is estimated there are approximately 900 to 1100 individuals in the putative class.  Therefore, the putative class is so numerous that separate joinder of each member is impracticable. The proposed class consists of: All inmates in the supervision, care and custody of the Defendant and held at the Bay County Jail on and after October 10, 2018;

6.     Adequacy of Representation: Plaintiffs will fairly and adequately protect and represent the interests of each member of the class in that they have interests in common with the class, have no conflicts with the class, understand their responsibilities as class representatives, and have retained counsel experienced in the prosecution of complex class action litigation. The Plaintiffs are members of the class they seek to represent.

7.     The Defendant has acted on grounds generally applicable to all the members of the class, to wit: his breach of the reasonable duty of care adversely affected in a general manner the class, thereby making appropriate final declaratory relief in the form of a finding of liability on the issue of negligence respecting the class as a whole. Accordingly, this action is maintainable under subsection (b)(2) of Rule 1.220.

8.     Alternatively, Defendant's breach of his duty of reasonable care raises questions of law and fact common to the Plaintiffs and the class. These questions,

stated above, predominate over questions affecting only individual members, and class representation is superior to other available methods for the fair and efficient adjudication of the controversy. Accordingly, this action is also maintainable under subsection (b)(3) of Rule 1.220.

## COUNT I:  NEGLIGENCE

9.     The Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs 1 through 125, 127, 129, 132, 134, 136 through 451 and Class allegations 1-8 above.

10.    Each of the Plaintiffs was under the supervision, care, and custody of and held by Defendant at the Bay County Jail on October 10, 2018, and thereafter.

11.    Each of the Plaintiffs was subjected to and endured the conditions at the jail described above.

12.    Plaintiffs have all been identified and their locations described above.

13.    Defendant owed Plaintiffs multiple duties of reasonable care to protect Plaintiffs from injury and harm as described above and in Exhibit A.

14.    Defendant negligently breached his duty of care by failing to provide Plaintiffs and the class adequate housing, food, water, clothing and bedding, sanitation and privileges as prescribed in and required by the MJS.

15.    As a direct and proximate result of the above-described negligence of Defendant, Plaintiffs have each suffered actual physical injury, emotional pain and

suffering, economic damages, loss of the capacity for the enjoyment of life, and other tangible and intangible damages and are entitled to recover damages from Defendant in an amount to be proven at trial.

## COUNT II: JAIL CONDITIONS CONSTITUTING CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FOURTEENTH AMENDMENT

16.     Paragraphs 1 through 451 and Class allegations 1-8 above are re-alleged and incorporated herein by reference.

17.     42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

18.     Plaintiffs are citizens of the United States and thus entitled to the full benefit and equal protection of the Federal Constitution and all laws and regulations enacted thereunder.

19.     Defendant is a person under 42 U.S.C. § 1983.

20.     Defendant and its employees, agents, and representatives were, at all times relevant, acting under the color of ordinances, regulations, customs, and laws of the State of Florida.

21.     At all times relevant to this Complaint, Plaintiffs had a clearly established constitutional right under the Fourteenth Amendment to be free from conditions that amount to cruel and usual punishment, as described above, including:

      a.  No safe drinking water

      b.  No water to shower

      c.  No clean underwear or clothing

      d.  No working toilet facilities

      e.  Overflowing sewage

      f.  Extreme heat

      g.  Black mold

      h.  Contaminated air

      i.  Inadequate and/or nonexistent medical care

      j.  Understaffing, and

      k.  Such further unconstitutional conditions that discovery reveals.

22.     Each condition described above, on its own, violates the Constitution.

23.     Pleading alternatively, the totality of the circumstances illustrated by the conditions described above violates the Constitution.

24.     The conditions described above are the result of intentional actions in violation of the Constitution.

25.     The conditions described above deprived Plaintiffs of the minimal civilized measures of life's basic necessities, in violation of the Constitution.

26.     Defendant and its employees, agents, and representatives knew, or should have known, of these rights during the time period relevant to this Complaint as they were clearly established.

27.     Defendant and its employees, agents, and representatives were deliberately indifferent to the excessive health risks created by the conditions at the jail, and have violated Plaintiffs' right to basic human dignity and to be free from cruel and unusual pretrial conditions under the Fourteenth Amendment to the United States Constitution.

28.     The acts or omission of Defendant and its employees, agents, and representatives as described herein, deprived Plaintiffs of their constitutional rights, resulting in unnecessary pain, suffering, and sickness, and causing Plaintiffs to incur damages.

29.     Defendant and its employees, agents, and representatives intentionally, knowingly, and purposely deprived Plaintiffs of their clearly established rights, privileges, and immunities as secured by the Constitution and laws of the United States in violation of 42 U.S.C. § 1983.

30.     Defendant and its employees, agents, and representatives maintained policies, procedures, customs, and/or practices exhibiting deliberate

indifference to the constitutional rights of citizens, which were the moving forces behind, and proximately caused the violations, of Plaintiffs constitutional rights as set forth herein.

31.   The Major over the Jail, Rick Anglin, was the final decisionmaker regarding all matters involving the Jail during the time period pertinent to this action. Anglin was aware of the deplorable conditions in the jail and did nothing to cure, prevent, rectify or fix these conditions, all of which resulted in harm to Plaintiffs.

32.   Alternatively, there was a custom and practice, over a period of weeks if not months, of Defendant denying Plaintiffs of basic necessities like food and water, restroom facilities and other needs set forth in paragraphs 21 and 127.

33.   As a direct result of the policies, practices, and customs described herein, Plaintiffs have been subjected to the unconstitutional conditions above which are the proximate cause of Plaintiffs' deprivation of rights under the Fourteenth Amendment.

34.   As a direct and proximate result of the above-described actions and inactions of Defendant, Plaintiffs have each suffered actual physical injury, emotional pain and suffering, economic damages, loss of the capacity for the enjoyment of life, and other tangible and intangible damages and are entitled to recover damages from Defendant in an amount to be proven at trial.  Plaintiff are entitled to attorneys' fees under 42 U.S.C. §1988.

## COUNT III: 42 U.S.C. § 1983, DELIBERATE INDIFFERENCE

35.    The Plaintiffs reallege and incorporate herein by reference the foregoing 1 through 451 and Class allegations 1-8 above.

36.    42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

37.    Plaintiffs are citizens of the United States and thus entitled to the full benefits and equal protection of the Federal Constitution and allows and regulations enacted thereunder.

38.    Defendant is a person under 42 U.S.C. § 1983.

39.    Defendant was, at all times relevant, acting under the color of ordinances, regulations, customs, and laws of the State of Florida.

40.    At all times relevant to this complaint, Plaintiffs had clearly established constitutional rights, including the right under the Fourteenth Amendment to not be subjected to unconstitutional policies, practices, and/or customs.

41.    Defendant knew or should have known of these rights during the time period giving rise to this Complaint as they are clearly established.

42.    The policies, practices, and/or customs of Defendant, as described herein, deprived Plaintiffs of their constitutional and statutory rights, resulting in pain, suffering, and sickness, and causing Plaintiffs damages.

43.    Defendant intentionally, knowingly, and purposely deprived Plaintiffs of their clearly established rights, privileges, and immunities as secured by the Constitution and laws of the United States in violation of 42 U.S.C. § 1983.

44.    Defendant maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of Plaintiffs which were the moving forces behind and proximately caused the violations of their constitutional rights as set forth herein.

45.    Defendant developed and maintained long-standing, department-wide policies, procedures, practices, and/or customs amounting to deliberate indifference to Plaintiffs.

46.    Defendant's policies resulted in the deliberate indifference to Plaintiffs' constitutional rights.

47.    Defendants have shown deliberate indifference to or tacit authorization of the above conduct after notice to officials of that conduct.

48.    Plaintiffs' extended pain, suffering, and sickness was caused by Defendants' unconstitutional policies, procedures, practices, and/or customs.

49.     The systemic nature of Defendant's conduct shows a complete indifference or a conscience disregard of the health and safety of Plaintiffs.

50.     The Major over the Jail, Rick Anglin, was the delegated final decisionmaker regarding all matters involving the Jail during the time period pertinent to this action. Anglin was aware of the deplorable conditions in the jail and did nothing to cure, prevent, rectify or fix these conditions, all of which resulted in harm to Plaintiffs.

51.     Alternatively, there was a custom and practice, over a period of weeks if not months, of Defendant denying Plaintiffs of basic necessities like food and water, restroom facilities and other needs set forth in paragraphs 21 and 127.

52.     Anglin was aware of the deplorable conditions in the jail and did nothing to cure, prevent, rectify or fix these conditions, all of which resulted in harm to Plaintiffs.

53.     Alternatively, there was a custom and practice, over a period of weeks if not months, of Defendant denying Plaintiffs of basic necessities like food and water, restroom facilities and other needs set forth in paragraphs 21 and 127.

54.     As a direct and proximate result of the above-described negligence of Defendant, Plaintiffs have each suffered actual physical injury, emotional pain and suffering, economic damages, loss of the capacity for the enjoyment of life, and other tangible and intangible damages and are entitled to recover damages from Defendant

in an amount to be proven at trial.  Plaintiff are entitled to attorneys' fees under 42 U.S.C. §1988.

## COUNT IV:  42 U.S.C. § 1986 FAILURE TO PROTECT

55.    The Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs 1 through 451 and Class allegations 1-8 above.

56.    42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

57.    Plaintiffs are citizens of the United States and thus entitled to the full benefits and equal protection of the Federal Constitution and allows and regulations enacted thereunder.

58.    Defendant is a person under 42 U.S.C. § 1983.

59.    Defendant was, at all times relevant, acting under the color of ordinances, regulations, customs, and laws of the State of Florida.

60.    At all times relevant to this complaint, Plaintiffs had clearly established constitutional rights, including the right under the Fourteenth Amendment to not be subjected to unconstitutional policies, practices, and/or customs.

61.     Defendant knew or should have known of these rights during the time period giving rise to this Complaint as they are clearly established.

62.     Under settled United States Supreme Court authority, and in accordance with the Eighth Amendment, Plaintiffs are entitled to be free from a known and substantial risk of serious harm while in the custody of the state.

63.     Defendant has been and continues to be deliberately indifferent to the substantial risk of harm Plaintiffs faced from being held in the jail without being provided clean drinking water, water with which to clean themselves, overflowing toilets which flooded the jail with feces, urine, used sanitary products, no adequate removal of feces and urine, clean air, and sanitation including addressing the growth of black mold.

64.     Defendant, through its agents, demonstrated without question that they were not going to protect Plaintiffs from these serious health and safety concerns, nor ensure that they received basic necessities.

65.     Defendant's action and/or lack of actions were the direct and proximate cause of the violations of Plaintiffs' constitutional rights and the damages suffered by Plaintiffs, including pain, suffering, emotional distress, anguish, and illness.

66.     Defendant's above-described actions and omissions were undertaken with malice and/or reckless disregard for Plaintiffs clearly established constitutional rights.

67.     The Major over the Jail, Rick Anglin, was the delegated final decisionmaker regarding all matters involving the Jail during the time period pertinent to this action.  Anglin was aware of the deplorable conditions in the jail and did nothing to cure, prevent, rectify or fix these conditions, all of which resulted in harm to Plaintiffs.

68.     Alternatively, there was a custom and practice, over a period of weeks if not months, of Defendant denying Plaintiffs of basic necessities like food and water, restroom facilities and other needs set forth in paragraphs 21 and 127.

69.     As a direct and proximate result of the above-described negligence of Defendant, Plaintiffs have each suffered actual physical injury, emotional pain and suffering, economic damages, loss of the capacity for the enjoyment of life, and other tangible and intangible damages and are entitled to recover damages from Defendant in an amount to be proven at trial.  Plaintiff are entitled to attorneys' fees under 42 U.S.C. §1988.

### COUNT V: FAILURE TO TRAIN IN VIOLATION OF THE FOURTEENTH AMENDMENT

70.     The Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs 1 through 451 and Class allegations 1-8 above.

71.     42 U.S.C. § 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or

> the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper
> proceeding for redress[.]

72.    Plaintiffs are citizens of the United States and thus entitled to the full benefits and equal protection of the Federal Constitution and allows and regulations enacted thereunder.

73.    Defendant is a person under 42 U.S.C. § 1983.

74.    Defendant was, at all times relevant, acting under the color of ordinances, regulations, customs, and laws of the State of Florida.

75.    At all times relevant to this complaint, Plaintiffs had clearly established constitutional rights, including the right under the Fourteenth Amendment to not be subjected to unconstitutional policies, practices, and/or customs.

76.    Defendant knew or should have known of these rights during the time period giving rise to this Complaint as they are clearly established.

77.    The training conducted by Defendant, or the lack thereof, as described herein, deprived Plaintiffs of their constitutional and statutory rights, resulting in pain, suffering, and sickness, and proximately caused Plaintiffs' damages.

78.   Defendant intentionally, knowingly, and purposely deprived Plaintiffs of their clearly established rights, privileges, and immunities as secured by the Constitution and laws of the United States in violation of 42 U.S.C. § 1983.

79.   Defendant and its employees, agents, and representatives engaged in constitutionally inadequate training and supervision which were the moving forces behind and proximately caused the violations of Plaintiffs' constitutional rights as set forth herein.

80.   Defendant Tommy Ford had a duty to train Defendant's employees on how to protect the health and safety, and ensure the basic needs of, inmates when the jail was damaged by a hurricane, including but not limited to: a) how to provide clean drinking water; b) how to address the sewerage system so that toilets were usable; c) how to provide adequate ventilation for clean air circulation; d) how to keep black mold out of the jail; e) how to ensure sufficient staff were on hand to address i) sanitation of the facility; ii) medical care; iii) supervision of inmates to protect the lives and ensure the safety of inmates.

81.   The inadequate training and supervision described herein demonstrates deliberate indifference because the need for training and/or supervision was so obvious—and the lack of training and/or supervision was so inadequate—that it was likely to result in violating the rights of detainees such as Plaintiffs

82.    The failure to adequately train and supervise led directly to the harms suffered by Plaintiffs.

83.    The Major over the Jail, Rick Anglin, was the delegated final decisionmaker regarding all matters involving the Jail during the time period pertinent to this action.  Anglin was aware of the deplorable conditions in the jail and did nothing to cure, prevent, rectify or fix these conditions, all of which resulted in harm to Plaintiffs.

84.    Alternatively, there was a custom and practice, over a period of weeks if not months, of Defendant denying Plaintiffs of basic necessities like food and water, restroom facilities and other needs set forth in paragraphs 21 and 127.

85.    The systemic nature of Defendants' conduct shows a complete indifference or a conscious disregard of the safety of Plaintiffs.

86.    As a direct and proximate result of the above-described negligence of Defendant, Plaintiffs have each suffered actual physical injury, emotional pain and suffering, economic damages, loss of the capacity for the enjoyment of life, and other tangible and intangible damages and are entitled to recover damages from Defendant in an amount to be proven at trial.  Plaintiff are entitled to attorneys' fees under 42 U.S.C. §1988.

WHEREFORE, the Plaintiffs demand the following relief:

a.      certification of the class defined herein under subsection (b)(2) or, alternatively, subsection (b)(3) of Rule 1.220 against the Defendant; and under Federal Rule 23(a), (b)(1), (b)(2), and (b)(3).

b.      certification of the Plaintiffs as class representatives of the class alleged and of Plaintiffs' counsel as class counsel;

c.      judgment in favor of the Plaintiffs and class and against the Defendant finding and declaring that the Defendant' actions described violated the Defendant's duty of care to the Plaintiffs and the class

d.      judgment in favor of the class finding and declaring that the common core finding of liability alleged herein will have *res judicata* effect in any subsequent proceedings brought by class members against the Defendant arising out of the allegations of this Complaint;

e.      judgment in favor of the Plaintiffs and against the Defendant awarding each of them damages in an amount to be proved at trial;

f.      award Plaintiffs their attorneys' fees (federal claims) and costs as allowed by law; and award such further relief as is equitable and just.

Respectfully submitted:

s/*Marie A. Mattox*
Marie A. Mattox
Fla. Bar No. 0739685
MARIE A. MATTOX, P.A.
203 N. Gadsden Street
Tallahassee, FL 32301
(850) 383-4800
(850) 383-4801(fax)
marie@mattoxlaw.com

s/*John C. Davis*
John C. Davis
Fla. Bar No. 827770
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
(850) 222-4770
(850) 222-3119
john@johndavislaw.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing has been filed this 16th day of

October 2023, via CM/ECF to all counsel of record.

s/Marie A. Mattox
Marie A. Mattox