## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**KRISTINA TRIPP, THOMAS
MCFATTER,** *et al.*, **individually and
on behalf of all others similarly situated,**

    **Plaintiffs,**

**v.**                    **Case No. 5:23-cv-112-AW-MJF**

**TOMMY FORD, SHERIFF OF BAY
COUNTY, FLORIDA, in his official
capacity as Sheriff,**

    **Defendant.**

_____/

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL, AND INCORPORATED MEMORANDUM OF LAW

By and through undersigned counsel, Plaintiffs Kristina Tripp, Thomas McFatter, Michael Murrero-Delgado, Amber Ahne, Amber Lyn Tidwell, Conrad Forrence, Paula Cooper, Cameron Wilson, Joshua Foster, and Normando Brown (together, "Plaintiffs"), respectfully submit this Motion for Class Certification and Incorporated Memorandum of Law ("Motion"), and hereby respectfully request that this Court certify the following Primary Class and Subclasses under Fed. R. Civ. P. 23(b)(3), as well as Equitable Class under Fed. R. Civ. P. 23(b)(2):

**Primary Class – Rule 23(b)(3)**: All inmates under supervision, care, or custody of the Bay County Sheriff's Office, and held in the Bay County Jail

in Panama City, Florida, at any time from October 10, 2018, through and including May 31, 2019.[1]

> **Subclass No. 1**: All inmates under the supervision, care, or custody of BCSO and held in the Bay County Jail, at any time from October 10, 2018, through and including October 30, 2018.

> **Subclass No. 2**: All inmates under the supervision, care, or custody of BCSO and held in the Bay County Jail, at any time from November 1, 2018, through and including December 1, 2018.

> **Subclass No. 3**: All inmates under the supervision, care, or custody of BCSO and held in the Bay County Jail, at any time from December 2, 2018, through and including May 31, 2019.

**Equitable Class – Rule 23(b)(2)**: All inmates under the supervision, care, or custody of BCSO and held in the Bay County Jail, who are now, or will in the future be, subject to Defendant's policies and practices governing the Jail's preparations for or response to emergency events that impact or endanger the Jail or its inmates.

## I.    INTRODUCTION [2]

This quintessential civil rights class action arises from gross misconduct of Tommy Ford, Sheriff of Bay County, who knowingly caused the detainees of Bay County's Jail to live in and remain in life-threateningly dangerous and inhumane squalor. Plaintiffs were inmates housed in the Jail when and after Hurricane Michael (the "Hurricane") struck Florida's panhandle in October 2018. Despite knowing and anticipating the devastating effects of the Category 5 storm, and rather than ensure inmates' health or safety, Defendant unconstitutionally and unlawfully chose to

---

[1] The Bay County Sheriff's Office is referred to at times herein as the "BCSO," and the Bay County Jail, located in Panama City, Florida, is referred to at times herein as the "Jail."

[2] All emphasis herein is added, and citations altered or omitted, unless otherwise expressly noted.

force the Jail's helpless inmates into lethal danger, and then endure unlivable and conscience-shocking conditions and treatment in the aftermath.

The disturbing events at-issue here begin with and center around Defendant's policy and practice governing preparation for and response to emergencies impacting the Jail, whereby Defendant refused or failed to develop and implement plans or procedures to protect and ensure inmates' health and safety in the event of such emergencies. Aware of the exigent dangers posed to the Jail and its inmates by the storm—both firsthand and also through his delegee of final policymaking authority over the Jail—Defendant's policy and practice provoked his flouting of pre-landfall evacuation orders, as well as subsequent refusal or failure to transfer inmates to the safety of other facilities that had offered to assume their custody.

Catastrophic damage throughout the Jail and all its living areas forced inmates to endure uninhabitable conditions and barbaric treatment, including denial of access to basic life necessities (*i.e.*, food, water, and medical care), or safe and habitable living conditions. Defendant's policy and practice exacerbated inmates' unrelenting suffering and harm by refusing or failing, for a dangerously long duration of weeks or months, to redress inmates' insufferable conditions in the Jail; rather, Defendant openly mocked and ***even actively concealed*** its conduct and inmates' conditions, maximizing the inexorable harm to all of the overcrowded Jail's destitute inmates.

This action asserts that Defendant's sweeping policy and practice governing emergency preparation and response for the Jail, constitutes deliberately indifferent, across-the-board violation of similarly situated inmates' fundamental and clearly-established legal and civil rights.[3] Plaintiffs seek damages for the unlawful conditions and harm they and all Class Members suffered, as well as equitable relief to declare the illegality of Defendant's inhumane conduct and enjoin Defendant from further violating inmates' critical rights via the policy and practice at-issue here.

As detailed herein, the asserted claims are distinctly ideal for class treatment, because all Plaintiffs and Class Members share common and substantially similar (if not identical) circumstances, harms, and legal claims, issues, and questions arising from Defendant's unlawful policy and practice, applied indiscriminately across all Class Members, governing emergency preparations and response at the Jail. Cases like this, involving across-the-board civil rights violations, are routinely certified as appropriate for class treatment.[4] This case is no different, as the necessary elements

---

[3] The laws bestowing these fundamental rights and protections, of which Sheriff Ford—through Anglin, the Jail's Warden/Major to whom Ford delegated final policymaking authority over the Jail, *see infra*—was fully aware must be protected and cannot be violated, include the Fourteenth Amendment, 42 U.S.C. § 1986, and Florida law and Model Jail Standards ("MJS"). [*Id.* at ¶¶33, 88, 90-93, 95, 97, 99-100, 102, 104-05, 108, 110, 113, 131; 99-101 at ¶¶9-34; 107-08 at ¶¶55-69].

[4] *See Hoffer v. Jones*, 323 F.R.D. 694, 696 (N.D. Fla. 2017) (certifying class of prisoners asserting civil rights violations for policy and practice of refusing to treat serious medical needs of chronic Hepatitis C); *accord Armstead v. Pingree*, 629 F.Supp. 273, 279 (M.D. Fla. 1986) (citing *Jones v. Diamond*, 519 F.2d 1090, 1099-1100 (5th Cir. 1975)); *Cooper v. Fla. P&L*, No. 76-cv-128, 1978 U.S. Dist. LEXIS 15442, at *5 (M.D. Fla. Sep. 19, 1978) (citing *Payne v. Travenol Labs.*, 565 F.2d. 895, 900 (5th Cir. 1978)).

of Rule 23(a), as well as (b)(2) and (b)(3), are readily satisfied. The class device best serves its purposes in a case like this, facilitating aggregation of identical claims and issues (particularly civil rights, and also those of inmates) arising from virtually identical facts and circumstances, among Plaintiffs and hundreds of identifiable, similarly situated inmates. As such, this Motion is due to be granted in its entirety.

## II.    FACTUAL BACKGROUND

### A.    *The Parties*

The Plaintiffs (like nearly all Class Members) were all inmates of the Jail during and after Hurricane Michael struck on October 10, 2018, and resided in virtually every relevant living area experienced by Class Members.[5] [*See* ECF No. 17 at ¶¶4-13]. Plaintiffs further represent virtually every relevant condition and treatment endured, and harm suffered, by Class Members during the Primary Class Period,[6] arising from a single policy and practice applied evenhandedly to the Class by Defendant. [*Id.* at ¶¶118-24, 125-36]. Plaintiffs (and Class Members) suffered

---

*See also Hill v. Cty. of Montgomery*, No. 9:14-cv-933, 2018 U.S. Dist. LEXIS 140305, at *16-45 (N.D.N.Y. Aug. 20, 2018); *Scott v. Clarke*, 61 F.Supp.3d 569, 582-91 (W.D. Va. 2014) ("courts routinely certify class actions involving prisoners"); *Anderson v. Garner*, 22 F.Supp.2d 1379, 1381-87 (N.D. Ga. 1997); *Coley v. Clinton*, 635 F.2d 1364, 1378-80 (8th Cir. 1980) (class actions are "an especially appropriate vehicle for civil rights actions," and even more particularly "for prison and hospital reform").

[5] Each Plaintiff was housed at the Jail leading up and during, and for weeks or even months after, the Hurricane. [*Id.* at ¶¶4-13, 137, 158, 160, 182, 184, 215, 219, 253, 256, 287, 290, 321, 325, 350, 353, 385, 389, 413, 415, 449, 451]; *see also* **Exhibits A-3, A-4, A-5 & A-6**. Based on the Primary Class Definition, each Class Member was also housed at the Jail during and/or after the Hurricane. [*Id.* at ¶¶ 29, 89, 94, 96, 98, 101, 103, 106, 109, 118-24].

[6] [*Id.* at ¶¶158, 182, 215, 218, 253, 255, 287, 289, 321, 324, 350-51, 385, 388, 413, 449, 451]; *see* Exs. A-3, A-4, A-5 & A-6; *see also* **Exhibits A-7 & A-8**.

grave harms due to Defendant's knowingly unlawful policies and practices, and the dangerous conditions and treatment they were forced to endure as a result, including:

(i)      life-threatening inability to evacuate the Jail in compliance with evacuation orders issued for Bay County prior to the Hurricane's landfall, or be transferred/transported to any of the other, safer facilities that had expressly offered to take custody of the Jail's inmates following the Hurricane;[7]

(ii)      prolonged lack of access to clean and potable water, safe and edible food, medical care or treatment, showers or bathing, plumbing, sewage and waste disposal, clean bedding, clean or sufficient clothing, cleaning or protective equipment, electricity, ventilation, or ability to leave their cells;[8]

(iii)     direct, prolonged exposure to toxic mold, extreme temperatures and humidity, life-threateningly-poor air quality, raw sewage, standing water, feces, urine, soiled hygiene or sanitation products, biohazardous contaminants, chemicals, and diseases (*e.g.*, HIV and STDs);[9] and

---

[7] [*Id.* at ¶¶ 128, 130]; *see infra*.

[8] [*Id.* at ¶¶102-03, 137, 139, 141, 143-46, 148-53, 157, 160, 164-67, 169, 172-76, 180-81, 185-92, 197-200, 202, 205-07, 209-10, 212-14, 216-17, 220-24, 226-30, 232, 235-41, 244, 246-47, 249-52, 255, 257-59, 262-65, 269-75, 278, 281-82, 284-86, 289, 291, 293-97, 301-07, 309, 312, 314-15, 317-20, 323-25, 327-32, 334, 336-43, 345, 348-49, 353-54, 356-60, 364-71, 373, 376, 378-79, 381-84, 387, 389-96, 398, 400-08, 411-12, 416-17, 422-25, 429-36, 438, 442-43, 445-48, 450]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8.

[9] [*Id.* at ¶¶138-40, 143-46, 150, 152, 154-55, 157, 161-63, 165, 167-69, 173, 175, 177-78, 180, 186-87, 190, 192-94, 200-01, 203, 205-08, 214, 216-17, 221-26, 228-32, 240, 242, 244-45, 248, 251, 254-55, 258-61, 264-67, 274, 276, 278-80, 283, 286, 289, 292-93, 296-99, 308, 310, 312-13, 316, 320, 322-23, 326-27, 330, 332-34, 344, 346, 348-49, 390-91, 394, 396-98, 407, 409, 411,

(iv) denial of continuous visual, and/or 15-minute physical, observations or checks—as required by law for inmates' safety and health— due to Defendant's serious staff shortages, and staff's fear of infection due to the dangerous and biohazardous conditions throughout the Jail.[10]

Defendant Ford ("Ford" or "Sheriff"), is and at all relevant times was Bay County's duly elected Sheriff, and is sued in that official capacity. [*Id.* at ¶14]. As Sheriff, Ford had final policymaking authority over the Jail and its operations, and thus was responsible for its policies and practices, including emergency preparations and response, as well as development and implementation of plans or procedures to protect and ensure inmates' health and safety, including in the event of emergencies. [*See id.* at ¶¶32-33, 104]. After becoming Sheriff, Ford confirmed total delegation of his final authority over the Jail to its Warden/Major, Rick Anglin,[11] who thus acted

---

354-55, 358-62, 371-72, 374, 376-77, 380, 384, 386, 388, 417-18, 420-21, 424-27, 436-37, 439, 441, 447, 450]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8.

[10] [*Id.* at ¶¶147-48, 156, 159, 171-72, 179, 183, 195-96, 204-05, 211, 233-34, 243, 248, 268-69, 277, 283, 300-01, 311, 316, 335-36, 347, 352, 363-64, 375, 380, 399-400, 410, 414, 428-29, 440, 444]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8.

[11] Anglin was previously delegated final policymaking authority over the Jail on December 8, 2009, in writing from former Sheriff Frank McKeithen, which Ford then ratified upon becoming Sheriff. Anglin's status and authority as the Jail's final policymaker was also confirmed in recent litigation against Ford, based on a "clear concession" on Ford's behalf that "[W]arden [Anglin] is a person whose edicts or acts could fairly be said to represent official policy." *Carnley v. Sheriff of Bay Cty.*, No. 5:17-cv-85, 2018 U.S. Dist. LEXIS 66596, at *5 (N.D. Fla. Apr. 20, 2018).

Through this delegation, Anglin was responsible for all Jail operations, including policies and practices, as alleged by Plaintiffs. [ECF No. 17 at 33]. Anglin did, in fact, make all decisions for the Jail regarding emergency preparation and response for the Hurricane, which decisions were both unreviewed by Ford (who was wholly uninvolved in policymaking and operations for the Jail

as the Jail's delegated final policymaker at all relevant times. [*See id.* at ¶¶32-33, 130, 133].

Ford (through Anglin) knew but ignored (or even fostered), *inter alia*: (i) the grave and profound risks presented to the Jail and its inmates by the emergency of the imminent Hurricane;[12] (ii) the Jail's policy and practice of failing to prepare (or protect and ensure the health or safety of inmates in preparation) for such emergency, despite and in clear violation of Defendant's non-discretionary legal obligations to do so; and (ii) following significant destruction throughout the Jail and inmates' living areas—as resulting from Defendant's refusal or failure to make emergency preparations—the Jail's policy and practice of knowingly ignoring inmates' welfare and forcing them to endure life-threateningly dangerous, biohazardous, and cruel conditions and treatment, for dangerously long durations (weeks or even months), in deliberately-indifferent violation of Ford's non-discretionary legal obligations and inmates' clearly-established legal rights. [*Id.* at ¶¶15-17, 19-25, 27, 32-33, 46,

---

following his delegation of such authority to Anglin), and also immune from further review. [*Id.* at ¶¶32-33, 83, 130, 133; 103 at ¶31; 106 at ¶50, 109 at ¶67].

[12] *See* C. Breaux, *Mandatory Evacuation Begins Tuesday Ahead of Hurricane Michael*, PANAMA CITY NEWS HERALD, Oct. 8, 2018, www.newsherald.com/story/news/2018/10/08/mandatory-evacuation-begins-tuesday-ahead-of-hurricane-michael/9610683007/ (quoting Ford, discussing the gravity of and preparations for Hurricane Michael: "We've practiced this many times. This is game time. This is the real thing. This is a significant threat to life and safety. . . . People need to start leaving now. The roads are going to get more and more congested as time goes on.").

67, 88-110, 113-17, 125-30, 131-35; 101-03 at ¶¶21-32; 107-09 at ¶¶60-68]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8.[13]

### B.   Defendants' Unlawful and Unconstitutional Conduct, In Violation of Plaintiffs' and Class Members' Legal and Civil Rights

Ford, as the Jail's final policymaker—including through his total delegation of that authority to Warden/Major Anglin, who thus acted as its final policymaker—was responsible and legally obligated to develop and implement plans or procedures for emergency preparations and response, as well as ensuring and protecting inmates' health and safety in such events. [*Id.* at ¶¶14, 17, 19-20, 33, 88, 90-93, 95, 97, 99-100, 102, 104, 108, 110, 115-16, 129-30.]

Ford (personally and through Anglin) had advanced knowledge of the Hurricane's expectedly destructive impacts, and the fact Bay County was accordingly under mandatory pre-landfall evacuation orders—*i.e.*, with sufficient opportunity to develop and implement emergency plans to prepare for the Hurricane, and protect and ensure inmates' most fundamental and clearly-established rights to health and safety. During that time, Ford **_did_** make and implement emergency plans and procedures for virtually all relevant governmental functions under his authority (*i.e.*, administration, field services, SID, CID, civil warrants and court security,

---

[13] *See Burke v. Bowns*, 653 F.App'x 683, 700-01 (11th Cir. 2016) ("it is well established in this Circuit that conditions lacking basic sanitation are sufficiently 'extreme' and 'serious' to pose a substantial risk to Plaintiff's health or safety") (quoting *Brooks v. Powell*, 800 F.3d 1295, 1303-04 (11th Cir. 2015)); *Robbins v. Fogel*, No. 5:18-cv-175, 2020 U.S. Dist. LEXIS 19253, at *6-13, 27-34 (N.D. Fla. Jan. 7, 2020).

community services, bridges, etc.), yet Ford (through Anglin) explicitly decided and directed that for the Jail's inmates, the only ostensible "plan" was simply: "Jail – Locked and loaded – literally." [*Id.* at ¶¶21-25, 27, 86, 104-107 & n.2]. Indeed, Ford (through Anglin) deliberately decided to make and implement no plans whatsoever to prepare for or respond to impending Hurricane, or otherwise protect inmates' health and safety in connection with such emergency. [*Id.*].

The Hurricane's devastating landfall endangered the lives, safety, and health of all inmates and caused severe devastation and damage to the Jail and all its living areas. [*Id.* at ¶¶15-16, 19-20, 28-32, 34-38, 40-45, 49-60, 63-73, 76-84, 112, 118-24, 126-28]; *see also* Exs. A-3, A-4, A-5 & A-6. The living areas of all Class Members— where they were strictly and dangerously confined at all times during and after landfall—were flooded by stormwater, raw sewage, biohazards, and other abhorrent, uninhabitable conditions; yet Ford (through Anglin) knowingly allowed such conditions to remain and worsen ***for days, weeks, and months***, [*id.* at ¶¶32, 45, 57, 59-60, 73, 77, 131-135]; Exs. A-3, A-4, A-5, A-6, A-7 & A-8, despite inmates' desperate pleas for (and in light of their utter lack of access to any) basic but critical necessities, including *inter alia*:

        (i)    <u>central air-conditioning (or ventilation)</u>: causing dangerous, constant exposure to not only unsafe air quality, offensive odors, and extreme temperatures (to the point paint stripped off the walls), but also rapid growth of

dangerous mold and mildew in and throughout the jail and all inmates' living areas (which Defendant not only failed to remediate or protect from, but unimaginably and repeatedly tried to conceal by merely painting over the mold)—while simultaneously prohibiting inmates from any outdoor access—for weeks and months after the Hurricane's landfall;[14]

(ii)    <u>working toilets, plumbing, or waste disposal</u>: leaving inmates (already forced to remain at all times in the dangerous standing water of their cells) with no place to defecate, urinate, or discard hygiene products besides baggies that had to be passed through (and thus contaminated by) the feeding slots of their cells, or else the standing water of their cells; then forcing the inmates to remain at all times in that standing water, containing their and other inmates' commingled excrement; without providing access to showers, clean bedding, clean or sufficient clothing, hygiene items, or protective equipment; and thereby causing dangerous illness and exposure to infections and diseases (*i.e.*, HIV and STDs) for all inmates, for weeks (or even months) after the Hurricane's landfall;[15]

---

[14] [*Id.* at ¶¶16, 20, 30, 35, 42, 59, 62, 66, 78, 123-27, 134-36, 138, 145, 152, 154, 157, 168, 175, 177, 180-82, 193, 201, 203, 207-08, 214-16, 218, 223-24, 231, 240, 242, 244-45, 251, 253-55, 259-60, 266, 274, 276, 279-80, 286-89, 298, 308, 310, 312-13, 320-24, 333, 344, 346, 348-51, 361, 372, 374, 376-77, 384, 386-88, 397, 407, 409, 411-13, 418, 420, 426, 437, 439, 441, 447-50; 101 at ¶21; 108 at ¶63; 111 at ¶¶80-82]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8.

[15] [*Id.* at ¶¶20, 36-38, 40-42, 95-96, 100-01, 121-22, 124-27, 143-44, 146-48, 152-53, 157-58, 165-67, 169-71, 175-76, 182, 186-88, 190-92, 194-96, 199-202, 205-06, 211-15, 218, 221-23, 225-30, 232-34, 237, 239-41, 244, 248-50, 253-55, 258-62, 264-65, 267-69, 272, 274-75, 278-79, 283-84, 286-88, 292-94, 296-97, 299-301, 304-05, 307-10, 312, 316-17, 319-24, 326-28, 330-32, 334-36, 339, 342-45, 348-51, 354-56, 358-60, 362-64, 367-68, 370-73, 376, 380-81, 383-86, 388, 390-92,

(iii)   <u>adequate, safe, uncontaminated drinking water and food</u>: by receiving only limited, sporadic, and insufficient amounts of contaminated brown water (required to be, ***but not***, boiled for safety reasons pursuant to a boil-only notice in-effect for Bay County), as well as uncooked, moldy, contaminated, and insufficient food (served on dirty trays via feeding slots contaminated with feces, urine, mold, and other biohazards)—unnecessarily placing all inmates at terrible and constant risk of life-threatening infection, disease, illness, dehydration, and malnourishment, for several weeks after the Hurricane's landfall;[16] and

(iv)   <u>access to medical care or treatment</u>: resulting in the exacerbated and prolonged suffering of inmates—all of whom were endangered by or sick from the unresolved and worsening conditions of the jail, and many of whom were further endangered and made sicker by the refusal or denial of treatment for preexisting medical conditions—for at least two weeks after the Hurricane's landfall.[17]

---

394-96, 398-400, 403-04, 406-08, 411-13, 417, 421-22, 424-25, 327-29, 432-33, 436-38, 441, 444-51; 101 at ¶21; 108 at ¶63; 111 at ¶¶80-82]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8.

[16] [*Id.* at ¶¶20, 32, 44, 46, 49-58, 64, 76, 79, 95-96, 100-01, 119, 121, 127, 134, 136, 137, 142-43, 149-50, 153, 157-58, 160, 165-66, 173, 176, 180-81, 185, 189-90, 197-98, 202, 205, 208-09, 212-15, 217, 220, 222-23, 228-29, 235-36, 241, 244, 246, 249-53, 255, 257-59, 263-64, 270-71, 275, 278, 281, 285-87, 289, 291, 295-96, 302-03, 309, 314, 316, 318-22, 324, 325, 329-31, 337-38, 345, 348-49, 353, 357-59, 365-66, 369, 373, 378, 382-88, 389, 393-95, 401-02, 408, 411-13, 416, 423-24, 430-31, 438, 442, 445-51; 99 at ¶14; 101 at ¶21; 103 at ¶32; 106 at ¶¶51, 53; 108 at ¶63; 109 at ¶68; 111 at ¶80; 112 at ¶84]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8.

[17] [*Id.* at ¶¶48, 67-71, 108-09, 127, 134, 136, 139, 146-48, 169-71, 194-96, 212-13, 232-34, 249-50, 267-69, 285, 299-301, 319, 334-36, 362-64, 383, 398-400, 420, 427-29, 446; 101 at ¶21; 102 at ¶27; 108 at ¶64; 111 at ¶80]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8.

Ford (through Anglin) treated each Class Member with the same unlawful and unconscionable disregard and/or deliberate indifference. Ford's conduct (through Anglin's) violated, and Ford (through Anglin) knew or should have known his conduct violated applicable, clearly-established laws and standards to which Florida Sheriffs, law enforcement, and jail administrators are knowingly beholden, and designed to protect and ensure the basic rights of all inmates to health and safety.

Ford (through Anglin) was responsible for lawfully and safely operating the Jail, including making plans and preparations in the event of emergencies, but deliberately chose and instructed to set forth and implement no plan at all for how to prepare for, and protect inmates from, the devasting but foreseen effects of the Hurricane. Ford's conduct (through Anglin's) not only constitutes negligence and violations of the Fourteenth Amendment (unconstitutional jail conditions) and 42 U.S.C. § 1986 (failure to protect), but critically was also applied evenly across all Class Members, who thus were nearly-identically affected and harmed, and giving rise to identical legal claims and issues among the Plaintiffs and Class Members.

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A.   *Standards for Class Certification*

Class certification is governed by Fed. R. Civ. P. 23, which "establishes the legal roadmap courts must follow when determining whether class certification is appropriate." *Valley Drug v. Geneva Pharma.*, 350 F.3d 1181, 1187 (11th Cir. 2003).

Class certification is a procedural issue, *Eisen v. Carlisle Jacquelin*, 417 U.S. 156, 177-78 (1974), and while some consideration of merits may be required in analysis thereof, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *Howard v. Coonrod*, No. 6:21-cv-62, 2022 U.S. Dist. LEXIS 245074, at *4 (M.D. Fla. Mar. 30, 2022) (citing *Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1234 (11th Cir. 2016); *Vega v. T-Mobile USA*, 564 F.3d 1256, 1266 (11th Cir. 2009)); *Gayle v. Meade*, 614 F.Supp.3d 1175, 1195 (S.D. Fla. 2020) (citing *Eisen*, 417 U.S. at 177-78; *Cox v. American Cast Iron Pipe*, 784 F.2d 1546, 1557 (11th Cir.1986)). A certification ruling is "not to adjudicate the case," but rather, more narrowly to determine if Rule 23's criteria are met. *See Amgen*, 568 U.S. at 460; *Eisen*, 417 U.S. at 178; *Miller v. Mackey Int'l*, 452 F.2d 424, 428 (5th Cir. 1971).

In light of these "well-worn admonitions," Plaintiffs need not prove every relevant consideration at this stage,[18] as the Court must accept as true all allegations

---

[18] *See Fabricant v. Sears*, 202 F.R.D. 310, 313 (S.D. Fla. 2001) ("the Court must take the factual allegations of the Complaint as true and examine only whether those factual allegations meet the requirements of Rule 23"); *Hirsch* v. Jupiter Golf Club, No. 13-cv-80456, 2015 U.S. Dist. LEXIS 62719, at *8-12 (S.D. Fla. May 12, 2015) (comparing *Wal-Mart v. Dukes*, 564 U.S. 338 (2011) with *Amgen*, 568 U.S. 455, in rejecting "conten[tion] that a more rigorous analysis is required before granting class certification and that class certifications must be based on evidence, not allegations"); *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985); *Allen v. Wright*, 468 U.S. 737, 784 n.1 (1984) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)); *Cooper v. S. Co.*, 390 F.3d 695, 712 (11th Cir. 2004), *rev'd on other grounds*, *Ash v. Tyson Foods*, 546 U.S. 454, 457 (2006)).

in Plaintiffs' complaint (which, notably, are presently unrebutted),[19] and not reach the merits thereof or weigh evidence, and must "draw[] all inferences and present[] all evidence in the light most favorable to the party seeking class certification." *Brown*, 817 F.3d at 1232; *Vazquez v. Marriott*, No. 8:17-cv-116, 2018 U.S. Dist. LEXIS 152588, at *4 (M.D. Fla. Aug. 7, 2018); *Butler-Jones v. Sterling Casino*, No. 6:08-cv-1186, 2009 U.S. Dist. LEXIS 137424, at *5 (M.D. Fla. Jan. 6, 2009) (citing *Heffner v. Blue Cross of Ala.*, 443 F.3d 1330, 1337 (11th Cir. 2006)).

Relatedly, the certification analysis should account for the well-settled policy of applying a liberal construction favoring certification:

> Generally, Rule 23 is liberally construed in order to meet its objectives. The District Court thus has broad discretion in determining whether a particular action complies with the requirements of Rule 23. However, the Court must not exercise its discretion in a manner that would undermine the policies underlying class actions.

*Walco*, 168 F.R.D. at 323; *Gayle*, 614 F.Supp.3d at 1195 ("Generally, Rule 23 is liberally construed in order to further its objectives"); *Grillasca v. Hess*, No. 8:05-cv-1736, 2007 U.S. Dist. LEXIS 53356, at *9 (M.D. Fla. Jul. 24, 2007). Further, these principles are applied even more liberally in the context of classwide civil rights actions, like this. *See Groover v. Prisoner Transp. Servs.*, No. 15-cv-61902, 2018 U.S. Dist. LEXIS 215959, at *21 (S.D. Fla. Dec. 21, 2018); *Armstead*, 629

---

[19] Well-pled, uncontradicted allegations of a complaint, especially where "the issues are plain enough," may alone (or together with allegations of a certification motion), suffice to establish Rule 23's criteria. *See Gen. Tel. v. Falcon*, 457 U.S. 147, 160 (1982); *Huff v. N.D. Cass*, 485 F.2d 710, 713 (5th Cir. 1973); *MRI Assocs. v. State Farm*, 755 F.Supp.2d 1205, 1207 (M.D. Fla. 2010).

F.Supp. at 279; *Cooper*, 1978 U.S. Dist. LEXIS 15442, at *5 (citing *Payne*, 565 F.2d. at 900). Accordingly, "the court is instructed to resolve any doubt in favor of class certification." *Neumont v. Fla.*, 198 F.R.D. 554, 557 (S.D. Fla. 2000) (citing *Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229, 232 (M.D. Fla. 1993)).

The proposed primary Class readily satisfies each requirement of Rule 23(a), as well as Rule 23(b)(2) and (b)(3). Accordingly, Plaintiffs request that the Court certify the Classes (and Subclasses, as appropriate) proposed hereinabove, *supra*.

## B. The Proposed Class Satisfies Each Requirements of Rule 23(a)

Fed. R. Civ. P. 23(a) sets forth four requirements for class certification:[20] (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. All four are clearly satisfied here.

---

[20] Article III standing is "not technically a Rule 23 prerequisite," but courts have noted that "analysis of class certification must begin with the issue of standing." *Romano v. John Hancock*, No. 19-cv-21147, 2022 U.S. Dist. LEXIS 7966, at *23 (S.D. Fla. Jan. 14, 2022) (citing *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987)). Standing requires that a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016); *Venerus v. Avis Budget*, 723 F.App'x 807, 814 (11th Cir. 2018). "[M]eeting these elements is not a particularly onerous task, and will be completed by asserting 'general factual allegations of injury resulting from the defendant's conduct.'" *Howard*, 2022 U.S. Dist. LEXIS 245074, at *6 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Here, standing is readily established for each Plaintiff based on their allegations. *See supra* at 5-7 n.5-10, & at 12-13 n.14-17.

### 1. The Class is so Numerous as to Make Joinder of All Members Impracticable

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." *Vega*, 564 F.3d at 1266-67. "[A] plaintiff need not show the precise number of members in the class," *Evans v. U.S. Pipe & Foundry*, 696 F.2d 925, 930 (11th Cir. 1983), but rather "must only establish that joinder is impracticable through some evidence or reasonable estimate of the number of purported class members." *Morgan v. Orlando Health*, No. 6:17-cv-1972, 2019 U.S. Dist. LEXIS 223912, at *13 (M.D. Fla. Oct. 23, 2019). Thus, "the focus of the numerosity inquiry is not whether the number of proposed class members is 'too few' to satisfy the Rule, but 'whether joinder of proposed class members is impractical.'" *Checking Account Overdraft Litig.*, 275 F.R.D. 666, 671-72 (S.D. Fla. 2011) (quoting *Armstead*, 629 F.Supp. at 279).

"In assessing impracticability, 'courts should take a common-sense approach which takes into account the objectives of judicial economy and access to the legal system.'" *Bradley v. Harrelson*, 151 F.R.D. 422, 426 (M.D. Ala. 1993) (quoting 1 *Newberg On Class Actions* § 3.03 (2d Ed. 1985)). Relatedly, "[t]he Court may also 'make common sense assumptions in order to find support for numerosity.'" *Morgan*, 2019 U.S. Dist. LEXIS 223912, at *12 (citing *Evans*, 696 F.2d at 930).

This approach has yielded certification of prisoner classes involving "issues of common concern to inmates even when the potential class size is small and

somewhat undefined." *Id.*; *Andre v. Ambach*, 104 F.R.D. 606, 611 (S.D.N.Y. 1985) ("The fact that the [detention center] population . . . is constantly revolving establishes sufficient numerosity to make joinder of the class members impracticable"); *Green v. Johnson*, 513 F.Supp. 965, 975 (D. Mass. 1981) (certifying prisoner class "in light of the fact that the inmate population at these facilities is constantly revolving").

Here, there are no less than approximately 900 and as many as 1,100 members in the Primary Class. [*Id.* at 17 at 98 ¶5]; *see Saade v. Insel Air*, No. 17-cv-22003, 2019 U.S. Dist. LEXIS 59189, at *8 (S.D. Fla. Apr. 4, 2019) ("Because the allegations in Plaintiff's complaint are deemed admitted . . . we conclude that the proposed class is numerous for certification"). Moreover, each dorm of the Jail ***alone*** housed sufficient Class Members to satisfy numerosity. [*See id.* at ¶ 41(C-dorm contained 72 cells "housing around 140 inmates," and the Jail's cells "were occupied by two to three inmates per cell")].  These figures are undoubtedly sufficient to satisfy the numerosity threshold. *See Vega*, 564 F.3d at 1267 (more than 20 class members is sufficient). Furthermore, joinder of hundreds of (and potentially 1,100 or more) individual lawsuits, much less asserting the same legal claims and harms based on the same widespread conduct of Defendant and conditions of the Jail, is patently impractical. *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983)

("Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts"). Commonality is thus readily satisfied here.

### 2.  *Questions of Law and Fact are Common to the Class*

Rule 23(a)(2) requires "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "This part of the rule 'does not require that all the questions of law and fact raised by the dispute be common,' . . . or that the common questions of law or fact 'predominate' over individual issues." *Vega*, 564 F.3d at 1268. Rather, the Eleventh Circuit has deemed this a "low hurdle" or "light burden," which "does not require that all questions of law and fact be common." *Williams v. Mohawk Indus.*, 568 F.3d 1350, 1356 (11th Cir. 2009); *Vega*, 564 F.3d at 1268; *Hill v. Butterworth*, 170 F.R.D. 509, 514 (N.D. Fla. 1997). Such burden merely "requires the plaintiff to demonstrate that the class members have suffered the same injury," and it is sufficient that ***even one*** common question affects most class members. *Wal-Mart*, 564 U.S. at 350, 359. Thus, "commonality [] is generally satisfied when a plaintiff alleges that '[d]efendants have engaged in a standardized course of conduct that affects all class members.'" *Checking Account*, 275 F.R.D. at 673.

Here, all Class Members were subjected to "standardized conduct"—Defendant's policy and practice of refusing or failing to develop and implement plans or procedures in preparing for or responding to emergencies, as well as unlawfully disregarding and failing to protect and ensure the health and safety of

inmates in the event of such an emergency impacting the Jail—giving rise to the same legal claims, issues, and questions across the Class, including *inter alia*:

> a. What is the appropriate standard of care by which the Defendant's conduct should be measured; b. Whether the Defendant's failure to maintain adequate alternative electrical power was a breach of his duty of reasonable care; c. Whether the Defendant's failure to maintain an adequate water supply was a breach of his duty of reasonable care; d. Whether the Defendant's failure to maintain adequate sanitation and alternative sewage was a breach of his duty of reasonable care; e. Whether the conditions described herein that Defendant permitted at the jail constitute a violation of Plaintiffs' clearly established constitutional rights under the Fourteenth Amendment to be free from conditions that amount to cruel and unusual punishment.

[*Id.* at 96-97 ¶3]; *see also* Exs. A-3, A-4, A-5 & A-6.

A class proceeding will therefore generate common answers to these common questions and issues, as the common legal theories here are "susceptible to class-wide proof." *See Wal-Mart*, 564 U.S. at 349-50; *Cooper*, 390 F.3d at 714. A finding that the policies and practices at-issue violate the Fourteenth Amendment, 42 U.S.C. § 1986, or Defendant's duty of care, will afford classwide relief for the substantially similar harms suffered by all Class Members. *See* Exs. A-3, A-4, A-5, A-6, A-7 & A-8. In that instance, "every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide [] policy or practice that creates a substantial risk of serious harm." *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014).

Particularly "in civil rights cases, commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Howard*, 2022 U.S. Dist. LEXIS 245074, at *14. Explained further,

> [c]ommon questions also circle on the (in)adequacy of [defendant's] policies and practices governing the conditions of confinement, including [defendant's] failure to follow CDC Guidelines. These issues, which are at the core of the claims asserted by Plaintiffs and the class constitute the type of common questions that courts have found sufficient to meet the commonality requirement. . . . Here, [defendant's] uniform safety and hygiene practices and its alleged consistent refusal to follow CDC Guidelines at [defendant's prisons] expose each class member to the same "substantial risk of serious harm."

*Gayle*, 614 F.Supp.3d at 1227; *Hughes v. Judd*, No. 8:12-cv-568, 2013 U.S. Dist. LEXIS 61493, at *87-90 (M.D. Fla. Mar. 27, 2013), *rep. & rec. adopted as mod.*, 2013 U.S. Dist. LEXIS 61490 (M.D. Fla. Apr. 30, 2013).[21]

Finally, even if experiences with Defendant's policy and practice vary to any degree, "factual differences among the claims of [] class members do not defeat certification." *Cooper*, 390 F.3d at 714; *Parsons*, 754 F.3d at 675; *Doe v. Ladapo*, No. 4:23-cv-114, 2023 U.S. Dist. LEXIS 217438, at *12 (N.D. Fla. Oct. 18, 2023).

> The fact that certain details relating to their conditions of confinement may or will vary between class members does not defeat commonality.

> Those inevitable differences—which at most might entail some tailoring in the ultimate non-release remedy the Court might fashion— do not change the fact that conditions experienced in all three South

---

[21] *See also Graham v. Parker*, No. 3-16-cv-1954, 2017 U.S. Dist. LEXIS 68265, at *7-11 (M.D. Tenn. May 4, 2017); *Parsons v. Ryan*, 289 F.R.D. 513, 516-23 (D. Ariz. 2013); *Jones v. Gusman*, 296 F.R.D. 416, 465-66 (E.D. La. 2013); *Butler v. Suffolk Cty.*, 289 F.R.D. 80, 97-98 (E.D.N.Y. 2013); *Henderson v. Thomas*, 289 F.R.D. 506, 511 (M.D. Ala. 2012).

Florida detention centers at issue here are purportedly all uniformly unsanitary and unconstitutional or that [defendant] has supposedly shown deliberate indifference towards the risk of [] infection to all people they are detaining at those three facilities.

In other words, that class members may suffer varying degrees of injury does not defeat commonality.

The class members face a common risk of infection, and a ruling that [defendant's] conduct is unconstitutional and illegal will "resolve an issue that is central to the validity" of each class member's claim.

*Gayle*, 614 F.Supp. 3d at 1228.

This case challenges just ***one*** discrete and identifiable policy and practice of Defendant's, applied and causing the same harms even-handedly across the Class, and giving rise to the same legal claims and issues for all Class Members. Therefore, the commonality requirement is satisfied here.

### 3. *Plaintiffs' Claims are Typical of the Class Members' Claims*

Rule 23(a)(3) requires that "the claims [] of the representative parties are typical of the claims [] of the class." Fed. R. Civ. P. 23(a)(3). Typicality overlaps with commonality, but focuses on whether Plaintiffs' and Class Members' interests are sufficiently aligned. *See Busby v. JRHBW Realty*, 513 F.3d 1314, 1322 (11th Cir. 2008) (citing *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278-79 (11th Cir. 2000)); *Kornberg v. Carnival Cruise Lines*, 741 F.2d 1332, 1337 (11th Cir. 1984) (typicality met if plaintiffs' and class members' claims "arise from the same event or pattern or practice and are based on the same legal theory"). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members,"

but need not be substantially identical." *Checking Account*, 275 F.R.D. at 674; *Kornberg*, 741 F.2d at 1337 ("A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class"); *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2011) ("typicality [] may be satisfied despite substantial factual differences . . . when there is a strong similarity of legal theories") (quoting *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985)).

Here, Plaintiffs' and Class Members' interests are sufficiently (if not identically) aligned, as their claims irrefutably "arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg*, 741 F.2d at 1337. Defendant's pattern and practice of refusing or failing to develop and implement plans or procedures in preparing for or responding to emergency events (such as hurricanes), and to protect and ensure inmates' health and safety in the event thereof—all of which was legally required of Defendant—is perfectly typical across all Plaintiffs' and Class Members' claims. [*Id.* at ¶¶19-25, 27, 86, 104-07 & n.2, 1110-25, 127-30, 132, 134; 97 at ¶4]; *see also* Exs. A-3, A-4, A-5 & A-6. Those claims also are all based on the same legal theories: Defendant's lack of plans and procedures for the Jail, to protect its inmates in preparation for and/or response to the emergency of the Hurricane, and the dire conditions all inmates endured as a result, amount to unconstitutional jail conditions in violation of the Fourteenth

Amendment, failure to protect in violation of 42 U.S.C. § 1986, and negligence under Florida law. [*Id.* at ¶¶131-35; 97 at ¶4; 99-103 at ¶¶9-34; 107-09 at ¶¶55-69]; *see also* Exs. A-7 & A-8.

Notably, typicality is undisturbed by any supposed variation in severity of conditions or treatment suffered by, amounts of damages as between, or strength of defenses ostensibly available against, each Plaintiff or Class Member. *Kornberg*, 741 F.2d at 1337 (reversing decertification based on trial court's erroneous conclusion that typicality was lacking "because the[] [plaintiffs] were more affected by the toilet malfunction than the other passengers").

Plaintiffs' claims are "reasonably co-extensive" and "aligned" with, and share precisely the same essential factual and legal characteristics and interests of, absent Class Members' claims. Accordingly, typicality is also satisfied here.

### 4.  *Plaintiffs Will Fairly and Adequately Protect the Interests of the Class*

The fourth element of Rule 23(a) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This "involves questions [1] of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and [2] of whether plaintiffs have interests antagonistic to those of the rest of the class." *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985). Both criteria are satisfied here.

As to the first prong, Plaintiffs are represented by The Law Offices of Marie A. Mattox, P.A. and The Andrews Law Firm, each and both of which are more than experienced and capable to adequately manage this action, and represent and protect the interests of the Class. Ms. Mattox has practiced in the area of civil rights for more than 20 years, with preeminent experience in federal practice throughout Florida, garnering an established record and reputation in the field. *See* **Exhibit A-2**. Similarly, Ryan J. Andrews, Managing Attorney of The Andrews Law Firm, has distinguished experience litigating civil rights and prisoners' rights matters in federal courts throughout Florida, including significant and successful litigation against the Florida Department of Corrections. *See* **Exhibit A-1**. David A. Weisz, Senior Attorney of The Andrews Law Firm, likewise has substantial experience litigating civil rights and prisoners' rights cases in federal courts throughout the Eleventh Circuit, and further has significant experience litigating complex class action lawsuits in Florida and nationwide. *See* **Exhibit A**. Plaintiffs' counsel is qualified, experienced, competent, and able to vigorously prosecute this case, has no conflicts of interest with Class Members, and will adequately protect the interests of the Class.

The second prong merely requires that Plaintiffs have no substantial conflicts with, or interests antagonistic to, the Class Members. *See Valley Drug*, 350 F.3d at 1189 ("the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in

the controversy"). That requirement is easily satisfied here, as Plaintiffs have no conflicts or antagonistic interests whatsoever vis-à-vis Class Members, but rather "share the true interests of the class" because Plaintiffs have a "strong interest in . . . establishing [the] unlawfulness, demonstrating the impact of the illegal conduct and obtaining redress" for Defendant's conduct. *Checking Account*, 275 F.R.D. at 675 (citing *Hastings-Murtagh v. Tex. Air*, 119 F.R.D. 450, 459 (S.D. Fla. 1988); *Tefel v. Reno*, 972 F.Supp. 608, 617 (S.D. Fla. 1997) ("the 'common goal of each member of the class' is to remedy the unlawful conduct, and 'if the Plaintiffs succeed, the benefits will inure to all class members'")). Plaintiffs have explicitly averred their common interests with, and eagerness and understanding of responsibility to represent, the Class. [*Id.* at 98 ¶¶6, 89, 118-24]; *see* Exs. A-3, A-4, A-5.[22] Further, Plaintiffs and Class Members share a unifying goal: justice for the inhumane treatment they suffered as inmates at the Jail, at the hands of Defendant's unlawful policy and practice. There being no conflicts or antagonistic interests between Plaintiffs and Class Members, Plaintiffs will each fairly and adequately represent the Class, and should be appointed class representatives.

Adequacy, like all other elements of Rule 23(a), is satisfied.

---

[22] [*See also id.* at ¶¶29, 42, 80-84, 94, 96, 98, 101, 103, 106, 109, 141-50, 152, 154, 157-58, 164-73, 175, 177, 180, 182, 188-98, 201, 203, 207, 211-15, 218, 227-36, 240, 242, 244, 248-51, 253, 255, 262-71, 274, 276, 279, 283-87, 289, 294-303, 308, 310, 312, 316-17, 319-21, 324, 328-38, 344, 346, 348, 350-51, 356-66, 372, 374, 376, 380-81, 383-85, 388, 392-402, 407, 409, 411, 413, 422-31, 437, 439, 441, 444-47, 449-51].

## C.     The Requirements of Rule 23(b)(2) Are Also Satisfied

Certification is appropriate under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *Wal-Mart*, 564 U.S. at 360. A class should be certified under this rule when "a single injunction or declaratory judgment would provide relief to each member of the class." *Id.*; *Heffner*, 443 F.3d at 1345 ("Certification under Rule 23(b)(2) is proper when the relief sought necessarily affects all class members"). Importantly, "[t]he rule does not require [the court] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010); *Murray*, 244 F.3d at 810 (affirming (b)(2) certification despite need for individualized eligibility hearings); *Gayle*, 614 F.Supp.3d at 1199 (certifying (b)(2) class "because [defendant's] actions and inactions apply to the class generally"). Accordingly, the requirements of Rule 23(b)(2) are "almost automatically satisfied" in actions seeking equitable relief for common legal claims. *Navarro v. Fla. Inst. of Tech.*, No. 6:22-cv-1950, 2023 U.S. Dist. LEXIS 148333, at *13 (M.D. Fla. Aug. 23, 2023) (citing *Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) ("commentators have

also noted that the language of (b)(2) does not even require that the defendant's conduct be directed or damaging to every member of the class").

Plaintiffs' challenge to Defendant's unconstitutional and unlawful policies and practices, of refusing or failing to develop and implement plans or procedures for the Jail's preparations and response to emergencies, uniformly harmed a discrete class of all inmates housed in the Jail during and after the Hurricane, and falls squarely within the ambit of Rule 23(b)(2). Defendant acted on grounds generally applicable across the Class, and its unconstitutional jail conditions, unlawful failure to protect, and tortious conduct universally harmed Class Members. See Exs. A-3, A-4, A-5, A-6, A-7 & A-8. Thus, both declaratory relief (*i.e.*, a finding of liability against Defendant and as to its across-the-board violations of Class Members' legal rights), and injunctive relief (*i.e.*, to prevent Defendant from repeating its unlawful policies and practices for emergency preparation and response vis-à-vis current and future inmates of the Jail), are appropriate for class treatment here.

Critically, "Rule 23(b)(2) has been liberally applied in the area of civil rights, including suits challenging conditions and practices at various detention facilities." *Braggs v. Dunn*, 317 F.R.D. 634, 667 (M.D. Ala. 2016) (quoting *Bumgarner v. N.C. Dep't of Corr.*, 276 F.R.D. 452, 457 (E.D.N.C. 2011)); *Parson*, 289 F.R.D. at 524 ("claims for injunctive relief stemming from allegedly unconstitutional conditions of confinement are the quintessential type of claims that Rule 23(b)(2) was meant to

address"), *aff'd* 754 F.3d at 686 ("the primary role of [Rule 23 (b)(2)] has always been the certification of civil rights class actions"); *Wal-Mart*, 564 U.S. at 361 (quoting *Amchem*, 521 U.S. at 614); *Neal*, 43 F.3d at 64. Courts also routinely certify (b)(2) classes on behalf of prisoners alleging inadequate medical or mental healthcare. *Hoffer*, 323 F.R.D. at 700.[23] The common thread among such cases is class members' "alleged exposure, as a result of specified [prison] policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent." *Parsons*, 754 F.3d at 678.

The case for certification is equal if not ***stronger*** here, relative to the foregoing cases readily certifying (b)(2) classes. This civil rights action entails a group of 900 or more Class Members who suffered precisely the same injuries, through exposure to a single policy and practice of Defendant, applied across and affecting all similarly situated inmates uniformly. The Equitable Class satisfies the requirements of, and should be certified under Rule 23(b)(2), as proposed hereinabove (*see supra* at 2).

---

[23] *See also Colonel Fin. Mgmt. v. Austin*, 622 F.Supp.3d 1187, 1204 (M.D. Fla. 2022); *Drayton v. W. Auto Supply*, 203 F.R.D. 520, 528 (M.D. Fla. 2000); *Gayle*, 614 F.Supp.3d at 1199; *Hughes*, 2013 U.S. Dist. LEXIS 61493, at *92-93.

**D.     Class Certification is Also Appropriate Under Rule 23(b)(3)**

    *1.     Questions of Law and Fact Common to the Class Predominate Over Any Individual Questions*

The Primary Class further satisfies the predominance and superiority prongs of Rule 23(b)(3), warranting certification thereunder. "[P]redominance . . . is perhaps the central and overriding prerequisite for a Rule 23(b)(3) class." *Vega*, 564 F.3d at 1278. To satisfy the predominance requirement, movants must demonstrate that classwide issues predominate over individual issues. *See Babineau v. FedEx*, 576 F.3d 1183, 1191 (11th Cir. 2009); *Jackson v. Motel 6*, 130 F.3d 999, 1005 (11th Cir. 1997). "The Rule 23(b)(3) predominance inquiry is meant to tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wal-Mart*, 564 U.S. at 376 (quoting *Amchem*, 521 U.S. at 623). Predominance is a more demanding requirement than commonality, focusing on "the legal or factual questions that qualify each class member's case as a genuine controversy." *Jackson*, 130 F.3d at 1005; *Vega*, 564 F.3d at 1270.

Predominance requires more than just the presence of common issues; the common issues must outweigh and predominate over individualized issues presented in the litigation. *See Muzuco v. Re$ubmitIt*, 297 F.R.D. 504, 518 (S.D. Fla. 2013). Common issues of fact and law will predominate where they directly impact every Class Member's effort to establish liability and entitlement to monetary relief. *See Babineau*, 576 F.3d at 1191. As such, this inquiry focuses on "whether there are

common liability issues which may be resolved efficiently on a class-wide basis." *Brown v. SCI Funeral Servs.*, 212 F.R.D. 602, 606 (S.D. Fla. 2003). Thus, the Court must consider the causes of action and "what value the resolution of the class-wide issue will have in each class member's underlying cause of action." *Rutstein v. Avis Rent-A-Car*, 211 F.3d 1228, 1234 (11th Cir. 2000). The relevant causes of action, negligence, unconstitutional jail conditions (Fourteenth Amendment), and failure to protect (42 U.S.C. § 1986), are addressed in-turn:

i.   <u>Negligence</u>

The elements of common-law negligence in Florida are duty of care, breach of that duty, legal or proximate cause, and actual damage. *Wallace v. Dean*, 3 So. 3d 1035, 1047 (Fla. 2009); *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007).

Though less commonly the subject of class treatment, classwide negligence claims are nevertheless certified under Rule 23(b)(3) where the alleged negligence and damages arise from common operative facts. *See Navelski v. Int'l Paper*, 244 F.Supp.3d 1275, 1310 (N.D. Fla. 2017) (certifying classwide negligence claim under (b)(3): "the core factual and legal issues with respect to liability in this case— whether or not Defendant's conduct caused the Dam to fail, whether or not the Dam's failure caused flooding in the subject neighborhood, and, if so, to what extent Defendant should be held liable—are resolvable by proof that is common to all class members"); *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 623-27 (5th Cir. 1999)

– 31 –

(affirming (b)(3) certification of classwide negligence claim, deeming individual issues best managed via multistage trials: one for "liability issues common to all class members," "whether [defendant] was negligent in relation to the [defective] ventilation system", and another for "limited issues" of "causation, damages, and comparative negligence . . . affecting only individual class members").[24]

Plaintiffs assert that on and after October 10, 2018, they (like the Class Members) were under supervision, care, or custody of Defendant (through Anglin) at the Jail, and were subjected to its unlawful conditions. [*Id.* at 99 ¶¶10-11]; *see supra* at 5-7 n.5-10 & at 12-13 n.14-17. Defendant owed all Plaintiffs (and Class Members) numerous duties of care, under Florida law and MJS, including and most basically to protect inmates from harm. [*Id.* at ¶¶88-93, 95, 97, 99-100, 102, 104, 108, 110 115-16; 96 at ¶3; 99 at ¶13; 111 at ¶80]. Ford (through Anglin) breached his duties, *inter alia*, by failing to provide Plaintiffs (and Class Members) adequate housing, food, water, medical care, clothing, bedding, sanitation, or otherwise protect from harm and ensure their health and safety. [*Id.* at ¶¶88-89, 94, 96, 98, 101, 103, 106, 109, 111, 117, 126-325; 98-99 at ¶¶7-8, 14]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8. As a direct and proximate result, each Plaintiff and Class Member suffered actual and substantial injuries, for which they are each and all entitled to

---

[24] *See also Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558, 561 (S.D. Fla. 1973), *aff'd* 507 F.2d 1278 (5th Cir. 1975); *cf. Teggerdine v. Speedway*, No. 8:16-cv-3280, 2018 U.S. Dist. LEXIS 91043, at *16 (M.D. Fla. May 31, 2018).

recover damages from Defendant.[25]

Here, Plaintiffs' robust allegations that and how Defendant violated the same duties of care owed to all Class Members, in the same factual manner and circumstances, through conduct applied universally across the Class, and resulting in the same or substantially harms thereto. *See* Exs. A-3, A-4, A-5, A-6, A-7 & A-8. As a result, determination of liability for this negligence claim will be identical across all Plaintiffs and Class Members, with no presence or risk of highly individualized issues (if even any at all). Therefore, predominance is satisfied for Plaintiffs' negligence claim.

  ii. <u>Unconstitutional Jail Conditions in violation of Fourteenth Amendment</u>

Through 42 U.S.C. § 1983, Plaintiffs assert a Fourteenth Amendment claim for unconstitutional jail conditions amounting to cruel and unusual punishment, which claims routinely satisfy predominance. *See Williams v. Bennett*, 689 F.2d 1370, 1374 (11th Cir. 1982) (certifying a class of inmates for claims against a state prison for the use of cruel and unusual punishment against the inmates); *Dockery*, 253 F.Supp.3d at 839.[26]

---

[25] [*Id.* at ¶¶4-13, 42, 45, 57, 94, 96, 98, 101, 103, 106, 109, 111-12, 117, 130, 132-33, 158-59, 176, 182-83, 202, 213, 215, 218, 241, 244, 250, 253, 255, 275, 278, 285, 287, 289, 309, 319, 321, 324, 345, 351-52, 373, 383, 385, 388, 408, 412-14, 438, 446, 449-51; 99-100 at ¶15]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8.

[26] *See also Jackson v. Cuyahoga*, No. 1:20-cv-2649, 2021 U.S. Dist. LEXIS 156300, at *3 (N.D. Ohio Aug. 19, 2021) (certifying inmate class for unconstitutional conditions, including "spoiled food on moldy trays," "food [that] had dead or alive bugs in it," "provided cloudy, inconsumable

As explained, all Class Members had the same clearly-established constitutional right to be free from cruel and unusual punishment in connection with conditions of confinement, which Defendant universally refused or failed to ensure—and instead caused or exacerbated through a policy and practice fostering deliberate indifference—in the same manner, causing the same harm, and giving rise to identical Fourteenth Amendment claims that entail common questions and issues of law and fact. [*Id.* at 96-97 ¶3; 100-03 ¶¶16-34]; *see also* Exs. A-3, A-4, A-5, A-6, A-7 & A-8; *supra* at 5-7 n.5-10 & at 12-13 n.14-17. Thus, this claim is uniquely susceptible to classwide proof.

To be sure, determination of liability and entitlement to monetary relief for Defendant's contemptuous conduct at-issue, is devoid of ***any*** highly individualized issues. The ***only*** plausible individual issue that ***could*** arise with respect to that claim, potential variation in ***degree*** of risk and harm to which each Class Member was subjected (and thus, the ***amount*** of their damages), simply does ***not*** defeat or undermine predominance. *See Brown*, 817 F.3d at 1238-40. Moreover, the degree of risk to which Class Members were subjected may manifest into some varying degrees of harm or future harm, ultimately "every inmate suffers exactly the same

---

water," and "urine and feces pollut[ing] the floors of the [facility], and that the [facility] was infested with bugs," thereby creating "unsanitary, inhumane, and unconstitutional conditions"); *Scott v. Dart*, No. 23-1312, 2024 U.S. App. LEXIS 10305, at *27 (7th Cir. Apr. 29, 2024).

constitutional injury when he is exposed to a single statewide [prison] policy or practice that creates a substantial risk of serious harm." *Parsons*, 754 F.3d at 678.

At bottom, every single inmate in custody at the Jail during the Primary Class Period suffered the same constitutional injury, by virtue of those inmates' mere presence there during a time in which Defendant's uniform policy and practice created unlawful conditions and treatment afflicting all inmates. There can be few examples of Fourteenth Amendment claims that predominate more thoroughly.

### iii.   Failure to Protect in violation of 42 U.S.C. § 1986

Again through 42 U.S.C. § 1983, Plaintiffs assert a claim for failure to protect pursuant to 42 U.S.C. § 1986, which claims also routinely satisfy predominance. Similar to Plaintiffs' claim for unconstitutional jail conditions, courts also routinely conclude that claims for failure to protect satisfy the predominance requirement. *See Gayle*, 614 F.Supp.3d at 1200 (certifying class for detainees' claims of failure to protect from infection of Covid-19); *Doe v. Wash. Dep't of Corr.*, No. 4:21-cv-5059, 2021 U.S. Dist. LEXIS 93489, at *18 (E.D. Wash. May 17, 2021); *Chatman v. Otani*, No. 21-cv-268, 2021 U.S. Dist. LEXIS 130465, at *10 (D. Haw. Jul. 13, 2021); *Rouse v. Washington*, No. 20-cv-11409, 2021 U.S. Dist. LEXIS 111678, at *47 (E.D. Mich. Jun. 15, 2021); *Caroline v. Johnson*, 174 F.R.D. 452, 458 (D. Neb. 1996); *Snead v. CoreCivic of Tenn.*, No. 3:17-cv-949, 2018 U.S. Dist. LEXIS 108391, at *17 (M.D. Tenn. Jun. 27, 2018).

Individualized issues are utterly lacking with respect to this claim, as well, which is manifestly subject to classwide proof for the same reasons as Plaintiffs' Fourteenth Amendment claim. [*Id.* at 96-97 ¶3; 107-09 ¶¶55-69]; *see also* Exs. A-6, A-7 & A-8; *supra* at 5-7 n.5-10 & at 12-13 n.14-17. Defendant's uniformly applicable policy and practice governing emergency preparation and response, resulting in refusal or failure to develop and implement plans or procedures to protect inmates in the event of such an emergency at the Jail, constituted a failure to protect all inmates present during the Primary Class Period. Variation in their degree of risk or harm (and thus damages) is again the only individual issue that may arise as to that claim, and which does not defeat or undermine predominance. *See Brown*, 817 F.3d at 1238-40.

Because highly individualized issues are notably absent with respect to Plaintiffs' claim for failure to protect, predominance is readily satisfied. *See supra.*

### 2.   *A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of this Controversy*

The superiority requirement of Rule 23 requires a movant to show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The focus of this analysis is on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Sacred Heart Health v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1183-84 (11th Cir. 2010). "Where

predominance is established, this consideration will almost always mitigate in favor of certifying a class." *Klay v. Humana*, 382 F.3d 1241, 1270 (11th Cir. 2004); *Carrinolo v. Gen. Motors*, 823 F.3d 977, 989 (11th Cir. 2016).

In assessing superiority, courts often consider the damages sought by plaintiffs and the class. Where damages suffered by individual class members are not demonstrably large, particularly compared with the costs or barriers to pursuing claims individually, this factor weighs in favor of certification. *See Zinser v. Accufix*, 253 F.3d 1180, 1190 (9th Cir. 2001); *cf. Krukever v. TD Ameritrade*, 328 F.R.D. 649, 663 (S.D. Fla. 2018). Here, there is no indication that Plaintiffs' individual damages sought are so large as to defeat superiority, particularly given that Plaintiffs' only representation concerning perceived value of their claims, is that they **collectively** seek "damages in excess of $50,000." [*Id.* at ¶1].

Relatedly, the amount of **classwide** damages sought typically weighs against superiority only where "potentially annihilating" relative to a defendant's scarce resources, particularly where classwide claims entail statutory damages requiring no proof of actual harm suffered or damages incurred. *See Leysoto v. Mama Mia I.*, 255 F.R.D. 693, 697 (S.D. Fla. 2009); *cf. Legg v. Spirit Airlines*, 315 F.R.D. 383, 391-92 (S.D. Fla. 2015). While difficult at this junction to accurately estimate the value

of classwide damages, there is no indication they are "potentially annihilating," either alone or relative to Defendant's ability to pay a classwide judgment.[27]

Courts also consider factors such as the extent to which putative class members have sought to opt out or pursued their claims individually. *See DeSouza v. Aerocare Holdings*, No. 6:22-cv-1047, 2024 U.S. Dist. LEXIS 52076, at *7 (M.D. Fla. Mar. 25, 2024); *Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 856 (9th Cir. 1982). There are no known indications of any Class Members' desire or intent to opt out of the Class, or of filing their claims individually. Consideration of barriers to pursuing individual claims, including limited financial resources of class members and complexity of the claims, further suggests opt outs are unlikely here. *See Zhang v. Ichiban Grp.*, No. 1:17-cv-148, 2021 U.S. Dist. LEXIS 136308, at *22 (N.D.N.Y. May 21, 2021) (citing *Cuzco v. Orion Builders*, 262 F.R.D. 325, 335 (S.D.N.Y. 2009)); *Yazzie v. Ray Vickers' Special Cars*, 180 F.R.D. 411, 415 (D.N.M. 1998).

Concentrating the litigation in this forum is also desirable to hundreds of individual lawsuits, which would be "repetitive, wasteful, and an extraordinary burden on the courts." *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983);

---

[27] Courts have generally admonished against consideration of purported inability to pay by public entity defendants, such as the Defendant here. *See, e.g., Hall v. Bd. of Sch. Comm'rs of Conecuh Cty.*, 707 F.2d 464, 465 (11th Cir. 1983); *Rayna P. v. Campus Cmty. Sch.*, 390 F.Supp.3d 556, 570 (D. Del. 2019); *Zander v. Orlich*, No. 2:14-cv-400, 2017 U.S. Dist. LEXIS 200567, at *1 (N.D. Ind. Dec. 6, 2017); *E.C. v. Philadelphia Sch. Dist.*, 644 F.App'x 154, 157 (3d Cir. 2016); *Allegheny Cty. Jail v. Pierce*, 716 F.2d 177, 179 (3d Cir. 1983); *Sharrock v. Harris*, 489 F.Supp. 913, 915 (S.D.N.Y. 1980); *Simpson v. Sheahan*, 104 F.3d 998, 1003 (7th Cir. 1997).

*Califano v. Yamasaki*, 442 U.S. 682, 690 (1979). And finally, no management issues are presented with respect to classwide litigation of this matter, which is far better suited for classwide management, as explained. *See Eisen*, 417 U.S. at 164; *Klay*, 382 F.3d at 1272; *Cherry v. Dometic*, 986 F.3d 1296, 1304-05 (11th Cir. 2021).

In light of the foregoing, class treatment is clearly superior to other available methods for the fair and efficient adjudication of this controversy.

### E.   This Court Should Appoint the Undersigned as Class Counsel

Fed. R. Civ. P. 23(g)(1) provides that "unless a statute provides otherwise, a court that certifies a class must appoint class counsel," and outlines factors relevant to appointment of class counsel:

> (i) The work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

These factors weigh in favor of appointing the undersigned as class counsel. Counsel from The Law Offices of Marie A. Mattox have already done substantial work investigating the facts and identifying the claims for the Plaintiffs and Class. Over the last several years, Ms. Mattox has collected a bevy of documentation, completed multiple public records requests, obtained and reviewed inmate release information, former employee information, arrest records, mold reports, e-coli test reports, and water test reports, and hired multiple experts. The Andrews Law Firm has also done

substantial work in reviewing the significant materials collected by Ms. Mattox, and also in preparing this Motion. As already noted, Ms. Mattox, as well as Messrs. Andrews and Weisz, have extensive experience handling complex civil rights actions on behalf of inmates, while Mr. Weisz also has experience litigating complex class actions. *See* Exs. A, A-1 & A-2. Further, each and both firms have sufficient resources they will commit to representing the Class. *See id.*

Plaintiffs respectfully request the Court appoint as joint class counsel The Law Offices of Marie A. Mattox and The Andrews Law Firm, and specifically attorneys Mattox, Andrews, and Weisz.

## IV.   <u>CONCLUSION</u>

Defendant has a clear policy and practice governing preparation for and response to emergencies affecting the Jail—namely, refusing or failure to develop and implement plans or procedures to protect and ensure inmates' health and safety in the event of such emergencies. These policies and practices placed all Class Members in harm's way and at enormous risk of grave and permanent injury. Rather than file hundreds or more individual lawsuits entailing superfluous litigation of the same operative facts, issues, questions, and claims—risking inconsistent or varying determinations; straining the resources of Courts and litigants; and likely foreclosing relief for countless Class Members who, practically speaking, could not and/or

would not know to (or how to) pursue their claims individually[28]—Plaintiffs seek to remedy the rights of all affected through the efficient and inclusive vehicle of a class action. And as explained herein, class treatment is eminently appropriate in this case.

**WHEREFORE**, Plaintiffs respectfully request that the Court grant the requested relief herein, including certifying the Classes (and Subclasses) proposed under both Rule 23(b)(2) and (b)(3),[29] certifying Plaintiffs as Class Representatives, appointing the undersigned as Class Counsel pursuant to Rule 23(g), and for such further relief as the Court deems just and proper. Plaintiffs hereby further request an evidentiary hearing upon this Motion and request for class certification.

Respectfully submitted,

**ANDREWS LAW FIRM**
822 North Monroe Street
Tallahassee, Florida 32303
**T:** (850) 681-6416 | **F:** (850) 681-6984

*/s/ David A. Weisz*
DAVID A. WEISZ (FBN 1023229)
Ryan J. Andrews (FBN 0104703)
david@andrewslaw.com
ryan@andrewslaw.com
service@andrewslaw.com
*Counsel for Plaintiffs*

---

[28] These are the precise "three essential purposes" of class actions, as distilled by Eleventh Circuit courts. *Singer v. AT&T*, 185 F.R.D. 681, 685 (S.D. Fla. 1998) (citing *Am. Pipe & Constr. v. Utah*, 414 U.S. 538, 550 (1974); *Phillips Petro.*, 472 U.S. 797); *Johnson v. NPAS Sols.*, 43 F.4th 1138, 1145 (11th Cir. 2022) (noting "major purpose" of class actions to "'provide a method of protecting the rights of those who would not realistically bring individual claims for practical reasons'").

[29] Upon the Court's granting of this Motion and certification of the Class, Plaintiffs will prepare an appropriate plan and related forms for giving Notice to the Class pursuant to Rule 23(c)(2), and will submit the plan and forms to the Court for its review and approval.

*- and -*

**MARIE A. MATTOX, P.A.**
203 North Gadsden Street
Tallahassee, Florida 32301
**T:** (850) 383-4800 | **F:** (850) 383-4801

*/s/ Marie A. Mattox*
Marie A. Mattox (FBN 0739685)
marie@mattoxlaw.com
*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

I HEREBY CERTIFY that the foregoing motion and memorandum contains 10,981 words, exclusive of case style, signature block, and certificate of service, in compliance with the limit of 11,000 words as authorized by the Court, ECF No. 37.

/s/ David A. Weisz
David A. Weisz

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served to all parties of record through the CM/ECF portal, and/or electronic mail, on this 31st day of July, 2024.

/s/ David A. Weisz
David A. Weisz

Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

**KRISTINA TRIPP, THOMAS**
**MCFATTER,** *et al.*, **individually and**
**on behalf of all others similarly situated,**

   **Plaintiffs,**

**v.**                                                    **Case No. 5:23-cv-112-AW-MJF**

**TOMMY FORD, SHERIFF OF BAY**
**COUNTY, FLORIDA, in his official**
**capacity as Sheriff,**

   **Defendant.**
_____/

## DECLARATION OF DAVID A. WEISZ IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I hereby declare pursuant to 28 U.S.C. § 1746:

1.     I am more than twenty-one (21) years old, under no legal disability, and am competent to give this declaration. Unless otherwise indicated, the statements in this declaration are made based upon my personal knowledge, and if called to do so, I could and would competently testify to them.

2.     I am a Senior Attorney at the Andrews Law Firm in Tallahassee, Florida. The Andrews Law Firm, and specifically myself and Ryan J. Andrews, are putative Class Co-Counsel, together with Marie A. Mattox of The Law Offices of Marie A. Mattox, on behalf of the Plaintiffs and putative Class Representatives, Kristina Tripp, Thomas McFatter, Michael Murrero-Delgado, Amber Ahne, Amber

Lyn Tidwell, Conrad Forrence, Paula Cooper, Cameron Wilson, Joshua Foster, and Normando Brown (together, "Plaintiffs"), in the above-captioned action. I respectfully submit this declaration in support of Plaintiffs' Motion for Class Certification (the "Motion").

3.      I graduated from the Florida State University College of Law in 2014, *magna cum laude*. While in law school, I received book awards in Property Law, Legal Writing and Research I, and Legal Writing and Research II. I served as a Senior Member of the Law Review, a Member of the Chester Bedell Memorial Mock Trial Team, an Associate Justice to the FSU Student Supreme Court, and Treasurer of the Cuban American Bar Association. I also received the Richard M. Davis Scholarship for Outstanding Academic Merit and Service to the Law School, and upon graduation, was inducted into the Florida State University Chapter of the Order of the Coif. Prior to joining the Andrews Law Firm, I served as an attorney in the litigation and dispute resolution group of the esteemed Atlanta law firm, Taylor English Duma. I also previously served as an associate at the national securities and complex commercial litigation law firm of Johnson Fistel, and the Atlanta employment litigation boutique of Parks, Chesin & Walbert. I am an AV Preeminent® rated attorney through Martindale Hubbell, the highest rating of professional excellence available to any individual lawyer for ethical standards and legal ability.

4.      I was initially admitted to practice law in Georgia beginning in 2014, and subsequently in Florida (2020) and New York (2022). I am also admitted to practice in, and am in good standing with, the United States Court of Appeals for the Eleventh Circuit; the United States District Courts for the Northern and Middle Districts of Georgia, as well as the Northern and Middle Districts of Florida; the Supreme Court, Court of Appeals, and Superior Courts of Georgia; and the New York Supreme Court.

5.      I have substantial experience and a long-standing track record of success representing clients in complex litigation, including class actions such as this, as well as civil rights, prisoners' rights, securities fraud, appellate, and other civil matters, in federal and state courts throughout Florida, the Eleventh Circuit, and nationwide.

6.      Since 2014, my experience as a legal practitioner in the field of complex class action litigation includes: *Desrocher v. Covisint Corporation, et al.*, Case No. 1:14-cv-3878 (S.D.N.Y.) (securities class action litigation); *Gerneth v. Chiasma, Inc., et al.*, Case No. 1:16-cv-11082 (D. Mass.) (securities class action litigation); *Baker v. Visa International Corp.*, Case No. 06cv0376 (Super. Ct. of San Diego Cty.) (consumer class action litigation); *Bible v. City of Roswell*, 2023 Ga. Super. LEXIS 1082 (employment class action litigation); *Kreitman v. Fla. Dep't of Corr.*, No. 4:20-cv-371, 2020 U.S. Dist. LEXIS 260124, at *1 (N.D. Fla. Nov. 30, 2020) (prisoner

rights/HEP-C federal litigation); *Giancola v. Lincare Holdings, Inc.*, No. 8:17-cv-2427, 2018 U.S. Dist. LEXIS 206631, at *1 (M.D. Fla. Dec. 7, 2018) (consumer data breach class action litigation); *Cisneros v. Petland, Inc.*, 341 F. Supp. 3d 1365, 1368 (N.D. Ga. 2018) (federal RICO litigation).

7.     Plaintiffs' counsel, Marie A. Mattox, Esq., has engaged the Andrews Law Firm as co-counsel to assist in seeking certification of and managing this case as a class action, including preparation of Plaintiffs' Motion for Class Certification. Since joining Marie A. Mattox, Esq. as co-counsel in this matter, I and the Andrews Law Firm have been diligently familiarizing with this case, including the 114-page 537-paragraph Fifth Amended Complaint and voluminous pertinent materials, as well as advancing this case through preparation of the Class Certification Motion.

8.     Based on my co-representation with Marie A. Mattox, Esq., it is my belief that the undersigned attorneys are each and together committed to the vigorous, effective, and efficient prosecution of this matter, as well as qualified, experienced, and able to conduct this matter on a classwide basis. Accordingly, it is my belief that each and all of Plaintiffs' co-counsel thoroughly meet the adequacy requirements of Fed. R. Civ. P. 23(a)(4) and 23(g)(1)(A).

9.     Plaintiffs' counsel has agreed to act jointly as class counsel, if the Court so designates them.

10.    The Andrews Law Firm is committed to dedicating substantial resources to the representation of the putative Class, alongside Marie A. Mattox Esq.

11.    Attached hereto are true and correct copies of the following exhibits submitted in support of the Motion:

Exhibit 1:    Declaration of Ryan J. Andrews

Exhibit 2:    Declaration of Marie A. Mattox

Exhibit 3:    Declaration of Amber Ahne

Exhibit 4:    Declaration of Paula Cooper

Exhibit 5:    Declaration of Thomas McFatter

Exhibit 6:    Declaration of Lucas Rose

Exhibit 7:    Declaration of Richard Herstein

Exhibit 8:    Declaration of Lucinda Braswell

FURTHER DECLARANT SAYETH NAUGHT.

I hereby declare under penalty of perjury that the foregoing is true and correct, this 31st day of July, 2024.

_/s/ David A. Weisz_____
DAVID A. WEISZ

# Exhibit 1

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

KRISTINA TRIPP, THOMAS
MCFATTER, *et al.*, individually and
on behalf of all others similarly situated,

      **Plaintiffs,**

v.                                   **Case No. 5:23-cv-112-AW-MJF**

TOMMY FORD, SHERIFF OF BAY
COUNTY, FLORIDA, in his official
capacity as Sheriff,

      **Defendant.**

_____/

## DECLARATION OF RYAN J. ANDREWS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I hereby declare pursuant to 28 U.S.C. § 1746:

1.    I am more than twenty-one (21) years old and am under no legal disability. Unless otherwise indicated, the statements in this declaration are made based upon my personal knowledge, and if called to do so, I could and would competently testify to them.

2.    I am the Managing Attorney of the Tallahassee law firm, Andrews Law Firm. The Andrews Law Firm, and specifically myself and David A. Weisz, are putative Class Counsel, jointly with Marie A. Mattox of The Law Offices of Marie A. Mattox, on behalf of the Plaintiffs and putative Class Representatives, Kristina Tripp, Thomas McFatter, Michael Murrero-Delgado, Amber Ahne, Amber Lyn

Tidwell, Conrad Forrence, Paula Cooper, Cameron Wilson, Joshua Foster, and Normando Brown ("Plaintiffs"), in the above-captioned action. I respectfully submit this declaration in support of Plaintiffs' Motion for Class Certification.

3.      I graduated from the Florida State University College of Law in 2013, *magna cum laude*. In the same year, I was admitted and have continuously remained a member of the Florida Bar. This has included being a member of the District Courts for the Northern, Middle, and Southern Districts of Florida. I initially worked for Andrews Law Firm (formerly, the Law Offices of Steven R. Andres, P.A.) then worked as general counsel for two internet companies in Philadelphia. This work included litigation, HR and employment matters/litigation, and negotiating sales of securities. In 2015, I returned to Tallahassee to work at the Andrews Law Firm. In 2017, I became the managing attorney of the Andrews Law Firm, overseeing the firm's day-to-day operations and managing its cases. I have secured tens of millions of dollars for my clients through my eleven years of practice. This includes several millions of dollars against public officials and state agencies, including the Florida Department of Corrections and similar parties, specifically, through state and federal civil rights litigation, ADA litigation, as well as representing inmates in various civil rights matters. I was involved in the largest ADA inmate settlement against the Florida Department of Corrections in Florida state history. Through my career, I have appeared in cases in California, South Carolina, Mississippi, Arizona, New

York, and Georgia. I am an AV Preeminent® rated attorney through Martindale Hubbell, the highest rating of professional excellence available to any individual lawyer for ethical standards and legal ability.

4.      Since 2015, my experience as a legal practitioner in the field of prisoner rights and civil rights law, among other areas of law, federal courts of Florida and elsewhere have included: *Weimar v. Fla. Dep't of Corr.*, No. 5:19-cv-548, 2020 U.S. Dist. LEXIS 74381, at *1 (M.D. Fla. Apr. 28, 2020) (prisoner rights federal litigation); *Kinard v. Centurion of Fla., LLC*, No. 3:19-cv-490, 2020 U.S. Dist. LEXIS 114519, at *1 (M.D. Fla. June 30, 2020) (prisoner rights federal litigation); *Morrison v. Fla. Dep't of Corr.*, No. 4:18-cv-576, 2020 U.S. Dist. LEXIS 269468, at *1 (N.D. Fla. Mar. 2, 2020) (prisoner rights federal litigation); *Cloud v. Fla. Dep't of Corr.*, No. 4:19-cv-161, 2005 U.S. Dist. LEXIS 64562, at *1 (N.D. Fla. May 14, 2020) (prisoner rights/HEP-C federal litigation);

5.      Although not Civil Rights litigation, I have managed and been lead counsel on personal injury negligence cases, including specifically with hundreds of Plaintiffs. Those cases were litigated to successful resolution.

6.      Plaintiffs' counsel, Marie A. Mattox, Esq., has engaged my office as putative class counsel, specifically to assist in Plaintiffs' certification and management of this case as a class action, including the preparation and filing of Plaintiffs' Motion for Class Certification. Since joining Marie A. Mattox, Esq., the

Andrews Law Firm has been diligently and fully familiarizing themselves with this case (including the detailed, 114-page, 537-paragraph, operative Fifth Amended Complaint, and the voluminous materials attendant thereto), as well as preparing the Plaintiffs' forthcoming motion for class certification.

7.      Based on my co-representation with Marie A. Mattox, Esq., it is my belief that the undersigned attorneys are each and together committed to the vigorous, effective, and efficient prosecution of this matter, as well as qualified, experienced, and able to conduct this matter on a classwide basis. Accordingly, it is my belief that each and all of Plaintiffs' co-counsel thoroughly meet the adequacy requirements of Fed. R. Civ. P. 23(a)(4) and 23(g)(1)(A).

8.      Plaintiffs' counsel has agreed to act jointly as class counsel, if the Court so designates them.

9.      My office has dedicated, and will continue to commit, substantial resources to the representation of this class, alongside Marie A. Mattox Esq.

FURTHER DECLARANT SAYETH NAUGHT.

I hereby declare under penalty of perjury that the foregoing is true and correct, this 31st day of July, 2024.


                                        _/s/ Ryan J. Andrews_____
                                        RYAN J. ANDREWS


– 4 –

Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**KRISTINA TRIPP, THOMAS MCFATTER, MICHAEL MURRERO-DELGADO, AMBER AHNE, AMBER LYN TIDWELL, CONRAD FORRENCE, PAULA COOPER, CAMERON WILSON, JOSHUA FOSTER, and NORMANDO BROWN, individually and on behalf of all others similarly situated,**

      **Plaintiffs,**

**v.**                    **CASE NO.: 5:23-cv-112-AW-MJF**

**TOMMY FORD, SHERIFF OF BAY COUNTY, FLORIDA,**

      **Defendant.**

_____/

STATE OF FLORIDA
LEON COUNTY

### DECLARATION OF MARIE A. MATTOX

I hereby declare pursuant to 28 U.S.C. § 1746:

1.     I am more than twenty-one years of age and am under no legal disability.

2.     I am the principal of the Tallahassee law firm, Marie A. Mattox, P.A.

3.     I was originally admitted to practice law in Florida in 1988.  I have been continuously a member of The Florida Bar since then.  I am a member of the District Courts for the Northern and Middle Districts of Florida.  I am a member of the bar of the Eleventh Circuit Court of Appeal.

4.     I have practiced employment and civil rights law since 1991 in the state and federal courts of Florida and elsewhere.

5.     I have tried multiple cases to verdict and estimate that I have been lead counsel in  over 75-100 cases and maybe more that have been tried over the past 30 years.  Because of the fact that my firm handles almost exclusively employment and civil rights litigation, I am familiar with multiple employment and civil rights lawyers in Florida and especially those practicing in the Northern District.

6.     I am consulted on a regular basis to assist in civil rights litigation in cases in both federal and state court in Florida.

FURTHER DECLARANT SAYETH NAUGHT.

I hereby declare under penalty of perjury that the foregoing is true and correct, this 30th day of July, 2024.

/s/ Marie A. Mattox
Marie A. Mattox

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**KRISTINA TRIPP, THOMAS
MCFATTER, MICHAEL
MURRERO-DELGADO, AMBER
AHNE, AMBER LYN TIDWELL,
CONRAD FORRENCE, PAULA
COOPER, CAMERON WILSON,
JOSHUA FOSTER, and
NORMANDO BROWN, individually
and on behalf of all others similarly
situated,**

      **Plaintiffs,**

**v.**                         **CASE NO.: 5:23-cv-112-AW-MJF**

**TOMMY FORD, SHERIFF OF
BAY COUNTY, FLORIDA,**

      **Defendant.**

_____/

STATE OF FLORIDA
BAY COUNTY

## <u>DECLARATION OF AMBER AHNE</u>

I, AMBER AHNE, make the following statements under penalty of perjury

under 28 U.S.C. §1746 as follows:

1.     My name is Amber Ahne and I am one of the class representatives and

a Plaintiff in this case.  I am over the age of 18 years, and I verify under 28 U.S.C. §

1746 that the facts set forth in this Declaration are true and correct and are made under the penalty of perjury.

2.    I have read and verify as being accurate paragraphs 15-16, 27-31, the first sentence of paragraph 32, 34-46, 48-88, the factual basis for the breach of the standards in 89-112, 117-126, 131, and 135 of the Fifth Amended Complaint as well as paragraphs 389 through 414.

3.    I was incarcerated in the Bay County Jail from October 1, 2018 until October 18, 2018.   I was rearrested on December 7, 2018 and remained in the Bay County Jail until December 10, 2018.

4.    I was housed in E dorm during Hurricane Michael.

5.    Once the Jail lost power, we lost central air and heating and the ability to flush our toilets and get water.

6.    In E Dorm, we were confined to our dorms unless escorted by staff.

7.    In E dorm staff stopped coming in the dorms and conducting security checks due to the staff stating it was unsafe.

8.    This caused panicking with inmates in E Dorm Pod 2 which was already over population due to how many female inmates who were housed in E2.

9.    When the air conditioners came off the roof, water was coming in from the roof which caused humanity and condensation to build up.

10.     Inmates started panicking once they stopped seeing staff come in the dorms.  We also could not see out the windows of our dorm because of the humidity.

11.     There was no water provided the day of or the day after the storm.

12.     The buildup of mold also began shortly after the hurricane and all of the inmates were exposed to the mold.  We were watching the mold grow each day and we did not have access to chemicals to clean it off the walls.  This was frightening.

13.     We were told by Jail staff that we were going to be transferred or released.

14.     On October 18, 2018, I was released with several other inmates and told that we had two hours to walk home or wherever we were going from where we were dropped off due to the curfew. There was no phone service and there were increased law enforcement on the streets.

15.     I was released and then arrested again stating I missed a court date that I was not told about when I was released from the jail. When I was in the Jail the second time, from December 7-10, 2018, the conditions improved some but the

mold was still present.

16.     My experiences, and the conditions and treatment I endured, were
identical or substantially similar to every other inmate in my dorm and all other
dorms of the Bay County Jail at the time of and after Hurricane Michael based on
conversations I had with inmates in my dorm and others, as well as what I
personally observed.

17.     The facts in this declaration are based on my personal knowledge and
I will testify about them in Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of July 2024.

Amber Anne

# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**KRISTINA TRIPP, THOMAS
MCFATTER, MICHAEL
MURRERO-DELGADO, AMBER
AHNE, AMBER LYN TIDWELL,
CONRAD FORRENCE, PAULA
COOPER, CAMERON WILSON,
JOSHUA FOSTER, and
NORMANDO BROWN, individually
and on behalf of all others similarly
situated,**

      **Plaintiffs,**

**v.**                      **CASE NO.: 5:23-cv-112-AW-MJF**

**TOMMY FORD, SHERIFF OF
BAY COUNTY, FLORIDA,**

      **Defendant.**

_____/

STATE OF FLORIDA
BAY COUNTY

## <u>DECLARATION OF PAULA COOPER</u>

      I, Paula Cooper, make the following statements under penalty of perjury

under 28 U.S.C. §1746 as follows:

      1.      My name is Paula Cooper and I am one of the class representatives

and a Plaintiff in this case.  I am over the age of 18 years, and I verify under 28

U.S.C. § 1746 that the facts set forth in this Declaration are true and correct and are made under the penalty of perjury.

2.      I have read and verify as being accurate paragraphs 15-16, 27-31, the first sentence of paragraph 32, 34-46, 48-88, the factual basis for the breach of the standards in 89-112, 117-126, 131, and 135 of the Fifth Amended Complaint as well as paragraphs 325 to 352.

3.      I was incarcerated in the Bay County Jail from September 5, 2018 until October 18, 2018.

4.      I was housed in E dorm during Hurricane Michael.

5.      Once the Jail lost power, we lost central air and heating and the ability to flush our toilets and get water.

6.      In E Dorm, we were confined to our dorms unless escorted by staff.

7.      In E dorm staff stopped coming in the dorms and conducting security checks due to the staff stating it was unsafe.

8.      This caused panicking with inmates in E Dorm Pod 2 which was already over population due to how many female inmates who were housed in E2.

9.      When the air conditioners came off the roof, water was coming in from the roof which caused humanity and condensation to build up.

10.     Inmates started panicking once they stopped seeing staff come in the

dorms.  We also could not see out the windows of our dorm because of the humidity.

11.    Some inmates started to use a bunk that had been brought into the dorm to house another inmate at some point that was not secured to the ground and they were banging it against the exit door of E2 rec yard.

12.    We had no access to water except with meals and that was a 5-gallon igloo with each meal.  But the water was not boiled, was discolored and had sediment in the water cooler.

13.    The buildup of mold also began shortly after the hurricane and all of the inmates were exposed to the mold.  We were watching the mold grow each day and we did not have access to chemicals to clean it off the walls.  This was frightening.

14.    My experiences, and the conditions and treatment I endured, were identical or substantially similar to every other inmate in my dorm and all other dorms of the Bay County Jail at the time of and after Hurricane Michael based on conversations I had with inmates in my dorm and others, as well as what I personally observed.

15.    The facts in this declaration are based on my personal knowledge and I will testify about them in Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of July 2024.

_____
Paula Cooper

# Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**KRISTINA TRIPP, THOMAS MCFATTER, MICHAEL MURRERO-DELGADO, AMBER AHNE, AMBER LYN TIDWELL, CONRAD FORRENCE, PAULA COOPER, CAMERON WILSON, JOSHUA FOSTER, and NORMANDO BROWN, individually and on behalf of all others similarly situated,**

       **Plaintiffs,**

**v.**                                   **CASE NO.: 5:23-cv-112-AW-MJF**

**TOMMY FORD, SHERIFF OF BAY COUNTY, FLORIDA,**

       **Defendant.**

_____/

STATE OF FLORIDA
BAY COUNTY

## <u>DECLARATION OF THOMAS MCFATTER</u>

      I, Thomas McFatter, make the following statements under penalty of perjury

under 28 U.S.C. §1746 as follows:

      1.      My name is Thomas McFatter and I am one of the class

representatives and a Plaintiff in this case.  I am over the age of 18 years, and I

verify under 28 U.S.C. § 1746 that the facts set forth in this Declaration are true and correct and are made under the penalty of perjury.

2.      I have read and verify as being accurate paragraphs 15-16, 27-31, the first sentence of paragraph 32, 34-46, 48-88, the factual basis for the breach of the standards in 89-112, 117-126, 131, and 135 of the Fifth Amended Complaint as well as paragraphs 219 to 255.

3.      I was incarcerated in the Bay County Jail from June 22, 2018 until February 8, 2019 when Plaintiff posted bond after several failed bond reduction motions.

4.      I was housed in C dorm during Hurricane Michael.

5.      Once the Jail lost power, we lost central air and heating and the ability to flush our toilets and get water freely.

6.      In C Dorm, we were confined to our cells 24/7 unless escorted by staff.

7.      C Dorm is the old side of the jail and had no lights in our cell when we lost power. The walls were sweating and mold and mildew were building in our cells for a significant amount of time.

8.      We had to put our urine and feces into sandwich bags and pass them

through the food flaps.  The toilet in our cell was backed up with urine and feces and we had to live in those conditions.  Urine and feces were also on the floor and we just had to live with that too.  The smell was so bad that officers would keep the solid crash gate door in confinement shut so that they did not have to smell the conditions the inmates were living in.  It was inhumane and dangerous.

9.     The officers were also wearing medical masks while making security checks when they made them because of the stench.

10.     The staff were not making security checks like they should because of the smell.  It was hot in the cells and we started to get sick.  I suffered a seizure while in confinement and was drug through urine and feces to get medical attention outside the cell.

11.     My experiences, and the conditions and treatment I endured, were identical or substantially similar to every other inmate in my dorm and all other dorms of the Bay County Jail at the time of and after Hurricane Michael based on conversations I had with inmates in my dorm and others, as well as what I personally observed.

12.     The facts in this declaration are based on my personal knowledge and I will testify about them in Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29ᵗʰ day of July 2024.

_____
Thomas McFatter

# Exhibit 6

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**KRISTINA TRIPP, THOMAS MCFATTER, MICHAEL MURRERO-DELGADO, AMBER AHNE, AMBER LYN TIDWELL, CONRAD FORRENCE, PAULA COOPER, CAMERON WILSON, JOSHUA FOSTER, and NORMANDO BROWN, individually and on behalf of all others similarly situated,**

      **Plaintiffs,**

**v.**                                  **CASE NO.: 5:23-cv-112-AW-MJF**

**TOMMY FORD, SHERIFF OF BAY COUNTY, FLORIDA,**

      **Defendant.**

_____/

STATE OF FLORIDA
BAY COUNTY

## <u>DECLARATION OF LUCAS ROSE</u>

    I, Lucas Rose, make the following statements under penalty of perjury

under 28 U.S.C. §1746 as follows:

    1.    My name is Lucas Rose and I was employed by the Bay County

Sheriff's Office at the time of Hurricane Michael and thereafter.  I am over the age

of 18 years, and I verify under 28 U.S.C. § 1746 that the facts set forth in this

Declaration are true and correct and are made under the penalty of perjury.

2.      I have read and verify as being accurate paragraphs 15-16, 27-31, the

first sentence of paragraph 32, 34-46, 48-88, the factual basis for the breach of the

standards in 89-112, 117-126, 131, and 135 of the Fifth Amended Complaint as

well as the remaining paragraphs in the Fifth Amended Complaint.

3.      I have approximately 5 years experience as a certified correctional

officer in the state of Florida at both the State and County level custody.  From

2017-2019, I worked at the Bay County Jail as a Detention Deputy and I am dual

certified in Law Enforcement beginning in 2018.

4.      I worked in the Bay County Jail during the landfall of Hurricane

Michael and the months following. I directly observed the violations of policy and

Florida Model Jail Standards, Institutional conditions, and the effects caused by

those violations and conditions to inmates being held in the Bay County Jail as set

forth in all paragraphs in the Fifth Amended Complaint.

5.      The Bay County Jail made no effort to prepare for this disaster. An

office wide email went out days prior to the landfall of Hurricane Michael detailing

shelter locations, directives, and responsibilities for each division of the Sheriff's

office Pre/Post landfall but not the Jail. The only instructions for Bay County Jail

read as "locked and loaded, literally.". The Jail Division was the only division to not go on A – B schedule ahead of and following Hurricane landfall. Because of this scheduling, I realized that the Jail would be understaffed and would not be able to receive proper relief staff at the time of the Hurricane.  I reported to the Jail staff and supervisors early to help mitigate the staff shortage.

6.    After the Hurricane, this staff shortage caused numerous safety issues for staff and inmates. When the hurricane hit the Jail, there were multiple mass disturbances in dorms. All staff was ordered out of the dorms and to remain outside the dorms which meant that all security checks were suspended.  It was dangerous to go into the dorms because of the filth and water so we were directed to stay.

7.    This order kept officers from normal sight and sound of inmates. Inmates were unable to file grievances or make safety/medical concerns to staff.

8.    After the Hurricane, a Lt. Williams, a supervisor in the jail, attempted to have me posted at the entrance/exit of facility to keep staff from leaving. I asked who gave this order and was ignored. I then asked if staff was under an official order or recall to work. Lt. Williams refused to answer me and he contacted other deputies to block the entrance. I personally observed Lt. Williams prevent nonsworn staff from leaving the facility.

9.    Damage from the Hurricane left the entire Jail without any climate

control. Temperatures quickly rose well into the 80s, 90s and condensation built up and ran down walls and windows. It was personally difficult for me to breath in dorms and booking because of the heat and humidity.

10.     There was no running water for inmates or staff. Inmates were forced to live in close proximity to piled up feces in toilets with no way to flush toilets. Inmates were unable to shower, wash hands before meals, or maintain personal hygiene in any way.

11.     Inmates were denied any laundry exchange. They were forced to wear the same uniforms for weeks. The facility had no way to wash or exchange uniforms.

12.     Water poured in through the roof creating standing pools of water throughout the facility.

13.     Inmates were forced to drink unpotable water from a well from the maintenance room. Water was pumped directly from this well into unsterilized water coolers to distribute to inmates. This water was murky and contained heavy sediment.

14.     Juvenile inmates were housed in booking holding cells in sight and sound contact of adult inmates under the orders of Lt. Williams. I explained this order violates FMJS to Lt. Williams and was ignored. I observed Juvenile inmates

making direct physical contact with adult inmates through feed flaps.

15.     I recall two detention deputies telling me that they were told not to report mold in the facility. They were told they were not allowed to use the word "mold" in any reports.

16.     As these conditions continued without remedy, a mass release of inmates was authorized. As a booking Deputy, I assisted directly in this. Hundreds of inmates were released and driven by transport vehicles to predetermined locations throughout the county without confirming they had residences to go to. Some these transports took place after the county curfew. Many of these inmates were arrested again hours and days after their release.

17.     I personally observed the horrific suffering of inmates based on the utter failures described in the First Amended Complaint.  We were truly "locked and loaded" and were helpless to do anything about it.

18.     The facts in this declaration are based on my personal knowledge and I will testify about them in Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of July 2024.

Lucas Rose

# Exhibit 7

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**KRISTINA TRIPP, THOMAS
MCFATTER, MICHAEL
MURRERO-DELGADO, AMBER
AHNE, AMBER LYN TIDWELL,
CONRAD FORRENCE, PAULA
COOPER, CAMERON WILSON,
JOSHUA FOSTER, and
NORMANDO BROWN, individually
and on behalf of all others similarly
situated,**

     **Plaintiffs,**

**v.**                            **CASE NO.: 5:23-cv-112-AW-MJF**

**TOMMY FORD, SHERIFF OF
BAY COUNTY, FLORIDA,**

     **Defendant.**

_____/

STATE OF FLORIDA
MARTIN COUNTY

## <u>DECLARATION OF RICHARD HERSTEIN</u>

     I, Richard Herstein, make the following statements under penalty of perjury

under 28 U.S.C. §1746 as follows:

     1.     My name is Richard Herstein and I am a board eligible physician.  I have

attached my CV outlining my education including medical school and my relevant

1

employment.  I was most recently up until May 2024, the Chief Hospital
Administrator and Chief Medical Officer for all state hospitals operated by the
Department of Children and Families, a position I held starting in December 2020.

2.     I am over the age of 18 years, and I verify under 28 U.S.C. § 1746 that
the facts set forth in this Declaration are true and correct and are made under the
penalty of perjury.

3.     I have read the Fifth Amended Complaint (FAC) and state the
following, within a reasonable degree of medical certainty, that the named
plaintiffs and other inmates in the Bay County Jail from the date of Hurricane
Michael into the future, were exposed to various health risks/dangers/effects
suffered by all the inmates and that these caused by and related to their exposure to
the conditions of the jail; specifically:

1) That many/most inmates suffered, and would be expected to suffer,
digestive issues, conditions, or illnesses (including, but not limited to,
severe stomach cramping, nausea, vomiting and diarrhea), caused by
and related to exposure and consumption of contaminated or unsafe
water and/or contaminated or unsafe food.

2) That many/most inmates suffered, and would be expected to suffer,
respiratory issues, conditions, or illnesses caused by and related to

their exposure to mold (and lack of ventilation), feces/urine, sewage, used/discarded feminine hygiene products, and standing floodwater.

3) That many/most inmates suffered, and would be expected to suffer, other issues, conditions, or illnesses caused by and related to lack of clean or sufficient/appropriate clothes and sheets, lack of access to showers, lack of medical care or treatment for preexisting conditions, etc.

Water contaminated with human feces/urine, sewage, used/discarded feminine hygiene products and standing floodwater will harbor a variety of pathogenic bacteria. Some common types that would be expected to be found in such water to which many/most of the inmates were exposed, ingested, and thereby likely infected, include, but are not limited to, 1) Escherichia coli (E. coli), 2) Salmonella, 3) Shigella, 4) Vibrio cholerae (V. cholerae), 5) Helicobacter pylori (H. pylori), 6) Enterococcus, 7) Clostridium perfringens (C. perfringens), and 8) Yersinia enterocolitica.

E. coli, particularly certain pathogenic strains like E. coli O157, reside in the type of water to which many/most of the inmates were exposed to and ingested. These can cause severe stomach cramping, nausea, vomiting, and diarrhea. E. coli bacteria attach to the lining of the intestines and colonize, disrupting normal

intestinal function.  E. Coli strains like O157 produce Shiga toxins (Shiga-like toxins). These toxins damage the lining of the intestines, leading to inflammation and cell death.  The presence of E. coli and its toxins trigger an immune response, leading to inflammation of the intestinal lining. This inflammation causes pain and cramping.  The damage to the intestinal lining and the inflammatory response disrupts normal fluid absorption, leading to the secretion of fluids into the intestines. This results in diarrhea.  Inflammation and toxins can stimulate nerves in the intestines, leading to nausea and vomiting as the body attempts to rid itself of the harmful bacteria and toxins.  The toxins can cause significant damage to the intestinal cells, further exacerbating symptoms like severe cramping and diarrhea. These combined effects of colonization, toxin production, and the resulting inflammatory response lead to the severe gastrointestinal symptoms associated with E. coli infections.

Salmonella bacteria can also reside in the type of water to which many/most of the inmates were exposed.  These too can cause severe stomach cramping, nausea, vomiting, and diarrhea.  After ingestion, Salmonella bacteria travel through the stomach and reach the small intestine.  They attach to the lining of the intestines and invade the epithelial cells, causing cellular damage and inflammation.  The invasion and destruction of intestinal cells trigger the body's

immune response. White blood cells migrate to the site of infection, leading to inflammation and the release of various immune mediators. This inflammation contributes to symptoms like cramping and pain.  Salmonella bacteria produce toxins that further damage the intestinal lining and disrupt normal cell function. These toxins can interfere with the absorption of water and electrolytes, leading to diarrhea.  The damage to the intestinal lining and the inflammatory response causes the intestines to secrete more fluid and electrolytes into the intestinal lumen. This excessive fluid secretion results in watery diarrhea.  The toxins and inflammation can stimulate the enteric nervous system, leading to nausea and vomiting as the body attempts to expel the harmful bacteria.  Salmonella infection can disrupt the balance of the normal gut microbiota, further contributing to gastrointestinal symptoms and making it harder for the body to maintain normal digestive functions.

Shigella bacteria was also likely present in the water that many or most of the inmates were exposed to. These bacteria can also cause severe stomach cramps, nausea, vomiting, and diarrhea.  Shigella bacteria invade the epithelial cells lining the intestines, particularly the colon. This invasion disrupts the normal function of the intestinal lining and damages the cells.  Some strains of Shigella, especially Shigella dysenteriae, produce Shiga toxin. This potent toxin inhibits protein

synthesis in host cells, leading to cell death and further damage to the intestinal lining. The invasion and toxin production trigger a strong immune response. White blood cells migrate to the site of infection, causing inflammation and the release of inflammatory mediators. This inflammation contributes to severe cramping and pain. The combination of direct bacterial invasion, toxin action, and immune response can cause ulceration and death of the intestinal cells, leading to further tissue damage and bleeding. Damage to the intestinal lining impairs its ability to absorb water and electrolytes, leading to an increase in fluid secretion into the intestines. This results in watery diarrhea. The toxins and inflammation can stimulate the nerves in the gastrointestinal tract, leading to symptoms like nausea and vomiting as the body attempts to expel the bacteria and toxins. Shigella infection can disrupt the balance of the normal gut microbiota, making it harder for the body to maintain normal digestive functions and contributing to the severity of symptoms. The combination of these mechanisms – bacterial invasion, toxin production, inflammation, ulceration, and disruption of fluid absorption – leads to severe gastrointestinal symptoms associated with Shigella infections.

V. cholerae can also reside in the type of water to which many/most of the inmates were exposed. This too can cause severe stomach cramping, nausea, vomiting, and diarrhea. After ingestion, V. cholerae bacteria travels to the small

intestine, where it adheres to the intestinal lining and multiplies. V. cholerae produces cholera toxin (CTX), a potent enterotoxin. The toxin binds to the surface of intestinal cells and enters them, disrupting normal cellular function. The cholera toxin activates an enzyme called adenylate cyclase within the intestinal cells. This leads to an increase in cyclic AMP (cAMP) levels. Elevated cAMP levels cause the intestinal cells to secrete large amounts of chloride ions into the intestinal lumen. Sodium and water follow the chloride ions due to osmotic pressure, resulting in the secretion of large volumes of watery fluid into the intestines. The massive loss of fluids and electrolytes leads to the characteristic "rice water" diarrhea of cholera, which can be copious and rapid, causing severe dehydration. Excessive fluid loss and rapid intestinal contractions can cause severe cramping and abdominal pain. The body's response to the infection and the toxin can also include nausea and vomiting as it attempts to expel the harmful bacteria.

The combination of these effects – colonization, toxin production, disruption of cellular function, and massive fluid and electrolyte loss – leads to the severe gastrointestinal symptoms associated with cholera, including stomach cramping, nausea, vomiting, and diarrhea.

H. pylori bacteria was also likely present in the water to which the inmates were exposed and ingested. H. pylori bacteria colonize the mucosal lining of the

stomach.   The presence of H. pylori triggers an immune response, leading to inflammation of the stomach lining (gastritis). This inflammation can cause stomach pain and cramping.   H. pylori produces cytotoxins such as CagA and VacA.   These toxins damage the cells of the stomach lining, contributing to the development of ulcers and further inflammation.   H. Pylori bacterial infection and toxins disrupt the protective mucosal barrier of the stomach, making it more susceptible to damage from stomach acid.   This can lead to peptic ulcers, which cause pain, cramping, and sometimes bleeding.   The infection can also affect the motility of the stomach and intestines, leading to delayed gastric emptying or increased motility, both of which can cause nausea and vomiting.   H. pylori infection can lead to either increased or decreased gastric acid secretion, depending on the part of the stomach affected. Increased acid production can exacerbate ulcer formation and pain, while decreased acid can affect digestion and lead to gastrointestinal symptoms.   Although H. pylori primarily affects the stomach, the resulting changes in gastric function and motility can impact the intestines, potentially leading to diarrhea in some cases.   The combination of bacterial colonization, toxin production, inflammation, disruption of the mucosal barrier, and altered gastric function leads to the gastrointestinal symptoms associated with

H. pylori infection, including severe stomach cramping, nausea, vomiting, and, in some cases, diarrhea.

Enterococcus bacteria reside in the type of water to which many/most of the inmates were exposed.  Ingestion of this bacteria too causes severe stomach cramping, nausea, vomiting, and diarrhea.  Enterococcus can infect the gastrointestinal tract, particularly in cases where it is introduced via contaminated food, water, or through fecal-oral transmission, which is how many/most of the inmates were infected.  The bacteria colonize the intestinal mucosa and disrupt normal gut flora.  Some pathogenic strains of Enterococcus produce toxins or other virulence factors that can contribute to gastrointestinal symptoms. These toxins can irritate the intestinal lining and cause inflammation.  Enterococcus infections can disrupt the balance of the normal gut microbiota, leading to overgrowth of harmful bacteria or yeast, which can cause symptoms like diarrhea and cramping.  The body's immune response to the Enterococcus infection can lead to inflammation and increased gut motility.  This inflammation can cause pain, cramping, and discomfort.  Enterococcus bacteria adhere to the intestinal lining, causing local damage and inflammation.  This can lead to symptoms such as abdominal pain and cramping.  In severe cases, Enterococcus can spread from the gastrointestinal tract to other parts of the body, leading to systemic infections that can manifest with

gastrointestinal symptoms among others.  Enterococcus species are known for their antibiotic resistance, which can complicate treatment and lead to persistent infections.  Persistent infections can cause ongoing symptoms like diarrhea and abdominal pain.  These combined effects of bacterial infection, toxin production, disruption of gut flora, and the body's immune response contribute to the severe gastrointestinal symptoms associated with Enterococcus infections, including stomach cramping, nausea, vomiting, and diarrhea.

C. perfringens, likely present in the contaminated water to which the inmates were exposed/ingested, causes severe stomach cramping, nausea, vomiting, and diarrhea, like the other water-dwelling bacteria detailed above.  C. perfringens produces a heat-labile enterotoxin (CPE) that is one of the primary causes of gastrointestinal symptoms. This toxin disrupts the normal function of the intestinal lining, leading to increased fluid secretion and damage to the mucosal cells.  After ingestion, C. perfringens bacteria can grow and multiply in the intestines, particularly in the large intestine.  As they grow, they release toxins that affect intestinal cells.  The enterotoxins produced by C. perfringens increase the secretion of chloride and water into the intestinal lumen. This leads to watery diarrhea as the body loses large volumes of fluid and electrolytes.  The toxins can trigger an inflammatory response in the intestines.  This inflammation can cause pain and

cramping as well as nausea and vomiting. The presence of the bacteria and their toxins can disrupt normal gut motility, leading to symptoms such as abdominal cramping and diarrhea. The combination of toxin production, disruption of fluid balance, inflammatory response, and altered gut motility leads to the severe gastrointestinal symptoms associated with C. perfringens infections, including stomach cramping, nausea, vomiting, and diarrhea.

Like the other bacteria listed above, probably present in the contaminated and unsafe water to which the inmates were exposed/ingested, Yersinia enterocolitica also causes severe stomach cramping, nausea, vomiting, and diarrhea. Yersinia enterocolitica can invade and multiply within the epithelial cells of the intestines, particularly in the ileum and the colon. This invasion disrupts normal intestinal function and damages the mucosal lining. The bacteria produce Yersinia enterotoxin, which can contribute to gastrointestinal symptoms. This toxin interferes with the normal cell function of the intestinal lining, causing inflammation and damage. The presence of Yersinia enterocolitica triggers an immune response in the intestines. The resulting inflammation can lead to pain, cramping, and discomfort. This inflammatory response also contributes to increased fluid secretion and changes in gut motility. In severe cases, the infection can lead to the formation of pseudomembranes in the intestines, which can

contribute to abdominal pain and cramping. The infection can disrupt the balance of the normal gut microbiota, allowing for the overgrowth of harmful bacteria and contributing to diarrhea. Yersinia enterocolitica can also infect and cause inflammation in the lymph nodes of the abdomen (mesenteric lymphadenitis). This condition can mimic appendicitis and cause significant abdominal pain and cramping. In some cases, Yersinia enterocolitica can spread beyond the intestines and affect other parts of the body, leading to more generalized symptoms such as nausea and vomiting. The bacteria and their toxins can disrupt normal gut motility, leading to symptoms such as diarrhea and abdominal cramping. The combination of bacterial invasion, toxin production, inflammatory response, and disruption of normal gut function leads to the severe gastrointestinal symptoms associated with Yersinia enterocolitica infections, including stomach cramping, nausea, vomiting, and diarrhea.

In addition to a host of bacteria's, water contaminated with human feces/urine, sewage, used/discarded feminine hygiene products, and standing floodwater will likely harbor a variety of pathogenic viruses. Some common types that would be expected to be found in such water to which many/most of the inmates were exposed, ingested, and thereby likely infected, include Norovirus,

Hepatitis A (HAV), Hepatitis E (HEV), Rotavirus, and Adenovirus (Enteric Adenovirus and Cosackieviruses).

A common cause of gastroenteritis, norovirus can spread through contaminated water like that at the jail, and cause symptoms such as vomiting, diarrhea, and stomach cramps. Norovirus primarily infects the cells lining the small intestine. It attaches to and invades these cells, disrupting their normal function and causing damage to the intestinal mucosa. The presence of the virus triggers an immune response, leading to inflammation of the intestinal lining. This inflammation results in symptoms such as abdominal pain, cramping, and discomfort. Norovirus infection impairs the normal absorption of nutrients and fluids in the intestines. It increases the secretion of electrolytes and water into the intestinal lumen, leading to watery diarrhea. Although norovirus does not produce a classical toxin like some bacteria, it does induce the release of cytokines and other inflammatory mediators that contribute to gastrointestinal symptoms. The infection can affect the motility of the gastrointestinal tract, causing the intestines to contract more frequently. This can lead to rapid transit of intestinal contents, resulting in diarrhea and cramping. The disruption of the intestinal lining and normal gut flora by the virus can contribute to gastrointestinal symptoms. A damaged mucosa can alter the balance of gut bacteria and exacerbate symptoms.

Norovirus is highly infectious, and even a small amount of the virus can cause illness. The high viral load in the intestines contributes to the severity of symptoms. Norovirus has a short incubation period, usually 12-48 hours. This rapid onset of symptoms makes the infection particularly intense and sudden. These combined effects – viral invasion, immune response, disruption of normal gut function, and high viral load – lead to the severe gastrointestinal symptoms associated with norovirus infections, including stomach cramping, nausea, vomiting, and diarrhea.

Hepatitis A (HAV) and Hepatitis E (HEV) cause liver infection and can be transmitted through water contaminated with fecal matter like the unhygienic water that many/most of the inmates were exposed to and ingested. Hepatitis A (HAV) and Hepatitis E (HEV) cause severe stomach cramping, nausea, vomiting, and diarrhea. These viruses primarily infect liver cells (hepatocytes). The viruses are transported to the liver via the bloodstream after ingestion. Once in the liver, HAV and HEV replicate and cause cellular damage. The body's immune system responds to the infection by attacking the infected liver cells. This immune response leads to inflammation of the liver (hepatitis), which can cause abdominal pain, discomfort, and cramping in the upper right abdomen. Hepatic inflammation causes the release of various inflammatory mediators and cytokines that contribute

to gastrointestinal symptoms such as nausea and vomiting. Hepatitis A and E impair the liver's ability to perform its normal functions, including detoxification of the bloodstream and synthesis of proteins. This dysfunction can lead to gastrointestinal symptoms as the liver becomes less effective at managing digestive processes. The inflammation and systemic effects of Hepatitis A and E can affect gut motility. This disruption can lead to diarrhea as the intestines may contract more frequently or irregularly. Hepatitis A and E can cause jaundice due to the buildup of bilirubin in the blood. Jaundice is often associated with gastrointestinal symptoms like abdominal discomfort and nausea. With liver dysfunction, toxins that are normally processed and eliminated by the liver can accumulate in the bloodstream, potentially contributing to gastrointestinal symptoms. Hepatitis A and E infection often causes general systemic symptoms like malaise and fatigue, which can exacerbate the feeling of nausea and overall discomfort. The combination of liver inflammation, immune response, disruption of normal liver function, and systemic effects leads to the severe gastrointestinal symptoms associated with hepatitis A and E, including stomach cramping, nausea, vomiting, and diarrhea

Although Rotavirus primarily affects infants and young children, it too can cause severe diarrhea and vomiting in adults and can be spread through water

contaminated with fecal matter, like the water that the inmates were exposed to/ingested.  Rotavirus infects and replicates in the epithelial cells lining the small intestine.  The virus targets mature enterocytes, which are crucial for nutrient absorption and digestion.  As these cells are damaged and destroyed, it impairs the intestines' ability to absorb fluids and nutrients.  The destruction of enterocytes leads to a reduction in the surface area available for nutrient absorption and a loss of the digestive enzyme lactase.  This disruption contributes to malabsorption and diarrhea.  Rotavirus infection causes an increase in the secretion of electrolytes and fluids into the intestinal lumen. This excessive fluid accumulation results in watery diarrhea, as the body loses large amounts of water and electrolytes.  The infection triggers an immune response in the gut, leading to inflammation of the intestinal lining.  This inflammation contributes to abdominal pain, cramping, and discomfort.  The presence of the virus and the resultant inflammation can alter normal gut motility.  This can lead to increased intestinal contractions and contribute to symptoms like cramping and diarrhea.  The immune response to rotavirus infection involves the release of inflammatory cytokines.  These cytokines can affect gut motility and contribute to nausea and vomiting.  Rotavirus infection and damage to intestinal cells can disrupt the balance of the gut microbiota, further contributing to gastrointestinal symptoms.  The combination of

these factors – damage to intestinal cells, increased fluid secretion, immune response, and altered gut function – leads to the severe gastrointestinal symptoms associated with rotavirus infections, including stomach cramping, nausea, vomiting, and diarrhea.

Certain types of adenoviruses, specifically, enteric adenovirus and coxsackieviruses, are associated with gastrointestinal illnesses. These can be found in water contaminated with fecal matter and can cause gastrointestinal infections, diarrhea and vomiting, and can be present in contaminated water, like the water that the inmates were exposed/ingested. Adenovirus primarily infects the epithelial cells lining the gastrointestinal tract. The virus attaches to and enters these cells, leading to their destruction and disrupting normal intestinal function. The infection triggers an immune response in the gut. Inflammatory cells are recruited to the site of infection, causing inflammation of the intestinal lining. This inflammation contributes to abdominal pain, cramping, and discomfort. Adenovirus infection impairs the ability of intestinal cells to absorb nutrients and fluids. The damaged cells result in decreased nutrient absorption and increased secretion of fluids into the intestinal lumen, leading to diarrhea. The presence of the virus and the inflammatory response can disrupt normal gut motility. This can result in increased intestinal contractions and irregular bowel movements,

contributing to symptoms like cramping and diarrhea. The immune response to adenovirus involves the release of inflammatory cytokines. These cytokines can affect gut motility and contribute to gastrointestinal symptoms such as nausea and vomiting. Adenovirus infections can sometimes lead to systemic symptoms, including fever and malaise, which can exacerbate feelings of nausea and overall discomfort. Damage to the intestinal lining and the disruption of normal gut flora can further contribute to gastrointestinal symptoms, including diarrhea and abdominal pain. The combination of viral infection, immune response, disruption of intestinal function, and altered gut motility leads to the severe gastrointestinal symptoms associated with adenovirus infections, including stomach cramping, nausea, vomiting, and diarrhea.

An infection with bacteria and viruses that frequently reside in contaminated water, like the water that the inmates were exposed/ingested, likely lead to diarrhea and vomiting. Diarrhea and vomiting can result in dehydration, electrolyte imbalance, malnutrition, kidney dysfunction, hypovolemic shock, metabolic acidosis, fatigue and weakness, esophagitis, skin and mucosal irritation, sepsis, or electrolyte disturbances.

Dehydration is the most immediate concern, as the body loses a significant amount of fluids and electrolytes, leading to weakness, dizziness, and in severe

cases, shock.  Loss of sodium, potassium, and other electrolytes can cause muscle cramps, weakness, irregular heartbeats, and confusion.  Chronic or severe diarrhea and vomiting can interfere with the absorption of nutrients, leading to malnutrition and weight loss.  Severe dehydration can reduce blood flow to the kidneys, potentially leading to acute kidney injury or chronic kidney disease.  A severe decrease in blood volume due to fluid loss can lead to hypovolemic shock, a life-threatening condition where the organs do not receive enough oxygen.  Loss of bicarbonate in diarrhea can lead to metabolic acidosis, a condition where the body produces too much acid or cannot remove enough acid from the body.  Ongoing fluid and nutrient loss can cause persistent fatigue and general weakness.  Frequent vomiting can lead to inflammation and damage to the esophagus, causing pain and difficulty swallowing.  Dehydration can lead to dry skin and mucous membranes, increasing the risk of infections and irritation.  In severe cases, the infection causing diarrhea and vomiting can spread to the bloodstream, leading to sepsis, a life-threatening immune response to infection.  Imbalances in potassium and calcium levels can affect heart function, leading to arrhythmias or cardiac arrest.

Most/all the inmates were exposed to mold, feces/urine, and sewage.  These can lead to various respiratory conditions, particularly if there is inadequate ventilation.  These include allergic rhinitis, asthma, chronic sinusitis,

hypersensitivity pneumonitis, and respiratory infections from mold exposure. Exposure to feces/urine/human waste and excrement can lead to bacterial infections, histoplasmosis, and allergic reactions. The sewage to which the inmates were exposed can lead to Legionnaires' Disease, gastrointestinal and respiratory infections, and chemical irritation. The general impact of poor ventilation to which the inmates were exposed can exacerbate the effects of exposure to mold, feces, and sewage by allowing pollutants to accumulate in indoor air, leading to worsening respiratory symptoms. Individuals with pre-existing respiratory conditions, such as asthma or chronic obstructive pulmonary disease (COPD), may experience a worsening of their symptoms due to continued exposure to indoor pollutants and poor air quality.

More specifically, the mold to which most/all of the inmates were exposed releases spores and other allergenic particles (such as mold fragments and mycotoxins) into the air. When inhaled, these particles can trigger allergic reactions in susceptible individuals. In people with mold allergies, the immune system mistakenly identifies mold spores as harmful invaders. The immune system then produces specific antibodies (IgE) against these mold allergens. When these antibodies bind to mast cells in the nasal tissues, they trigger the release of histamines and other inflammatory mediators. The release of histamines and other

chemicals from mast cells causes the typical symptoms of allergic rhinitis, including sneezing, nasal congestion, runny nose, and itchy or watery eyes. Histamines increase blood flow to the nasal tissues and make the nasal lining more permeable, leading to swelling and mucus production. Mold exposure can lead to inflammation of the nasal mucosa. This inflammation can cause swelling, increased mucus production, and irritation, contributing to the symptoms of allergic rhinitis. Repeated exposure to mold allergens can lead to sensitization, where the immune system becomes increasingly reactive to the mold allergens over time. This heightened sensitivity can lead to more severe allergic rhinitis symptoms upon subsequent exposures. In some individuals, mold exposure can lead to increased airway hyperreactivity, making the nasal passages more sensitive to other allergens and irritants, further exacerbating allergic rhinitis symptoms.

Mold exposure can also cause or exacerbate asthma. Mold spores are common allergens that can sensitize individuals, particularly those who are genetically predisposed or already have allergic tendencies. When mold spores are inhaled, they can trigger an immune response that leads to the development or worsening of asthma. Mold exposure can lead to inflammation of the airways. The mold spores contain proteins that can cause an allergic reaction in the airways, leading to inflammation, which is a key feature of asthma. This inflammation can

make the airways more sensitive and reactive to other triggers. Mold-induced inflammation and immune response can cause airway hyperreactivity and the airways become overly sensitive to various stimuli, such as allergens, irritants, or changes in weather. This hyperreactivity contributes to asthma symptoms such as wheezing, shortness of breath, and coughing. Mold spores contain various antigens that can stimulate the immune system. In people with asthma, this stimulation can exacerbate symptoms by increasing the production of inflammatory cytokines and other mediators that worsen airway inflammation and constriction. Mold exposure can increase mucus production in the airways. Excessive mucus can contribute to airway obstruction and difficulty breathing, which are characteristic symptoms of asthma.

Histoplasmosis is caused by the fungus Histoplasma capsulatum. This fungus can grow in environments contaminated with bird or bat droppings, likely present on the roof of the jail that was damaged by the hurricane. When feces or human waste is disturbed, the spores of Histoplasma can become airborne and be inhaled. This can lead to lung infections, particularly in individuals with compromised immune systems or those who are frequently exposed to contaminated environments. Moist environments created by feces and urine can promote the growth of mold and fungi, which can release spores into the air.

Inhalation of these spores can trigger allergic reactions, such as allergic rhinitis or asthma.   Fecal matter and urine can contribute to the presence of dust and particulates in the air.   When these particulates contain allergens, they can lead to allergic reactions upon inhalation.   Urine and feces can contain various chemical compounds that may act as irritants or allergens.   These compounds can contribute to respiratory and skin allergies, especially in individuals with pre-existing sensitivities.   Prolonged exposure to fecal and urine contaminants can lead to sensitization of the immune system to various allergens present in these wastes, causing chronic allergic reactions.

Exposure to sewage can lead to a range of health issues, including Legionnaires' disease, gastrointestinal and respiratory infections, and chemical irritation.   Sewage can harbor Legionella bacteria, which are the causative agents of Legionnaires' disease.   These bacteria can proliferate in warm, stagnant water commonly found in sewage systems.   Legionella bacteria can become aerosolized in fine droplets, especially when sewage is disturbed or when there are malfunctioning or poorly maintained water systems.   Inadequate treatment of sewage can lead to contamination of drinking water supplies with Legionella.   This contamination can increase the risk of Legionnaires' disease when people consume or encounter contaminated water.

Sewage can also harbor parasites like Giardia and Cryptosporidium. These parasites can cause gastrointestinal infections if ingested via contaminated water or food. Pathogens from sewage, including bacteria, viruses, and fungi, can become aerosolized. Inhalation of these pathogens can lead to respiratory infections or exacerbate pre-existing respiratory conditions. Sewage can promote the growth of mold and fungi. Aerosolized spores from these molds and fungi can contribute to respiratory infections and exacerbate conditions like asthma or chronic bronchitis. Sewage contains a range of chemicals, including ammonia, hydrogen sulfide, and other potentially toxic substances. Inhalation or direct contact with these chemicals can cause respiratory irritation, including symptoms like coughing, throat irritation, and shortness of breath. Sewage can release VOCs into the air, which can cause irritation of the respiratory tract and eyes and can lead to chronic respiratory issues. Hydrogen sulfide, a common gas emitted from sewage, is known for its strong odor and potential to cause respiratory and eye irritation. High levels of exposure can lead to more severe health effects, including respiratory distress and long-term damage.

A lack of clean or sufficient clothes and sheets, insufficient access to showers, and inadequate medical care or treatment for preexisting conditions can lead to a variety of health issues. Dirty or inadequate clothing and bedding can

lead to skin infections, such as bacterial infections (e.g., *Staphylococcus* or *Streptococcus*), fungal infections (e.g., tinea pedis/corporis (athlete's foot/ringworm), and parasitic infestations (e.g., head louse (lice) or Sarcoptes scabiei (scabies). Prolonged contact with unclean or soiled clothing and bedding can cause dermatitis or other skin rashes due to irritation, friction, and exposure to allergens or pathogens. Accumulated dust, mold, and other allergens on dirty clothing and bedding can exacerbate respiratory conditions, such as asthma or allergies.

The inmates lack of access to showers/bathing will result in poor personal hygiene and can lead to infections such as bacterial skin infections (e.g., impetigo), fungal infections (e.g., tinea pedis/corporis (athlete's foot/ringworm), and urinary tract infections (UTIs) due to poor genital hygiene. Inadequate washing can result in body odor and skin problems like acne, dermatitis, and fungal infections due to the buildup of sweat, bacteria, and dead skin cells. Lack of access to showers can also contribute to the spread of parasites like lice or scabies, as personal hygiene practices are crucial in preventing these infestations.

A lack of medical care or treatment for preexisting conditions is perhaps the most significant and concerning consequence of the Defendant's action, or lack thereof. Without proper medical care, chronic conditions such as diabetes,

hypertension, and asthma can deteriorate, leading to complications like diabetic ketoacidosis, stroke, or severe asthma attacks. Untreated infections, including bacterial, viral, or fungal infections, likely created from this incident, can become severe and lead to systemic issues if not properly managed. Conditions like untreated pneumonia or urinary tract infections can become life-threatening. A lack of medical care can exacerbate mental health conditions such as depression or anxiety, potentially leading to worsened symptoms and overall decreased quality of life. Chronic conditions that are not managed can lead to nutritional deficiencies if individuals have specific dietary needs related to their health conditions. This can result in conditions like anemia or other nutrient deficiencies. Injuries or wounds that are not treated can become infected or worsen, leading to serious complications or prolonged recovery times, with too many to possibly detail.

A lack of clean or sufficient clothes and sheets, insufficient access to showers, and inadequate medical care or treatment for preexisting conditions can lead to a variety of health issues. Dirty or inadequate clothing and bedding can lead to skin infections, such as bacterial infections (e.g., *Staphylococcus* or *Streptococcus*), fungal infections (e.g., tinea pedis/corporis (athlete's foot/ringworm), and parasitic infestations (e.g., head louse (lice) or Sarcoptes scabiei (scabies). Prolonged contact with unclean or soiled clothing and bedding

can cause dermatitis or other skin rashes due to irritation, friction, and exposure to allergens or pathogens.  Accumulated dust, mold, and other allergens on dirty clothing and bedding can exacerbate respiratory conditions, such as asthma or allergies.

The inmates lack of access to showers/bathing will result in poor personal hygiene and can lead to infections such as bacterial skin infections (e.g., impetigo), fungal infections (e.g., tinea pedis/corporis (athlete's foot/ringworm), and urinary tract infections (UTIs) due to poor genital hygiene.  Inadequate washing can result in body odor and skin problems like acne, dermatitis, and fungal infections due to the buildup of sweat, bacteria, and dead skin cells.  Lack of access to showers can also contribute to the spread of parasites like lice or scabies, as personal hygiene practices are crucial in preventing these infestations.

A lack of medical care or treatment for preexisting conditions is perhaps the most significant and concerning consequence of the Defendant's action, or lack thereof.  Without proper medical care, chronic conditions such as diabetes, hypertension, and asthma can deteriorate, leading to complications like diabetic ketoacidosis, stroke, or severe asthma attacks.  Untreated infections, including bacterial, viral, or fungal infections, likely created from this incident, can become severe and lead to systemic issues if not properly managed.  Conditions like

untreated pneumonia or urinary tract infections can become life-threatening.   A

lack of medical care can exacerbate mental health conditions such as depression or

anxiety, potentially leading to worsened symptoms and overall decreased quality of

life.  Chronic conditions that are not managed can lead to nutritional deficiencies if

individuals have specific dietary needs related to their health conditions.  This can

result in conditions like anemia or other nutrient deficiencies.  Injuries or wounds

that are not treated can become infected or worsen, leading to serious

complications or prolonged recovery times, with too many to possibly detail.

The facts in this declaration are based on my personal knowledge and I will

testify about them in Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of July 2024.

DocuSigned by:

*Richard Herstein*

C09EE7DDEA8C43B...

Richard Herstein

Exhibit 8

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PANAMA CITY DIVISION

**KRISTINA TRIPP, THOMAS
MCFATTER, MICHAEL
MURRERO-DELGADO, AMBER
AHNE, AMBER LYN TIDWELL,
CONRAD FORRENCE, PAULA
COOPER, CAMERON WILSON,
JOSHUA FOSTER, and
NORMANDO BROWN, individually
and on behalf of all others similarly
situated,**

     **Plaintiffs,**

**v.**                             **CASE NO.: 5:23-cv-112-AW-MJF**

**TOMMY FORD, SHERIFF OF
BAY COUNTY, FLORIDA,**

     **Defendant.**

_____/

STATE OF FLORIDA
LEON COUNTY

     I, **LUCINDA BRASWELL, RN,** am a Registered Nurse with the State of

Florida.  I have over 34 years of nursing with experience in providing direct patient

care within healthcare facilities and make the following statements under penalty

of perjury under 28 U.S.C. §1746 as follows:

1.      I am over the age of 18 years, and I verify under 28 U.S.C. § 1746 that the facts set forth in this Declaration are true and correct and are made under the penalty of perjury. I have read and reviewed the Fifth Amended Complaint and identified the symptoms and complaints named by all Plaintiff's specifically described in paragraphs 66-67, 96-117, 133-136, 156-159, 180-181, 211-213, 222-232, 250-254, 284-286, 293-294, 318-323, 349-352, 383-388, 412-414, and 445-446.

2.      The conditions at the Bay County Jail following Hurricane Michael with inadequate sanitation, lack of potable water, and lack of any personal hygiene leading to a biohazardous and infectious environment.

3.      There is a crucial duty in public health and safety to understand and negate the risk and the dangers of exposure to human feces.  The inmates at the Bay County Jail were exposed to multiple contamination routes from the feces present without proper sanitation.

4.      The open sewage present in cells with no running water and no way to cleanse themselves or their environment had a direct deleterious effect on the physical health and the mental and physical well-being of the inmates.

5.      There is a direct relationship with sanitation and health as evidenced by the multitude of regulatory and health institutions (CDC, OSHA, FEMA, FDA) that have clear guidelines on how bloodborne, foodborne and waterborne

pathogens must be handled and managed to reduce the risk of exposure of transmission-based pathogens and infections.   The main goal of sanitation is containing human feces and prevention of the spread of pathogens from human feces via the fecal-oral route.

6.     Human feces can harbor a variety of harmful and infectious microorganisms including bacteria, viruses, and parasites. These pathogens pose a significant health risk when they come into contact with the human body through various routes.

7.     Oral ingestion of fecal matter even in small amounts can lead to gastrointestinal infections causing severe diarrhea, vomiting and other digestive issues. Direct skin contact can introduce pathogens into the body and result in skin and systemic infections.  Inadequate sanitation and poor hygiene practices can lead to dissemination of fecal particles in the air which when inhaled may cause respiratory infections.

8.     The inmates had no access to proper sanitation and their time confined was characterized with open defecation, contaminated water sources and inefficient sewage systems that led to widespread contamination and consumption of infectious pathogens. The risk of infectious pathogens was only exacerbated by the fact there was no ventilation and high humidity in the jail.

9.     Exposure to fecal material can lead to transmission of infections pathogens such as **salmonella, shigella, E.Coli, norovirus, botulism, streptococcus, giardia, cryptosporidium** as well as many other infectious pathogens, viruses and parasites. Infections with these infectious pathogens commonly show the following symptoms of diarrhea, fever, nausea, vomiting, chills, fever, pain and abdominal cramping.

10.     The reported symptoms of all the inmates during this time of exposure such as diarrhea, stomach/abdominal cramps, fever, nausea, vomiting, chills, headache and blood in the stools are all reported and common in the intestinal infections where fecal and food contamination are the cause and consistent with their exposure to the environmental hazards I have identified above.

11.     Most people exposed to salmonella develop diarrhea, fever and stomach cramps within 8 hours to 72 hours after exposure. Shigella is another strain of bacteria that is highly contagious and is typically spread through crowded living conditions and poor sanitation. The hallmark of shigella is diarrhea with abdominal pain, cramping and fever and can develop from limited exposure to the contamination with symptoms starting in two days. Inmates in this lawsuit complained about these symptoms and they are consistent with the exposure to the hazards and filth identified in the Fifth Amended Complaint.

12.    The literature related to incubation periods and symptoms for these infectious diseases indicates that even brief exposure to the contaminated areas and cells could cause the infections and symptoms to occur in the inmates.

13.    The gastrointestinal health symptoms suffered by the inmates due to this unsanitary environment were severe and are clinically identical to symptoms caused by exposure and consumption of contaminated water and food and open fecal material in the environment.

14.    Exposure to mold is a health risk and can cause severe respiratory illness and disease.  This was also seen in the inmates with cough, sinus and upper respiratory infections.  Exposure to mold is common after hurricanes and can develop within 48 hours after the flooding has occurred.

15.    FEMA's post storm clean-up mold guidelines state the prevention of mold contamination must be done quickly to prevent spread and contamination following the storm. The cleaning guidelines for mold prevention indicates that high humidity (as seen in the jail with no ventilation and the walls sweating) will proliferate the growth process of mold in the inside environment and that mold growth is not stopped when covered by paint.

16.    There was no cleanup of the mold that was noted to be growing inside the Bay County Jail.   The upper respiratory symptoms of the inmates during this period   mimic   the   expected   symptoms   of   acute   mold   exposure   and

contamination. These symptoms were common and persistent including coughing, sinus infections, sore throats, upper respiratory infections and skin rashes and disturbances.

17.   Areas of heavy flooding and standing flood water can pose an infectious hazard to humans after a hurricane due to contamination from feces of infected animals that are in the flood waters.  Leptospirosis risk of spread is highest after a hurricane when contaminated soil is flooded into areas where people are exposed.  Leptospirosis infection causes fever, headache, chills, body aches, stomach pain, diarrhea, red eyes and rashes.  If it is not treated it can lead to kidney failure, liver failure and meningitis that could lead to seizures. The symptoms reported by the inmates in the Bay County Jail were again identified as the same as being exposed to these infectious pathogens.

18.   In a review of the reported conditions and the aligning reported symptoms, the causal relationship between symptoms and illnesses is present. The injuries reported were, within a reasonable degree of medical certainly, caused by exposure to unsanitary biohazardous exposures to infectious pathogens.

The facts in this declaration are based on my expert knowledge and clinical references and research and I declare under penalty of perjury that they are true and correct.

Executed on this 29th day of July 2024

LuCinda Braswell, B.S.N., R.N.

# REFERENCES

https://www.osha.gov/bloodborne-pathogens/worker-protections#ftn4

https://www.cdc.gov/niosh/topics/heatstress/heatrelillness.html

https://www.cdc.gov/healthywater/drinking/contamination/germs.html

https://www.fema.gov/fact-sheet/prevent-mold-becoming-secondary-disaster

https://www.cdc.gov/leptospirosis/about/

https://www.cdc.gov/mold-health/media/Homeowners_and_Renters_Guide.pdf

https://www.alabamapublichealth.gov/onsite/assets/sewage-exposure-flyer.pdf

https://www.mayoclinic.org/diseases-conditions/salmonella/symptoms-causes/syc-20355329

https://www.health.com/shigella-7644552

https://www.cdc.gov/leptospirosis/about/